# EXHIBIT A

**ICC INTERNATIONAL COURT OF ARBITRATION**

**24471/JPA**

REDES ANDINAS DE COMUNICACIONES S.R.L. (Perú)

**vs/**

**1**. PROGRAMA NACIONAL DE TELECOMUNICACIONES – PRONATEL (Perú)

**2**. MINISTERIO DE TRANSPORTES Y COMUNICACIONES (Perú)

This document is an original of the Final Award rendered in conformity with the Rules of Arbitration of the ICC International Court of Arbitration.

Corte Internacional de Arbitraje de la Cámara de Comercio Internacional

Caso 24471/JPA

REDES ANDINAS DE COMUNICACIONES, S.R.L, (Perú)
*Demandante y Demandada Reconvencional*

y

1. PROGRAMA NACIONAL DE TELECOMUNICACIONES- PRONATEL (Perú)
2. MINISTERIO DE TRANSPORTES Y COMUNICACIONES- MTC (Perú)
*Demandadas y Demandantes Reconvencionales*

---

# LAUDO FINAL

---

José Antonio Caínzos Fernández (Presidente del Tribunal)
Guido Santiago Tawil (Coárbitro)
Eddy Rodríguez Mallma (Coárbitro)

2 de agosto de 2022

# ÍNDICE

I.     Introducción...................................................................... 10

II.    Participantes en este arbitraje...................................... 10

       A.   Demandante................................................................ 10

       B.   Demandadas................................................................ 12

       C.   Tribunal Arbitral........................................................ 13

       D.   Secretaría de la Corte............................................... 14

III.   Convenio Arbitral............................................................ 15

IV.    Idioma del arbitraje........................................................ 18

V.     Sede del arbitraje............................................................ 18

VI.    Ley aplicable a la controversia..................................... 18

VII.   Procedimiento arbitral................................................... 19

       A.   Inicio del procedimiento y constitución del Tribunal Arbitral............19

       B.   Acta de Misión y Orden Procesal nº1........................ 19

       C.   Medidas cautelares..................................................... 20

       D.   Escritos rectores de alegaciones escritas de las Partes.................... 23

       E.   Prueba......................................................................... 24

            E.1.  Prueba documental ............................................ 24

            E.2.  Prueba testifical................................................. 24

            E.3.  Prueba pericial................................................... 25

       F.   Conferencia y preparativos pre-audiencia................... 26

       G.   Audiencia para la práctica de la prueba..................... 27

       H.   Escritos de Alegatos finales........................................ 29

       I.   Escritos relativos a la liquidación de honorarios y listado de gastos
            incurridos por la defensa en el arbitraje..................... 29

       J.   Escritos sobre intereses............................................ 30

       K.   Cierre de la instrucción............................................. 30

VIII.  Plazo para dictar el laudo.............................................. 30

IX.    Pretensiones de las Partes.............................................. 31

       A.   Pretensiones de la Demandante................................. 31

B.   Pretensiones de las Demandadas…………………………………... 35

X.   **Posiciones de las Partes**……………………………………………… **37**

A.   Posición de la Demandante……………….……………………... 37

B.   Posición de las Demandadas……………….…………………… 39

XI.   **Decisión del Tribunal Arbitral**…………………………………….. **40**

A.   Reclamaciones de Redes en la demanda principal …………………..  41

B.   Reclamaciones de las Demandadas en relación con la demanda

principal …………………………………………………………  102

C.   Reclamaciones de las Demandadas en la demanda reconvencional…….. 103

D.   Reclamaciones de Redes en relación con la demanda reconvencional…. 105

**XII.  Costes del procedimiento**…………………………………………… **105**

**XIII. Fallo**…………………………………………………………………... **108**

## TÉRMINOS DEFINIDOS[1]

| | |
|---|---|
| **Redes Andinas de Comunicaciones, S.R.L. (Demandante o Redes)** | Es la sociedad Demandante y Demandada Reconvencional |
| **Programa Nacional de Telecomunicaciones- PRONATEL** <br><br> **(Junto con el MTC, las Demandadas y las Demandantes Reconvencionales)** | Es una de las entidades Demandadas y Demandantes Reconvencionales. <br><br> Sustituyó al Fondo de Inversión en Telecomunicaciones (FITEL) |
| **Ministerio de Transportes y Comunicaciones- MTC** <br><br> **(Junto con PRONATEL, las Demandadas y las Demandantes Reconvencionales)** | Es una de las entidades Demandadas y Demandantes Reconvencionales |
| **Partes** | Son todas las partes del arbitraje, incluyendo Demandante y Demandadas, principal y reconvencionales, respectivamente |
| **Tribunal Arbitral** | Es el Tribunal Arbitral que dicta el presente Laudo |
| **Secretaría** | Es la Secretaría de la Corte Internacional de la Cámara de Comercio Internacional que ha intervenido en este arbitraje |
| **FITEL** | Es el Fondo de Inversión en Telecomunicaciones que aparece como firmante del Contrato de 28 de diciembre de 2015. Fue absorbido por el MTC |
| **Contrato** | Es el Contrato de Financiamiento de los Proyectos "Instalación de Banda Ancha para la Conectividad Integral y Desarrollo Social de la Región |

---

[1] El Tribunal Arbitral ha definido una serie de términos que serán utilizados a lo largo del presente laudo para su mejor comprensión. Ninguno de estos términos tiene valor contractual alguno. Estos términos tienen como finalidad facilitar la lectura del laudo.

| | |
|---|---|
| | Cajamarca" celebrado entre el Fondo de Inversión en Telecomunicaciones y Redes Andinas de Comunicaciones S.R.L., con fecha 28 de diciembre de 2015 |
| **Acta de Misión** | Es el documento firmado el 6 de noviembre de 2020 por las Partes y el Tribunal Arbitral bajo esa denominación |
| **Orden Procesal nº1 u OP 1** | Es el documento de 8 de noviembre de 2020 que recoge el calendario procesal |
| **Reglamento CCI** | Es el Reglamento de Arbitraje de la CCI en vigor desde el 1 de enero de 2017 |
| **IBA** | Es la *International Bar Association* |
| **CEA** | Es el Club Español del Arbitraje |
| **Solicitud** | Es la solicitud de arbitraje presentada por la Demandante |
| **Contestación a la Solicitud** | Es la oposición de las Demandadas a la solicitud de arbitraje, en la que se incluye la demanda reconvencional de las Demandadas |
| **Contestación a la Demanda Reconvencional** | Es el escrito de la Demandante en el que se opone a la demanda reconvencional de las Demandadas |
| **Solicitud cautelar de la Demandante** | Es el escrito en el que la Demandante solicita medidas cautelares |
| **Solicitud cautelar de las Demandadas** | Es el escrito en el que las Demandadas solicitan medidas cautelares |

| | |
|---|---|
| **OP 2** | Es el documento de 9 de diciembre de 2020 que desestima la solicitud de exhibición documental solicitada por las Demandadas |
| **Oposición cautelar de la Demandante** | Es el documento de 7 de diciembre de 2020 por el que la Demandante se opone a la solicitud cautelar de las Demandadas |
| **Oposición cautelar de las Demandadas** | Es el documento de 7 de diciembre de 2020 por el que las Demandadas se oponen a la solicitud cautelar de la Demandante |
| **OP 3** | Es el documento de 28 de diciembre de 2020 que resuelve las solicitudes cautelares de las Partes |
| **Demanda** | Es el documento de 9 de febrero de 2021 que contiene la reclamación de la Demandante frente a las Demandadas |
| **Contestación y Reconvención** | Es el documento de 7 de mayo de 2021 que contiene la contestación de las Demandadas a la reclamación de la Demandante y su reconvención frente a la Demandante |
| **Contestación a la Reconvención** | Es el documento de 23 de julio de 2021 que contiene la contestación de la Demandante a la reconvención de las Demandadas y la réplica de la Demandante |
| **Dúplica de la Demanda** | Es el documento de 7 de septiembre de 2021 que contiene la dúplica de las Demandadas a la demanda y la réplica en la reconvención |
| **Dúplica de la Reconvención** | Es el documento de 25 de octubre de 2021 que contiene la dúplica de la Demandante a la reconvención de las Demandadas |
| **Primera Declaración de Mario Saona** | Es la declaración del testigo Sr. Saona firmada el 9 de febrero de 2021 |

| | |
|---|---|
| **Segunda Declaración de Mario Saona** | Es la declaración del testigo Sr. Saona firmada el 21 de julio de 2021 |
| **E&Y**<br><br>**Primer Informe de E&Y**<br><br>**Segundo Informe de E&Y**<br><br>**Tercer Informe de E&Y** | Es la firma Ernst &Young.<br><br>Son los tres informes de E&Y (7 de febrero de 2021, 22 de julio de 2021 y 22 de octubre de 2021) presentados en el arbitraje por la Demandante |
| **FTI Construcción**<br><br>**Primer Informe de FTI Construcción**<br><br>**Segundo Informe de FTI Construcción**<br><br>**Tercer Informe de FTI Construcción** | Es la firma FTI Consulting<br><br>Son los tres informes de FTI Consulting sobre construcción (8 de febrero de 2021, 23 de julio de 2021 y 25 de octubre de 2021) presentados en el arbitraje por la Demandante |
| **FTI Quantum**<br><br>**Primer Informe de FTI Quantum**<br><br>**Segundo Informe de FTI Quantum**<br><br>**Tercer Informe de FTI Quantum** | Es la firma FTI Consulting<br><br>Son los tres informes de FTI Consulting sobre *quantum* (8 de febrero de 2021, 23 de julio de 2021 y 25 de octubre de 2021) presentados en el arbitraje por la Demandante |
| **GYGA**<br><br>**Primer Informe de GYGA**<br><br>**Segundo Informe de GYGA**<br><br>**Tercer Informe de GYGA** | Es la firma GYGA Consulting<br><br>Son los tres informes de GYGA (8 de febrero de 2021, 22 de julio de 2021 y 22 de octubre de 2021) presentados en el arbitraje por la Demandante |
| **BRG Construcción** | Es la firma Berkeley Research Group |

| | |
|---|---|
| **Primer Informe de BRG Construcción**<br><br>**Segundo Informe de BRG Construcción** | Son los dos informes de BRG sobre construcción (9 de mayo de 2021 y 31 de agosto de 2021) presentados en el arbitraje por las Demandadas |
| **BRG Contabilidad**<br><br>**Primer Informe de BRG Contabilidad**<br><br>**Segundo Informe de BRG Contabilidad** | Es la firma Berkeley Research Group<br><br>Son los dos informes de BRG sobre contabilidad (3 de mayo de 2021 y 31 de agosto de 2021) presentados en el arbitraje por las Demandadas |
| **BRG Finanzas**<br><br>**Primer Informe de BRG Finanzas**<br><br>**Segundo Informe de BRG Finanzas** | Es la firma Berkeley Research Group<br><br>Son los dos informes de BRG sobre finanzas (9 de mayo de 2021 y 27 de agosto de 2021) presentados en el arbitraje por las Demandadas |
| **Red de Transporte** | Es la red de fibra óptica que se quería implementar mediante el Contrato |
| **Red de Acceso** | Es la red inalámbrica que se quería implementar mediante el Contrato |
| **Contratado** | Es Redes en el Contrato de Cajamarca |
| **Proyecto** | Es el conjunto de actuaciones que engloba la Instalación de Banda Ancha para la Conectividad Integral y Desarrollo Social de la Región Cajamarca |
| **Decreto de Urgencia** | Es el Decreto de Urgencia 041-2019, de 27 de diciembre de 2019 |
| **Resolución del Contrato** | Es la terminación del Contrato decidida por PRONATEL en carta de 23 de abril de 2019, notificada a Redes el 24 de abril de 2019 |

| | |
|---|---|
| **Garantía de Fiel Cumplimiento o GFC** | Es la Garantía constituida por Redes en el Contrato mediante la Carta Fianza de Fiel Cumplimiento |
| **Garantía de Adelanto o GA** | Es la Garantía constituida por Redes en el Contrato mediante la Carta Fianza de Adelanto |
| **Quanta Perú** **Quanta Services** | Es Quanta Services Perú, la empresa subcontratista de Redes para la ejecución del Proyecto Es Quanta Services Inc |
| **Plan de Sensibilización** | Es el Plan de Sensibilización y Difusión del Proyecto que se mencionaba en el Contrato |
| **Certificación Ambiental** **DIA** | Es la aprobación gubernamental del Instrumento de Gestión Ambiental de un proyecto Es la Declaración de Impacto Ambiental, la modalidad de Certificación Ambiental que había que obtener en este Proyecto |
| **Ruta crítica** | Es la secuencia de actividades de trabajo que constituye la mayor duración del trabajo a través del Proyecto |
| **Laudo** | Es el Laudo del presente caso (CCI 24471/JPA), de fecha 2 de agosto de 2022. |
| **CC** | Es el Código Civil peruano de 24 de julio de 1.984 |
| **SERNANP** | Es el Servicio de Áreas Naturales Protegidas por el Estado |
| **CPC** | Es el Código Procesal Civil de Perú |

| JOA | Es el *Joint Venture Operating Agreement* suscrito por Redes con Servicios de Infraestructura del Perú SAC (SIP) |
|---|---|
| DFC | Es el método de descuento de flujos de caja |
| WACC | Es la Tasa de descuento |
| VPN | Es el Valor Actual Neto |
| IGV | Es el Impuesto general a las ventas, también conocido como IVA |

I.  **INTRODUCCIÓN**

1.  El procedimiento fue iniciado por REDES ANDINAS DE COMUNICACIONES, S.R.L. para reclamar el pago de todas las consecuencias económicas derivadas de lo que considera un correcto cumplimiento de sus obligaciones en el Contrato suscrito con el PROGRAMA NACIONAL DE TELECOMUNICACIONES-PRONATEL para la instalación de Banda Ancha para lograr la conectividad e integración social de la Región Cajamarca y un paralelo incumplimiento de las obligaciones de PRONATEL que, entre otros extremos, se materializó en una resolución contractual abusiva y en  la ejecución por PRONATEL de las garantías de fiel cumplimiento y adelanto prestadas por la contraparte.

2.  PRONATEL no solo se opuso a la demanda principal sino que formuló reconvención contra su contraparte señalando que la resolución contractual vino impuesta por los graves incumplimientos contractuales producidos en la ejecución del Contrato por la encargada del tendido de la Banda Ancha, lo que justifica suficientemente la ejecución de las garantías y la condena de la parte incumplidora al pago de una indemnización de daños y perjuicios que se formula a través de la oportuna demanda reconvencional.

3.  La reconvención fue rechazada por la demandante principal.

II.  **PARTICIPANTES EN ESTE ARBITRAJE**

   A.  **Demandante**

4.  La Demandante y Demandada Reconvencional es REDES ANDINAS DE COMUNICACIONES, S.R.L. [**"Demandante"** o **"Redes"**], con domicilio en Av. El Derby Nº 254, departamento 2104, Urbanización El Derby, Distrito de Santiago de Surco, Provincia y Departamento de Lima, República del Perú.

C-0368-SPA

5.  La defensa de la Demandante en este arbitraje está a cargo de los letrados Mauricio Raffo, Cristina Ferraro, Carlos Glave, Luis Alonso Navarro y Diego Pulgar-Vidal, del despacho Miranda & Amado; Henry G. Burnett, Craig S. Miles y Arturo Oropeza Casas, del despacho King & Spalding LLP.

6.  Las direcciones que la Demandante ha indicado para efectuar válidamente las comunicaciones o notificaciones son:

Marco Castilla

MCastilla@QuantaServices.com

Quanta Services

Lesly Valdiviezo

lvaldiviezo@redesandinas.com

Redes Andinas

Avenida Minerales 771, sector 4-A

Cercado de Lima, Lima

Mauricio Raffo

Cristina Ferraro

Carlos Glave

Luis Alonso Navarro

Diego Pulgar-Vidal

MIRANDA & AMADO

mraffo@mafirma.com.pe

cferraro@mafirma.com.pe

cglave@mafirma.com.pe

lnavarro@mafirma.com.pe

dpulgar@mafirma.com.pe

arbitraje@mafirma.com.pe

Henry G. Burnett

Craig S. Miles

Arturo Oropeza Casas

KING & SPALDING LLP

hburnett@kslaw.com

cmiles@kslaw.com

aoropeza@kslaw.com

MIRANDA & AMADO

Teléfono (511) 610-4747

Av. Larco 1301 – Piso 20,

Miraflores. Lima 18 – PERÚ

KING & SPALDING LLP

1100 Louisiana

Suite 4100

Houston, X 77002

Teléfono +1 713 751 3200

1185 Avenue of the Americas

34th Floor

New York, NY 10036

Teléfono +1 212 556 2100

**B.      Demandadas**

7.   Las Demandadas son:

    a.      PROGRAMA NACIONAL DE TELECOMUNICACIONES – PRONATEL ["**PRONATEL**"]

    b.      MINISTERIO DE TRANSPORTES Y COMUNICACIONES ["**MTC**"]

8.   Las Demandadas también serán referidas conjuntamente como las "**Demandadas**" o las "**Demandantes Reconvencionales**".

9.   La defensa de las Demandadas en este arbitraje está a cargo de los miembros de la Procuraduría Pública del Estado a cargo de los asuntos del MTC David Ortiz y Esteban Quispe y de los letrados Carlos Paitan, José G. Salcedo y Danny Quiroga

del despacho Paitan Abogados.

10.  Las direcciones que las Demandadas han indicado para efectuar válidamente las comunicaciones o notificaciones son:

Procuraduría Pública MTC

David Aníbal Ortiz Gaspar

Acisclo Esteban Quispe Ricaldi

dortiz@mtc.gob.pe

aquisper@mtc.gob.pe

vcano@mtc.gob.pe

arbitraje2020@mtc.gob.pe

Dirección Postal Lima 01

Teléfono 955371830 - 975551199

Carlos Paitan

José G. Salcedo

Danny Quiroga

cpaitan@estudiopaitan.com

jsalcedo@estudiopaitan.com

dquiroga@estudiopaitan.com

PAITAN ABOGADOS
Manuel Olguín 327-12
Lima 15023, Perú

11.  La Demandante y las Demandadas en conjunto serán en adelante referidas como las "**Partes**".

C.  **Tribunal Arbitral**

12.  El Tribunal Arbitral se ha constituido como sigue:

(i)  La Demandante designó como árbitro a:

Prof. Guido Santiago Tawil

13

Ed. Aguas Azules II Ap 003
Rbla. Lorenzo Batlle Pacheco Pda. 32
20167 – 01236 Punta del Este, Maldonado
Uruguay
Email : arb-gtawil@arb-chambers.com

El 29 de agosto de 2019, la Corte decidió, de acuerdo con el artículo 13 (1) del Reglamento CCI, confirmar a Guido Santiago Tawil como coárbitro, tras la designación de la Demandante.

(ii) Las Demandadas designaron como árbitro a:

Eddy Rodríguez Mallma
SOLUCIONES ASESORES EMPRESARIALES SAC
Jirón Morro Solar 380, Dpto. 104
Edificio Alto Chacarilla
Distrito de Santiago de Surco 15039
Perú
Email : erodriguez@solucionessac.com
            eddy.rodriguez.m@gmail.com

El 14 de mayo de 2020, la Corte decidió, de acuerdo con el artículo 13 (1) del Reglamento CCI, confirmar a Eddy Neptalí Rodríguez Mallma como coárbitro, tras la designación conjunta de las Demandadas.

(iii) La Corte designó como Presidente del Tribunal Arbitral a:

José Antonio Caínzos Fernández
José Rizal, 32,
28043 Madrid,
España.
Email: joseantonio.cainzos@cainzosldr.com

El 8 de octubre de 2020, la Corte nombró, de acuerdo con el artículo 13 (4) (a), a José Antonio Caínzos Fernández Presidente del Tribunal Arbitral.

13. Así pues, en la misma fecha, el Tribunal Arbitral [el "**Tribunal Arbitral**"] se constituyó de conformidad con el Reglamento CCI.

**D.   Secretaría de la Corte**

14. La Secretaría de la Corte ha corrido a cargo de:

Juan Pablo Argentato (Consejero en misión)
Amanda Jiménez Pintón (Consejera)
Nicolás Gálvez Ortiz (Consejero Adjunto)
Secretaría de la Corte Internacional de la Cámara de Comercio Internacional [la "**Secretaría**"]

33-43 avenue du Président Wilson
75116 Paris
France
Email : ica1@iccwbo.org
Teléfono : 33 1 49 53 30 28
    33 1 49 53 28 51

## III.   CONVENIO ARBITRAL

15. El presente arbitraje se inició en virtud del pacto arbitral contenido en la cláusula vigesimosegunda del Contrato de Financiamiento de los Proyectos: "*Instalación de Banda Ancha para la Conectividad Integral y Desarrollo Social de la Región Cajamarca*"[2] celebrado entre el Fondo de Inversión en Telecomunicaciones ["**Fitel**"] y Redes Andinas de Comunicaciones S.R.L., con fecha 28 de diciembre de 2015 [el "**Contrato**"[3]].

16. A través del artículo 1 del Decreto Supremo No. 018-2018-MTC publicado el 10 de diciembre de 2018 en el Diario Oficial "El Peruano" se aprobó la fusión por absorción del Fitel con el MTC como entidad absorbente. Dicho Decreto Supremo establece que le corresponde al MTC la administración de Fitel. Para tal efecto, crea a través del artículo 4 de la norma antes indicada, el PRONATEL en el ámbito del MTC y dependiente del Viceministerio de Comunicaciones. En virtud de la fusión por absorción antes descrita, toda referencia a Fitel deberá entenderse hecha también a PRONATEL y viceversa.

17. La cláusula vigesimosegunda del Contrato establece lo siguiente:

> "*22.1 Si surgieren controversias de cualquier índole entre EL CONTRATADO y el FITEL relacionadas o derivadas de este CONTRATO DE FINANCIAMIENTO, que no puedan ser resueltas de común acuerdo por ambas partes o no cuente con un mecanismo de solución previsto en el presente documento, serán dirimidas por un tribunal arbitral en un arbitraje de derecho.*
>
> *22.2 El arbitraje será llevado a cabo por un Tribunal Arbitral compuesto por tres (03) miembros.*

---

[2]   En el Acta de Misión de este procedimiento firmada el 6 de noviembre de 2020 se cometió un error de numeración del procedimiento. En el mismo día se firmaron las Actas de Misión de dos procedimientos diferentes entre las mismas Partes y con el mismo Tribunal Arbitral, pero con distinto objeto: los procedimientos CCI 24471/JPA y CCI 24472/JPA. El que nos ocupa (CCI 24471/JPA) se refiere a la Región Cajamarca, mientras que el CCI 24472/JPA se refiere a la Región Tumbes - Piura. Sin embargo, en las Actas de Misión se puso la referencia equivocada, de tal modo que el Acta de Misión relativa al caso de Cajamarca aparece como CCI 24472/JPA cuando debería decir CCI 24471/JPA. A su vez, el Acta de Misión que menciona al caso CCI 24471/JPA es el que corresponde al caso de Tumbes - Piura, que es el arbitraje CCI 24472/JPA.

[3]   Documento C-001.

*22.3 El arbitraje se llevará a cabo en la Cámara de Comercio de Lima, de la AMCHAM u otra que elija FITEL o EL CONTRATADO, según sea que la demanda provenga de alguna de estas partes.*

*22.4 El Tribunal Arbitral se constituirá de la siguiente forma:*

- *Cada una de las PARTES designará un árbitro y éstas de común acuerdo designarán al tercer árbitro, quien presidirá el Tribunal Arbitral.*

- *En caso una de las PARTES no designe a su árbitro dentro de un plazo de diez (10) DÍAS contados desde la fecha en que una de ellas manifieste a la otra por escrito su voluntad de acogerse a la presente cláusula, el árbitro que no haya sido designado, será nombrado por la institución que tenga a su cargo la administración del proceso arbitral.*

- *En caso las PARTES no designasen al tercer árbitro dentro de un plazo de sesenta (60) DÍAS contados desde el nombramiento del segundo árbitro, el tercer árbitro será designado por la institución que tenga a su cargo la administración del proceso arbitral.*

*22.5 El Tribunal Arbitral tendrá un plazo de noventa (90) DÍAS HÁBILES desde su instalación para expedir el respectivo laudo arbitral, el cual será inapelable. Asimismo, el Tribunal puede quedar encargado de determinar con precisión la controversia, así como otorgar una prórroga en caso fuera necesario para emitir el laudo.*

*22.6 El lugar del arbitraje será en la ciudad de Lima. El idioma que se utilizará en el procedimiento arbitral será el español.*

*22.7 El Tribunal Arbitral, al momento de expedir el laudo arbitral, determinará la forma en que las partes deberán asumir los gastos y costos correspondientes al arbitraje.*

*22.8 En caso de que alguna de las PARTES decidiera interponer recurso de anulación contra el laudo arbitral ante el Poder Judicial, deberá constituir previamente a favor de la parte o las partes contrarias una Carta Fianza otorgada por un banco de primer orden con sede en Lima, equivalente a US$ 100,000.00 (Cien Mil y 00/100 DÓLARES DE LOS ESTADOS UNIDOS DE AMÉRICA), la misma que será solidaria, irrevocable, incondicionada y de ejecución automática en caso de dicho recurso, en fallo definitivo, no fuera declarado fundado. Dicha Carta Fianza deberá estar vigente durante el tiempo que dure el proceso promovido y será entregada en custodia a un notario de la ciudad de Lima.*

*22.9 El CONTRATO DE FINANCIAMIENTO se suscribe con arreglo a las normas legales de la República del Perú, razón por la cual cualquier controversia derivada de su celebración, interpretación, ejecución, validez y*

16

*eficacia se regirá por esas normas legales.*

*Los Servicios Públicos de Telecomunicaciones y el acceso a Intranet que proveerá EL CONTRATADO se regirán de manera supletoria por las normas regulatorias vigentes en el país, incluidas las normas de continuidad y calidad de los servicios, así como el régimen tributario aplicable a los contribuyentes de todo el territorio nacional y a los contribuyentes de las municipalidades o gobiernos locales del país en los que no esté regulado en el CONTRATO DE FINANCIAMIENTO.*"

18. PRONATEL se opuso inicialmente a que el arbitraje fuera administrado por la Cámara de Comercio Internacional en los siguientes términos:

"*Atendiendo a lo previsto en la cláusula vigésimo segunda del Contrato de Financiamiento del Proyecto "Instalación de Banda Ancha para la Conectividad Integral y Desarrollo Social de la Región Cajamarca", formulamos oposición a que el presente arbitraje sea administrado por la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional – CCI, puesto que la elección realizada por REDES ANDINAS no se ajusta a lo expresamente pactado en el Convenio Arbitral no permite la designación de un Centro de Arbitraje Internacional y por los costos elevados de los gastos arbitrales (honorarios de árbitros y gastos de administración) para el PRONATEL[4].*"

19. No obstante, durante el curso del procedimiento arbitral PRONATEL no ha vuelto a plantear objeción alguna sobre esta cuestión y ha realizado el pago de las provisiones de fondos solicitadas por la CCI. En cualquier caso, este Tribunal Arbitral considera que la objeción debe ser desestimada porque ninguna de las razones aducidas por las Demandadas justifica la falta de idoneidad de la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional. En la cláusula vigesimosegunda del Contrato se dice que las controversias "*serán dirimidas por un tribunal arbitral en un arbitraje de derecho*" (apartado 1), "*compuesto por tres miembros*" (apartado 2) y "*se llevará a cabo en la Cámara de Comercio de Lima, de la AMCHAM u otra que elija el FITEL o EL CONTRATADO, según sea que la demanda provenga de alguna de estas partes*" (apartado 3). No se excluye a un Centro de Arbitraje Internacional ni se puede eliminar a una determinada corte por lo que las Demandadas califican como "*costos elevados de los gastos arbitrales*". Además, en la Solicitud de Arbitraje, Redes se acogió a la facultad de elección de la corte y optó por la Cámara de Comercio Internacional como la institución arbitral bajo cuyas reglas de arbitraje se regiría el procedimiento[5]. Así pues, se ha cumplido con el convenio arbitral y la objeción de las Demandadas debe ser rechazada.

---

Oposición de las Demandadas a la Solicitud de Arbitraje.

[5]   Párrafos 31 y 32.

#### IV.   IDIOMA DEL ARBITRAJE

20.   De conformidad con la cláusula 22.6 (inciso final) del Contrato, según consta en el párrafo 20 del Acta de Misión de 6 de noviembre de 2020 [el "**Acta de Misión**"], el idioma del arbitraje es el español.

21.   En el párrafo 31 de la Orden Procesal nº 1 de 8 de noviembre de 2020 [la "**Orden Procesal nº1**" u "**OP 1**"] las Partes acordaron que podrían presentar documentos e informes en inglés con traducción simple al español salvo objeción justificada al respecto en todo o parte de la traducción, en cuyo caso se exigiría traducción jurada.

#### V.   SEDE DEL ARBITRAJE

22.   Con arreglo a lo establecido en la cláusula 22.6 (primer inciso) y, como se establece en el párrafo 20 del Acta de Misión, la sede del arbitraje es la ciudad de Lima (Perú).

23.   Sin perjuicio de ello, las Partes acordaron en el párrafo 46 del Acta de Misión que el Tribunal Arbitral podría reunirse y deliberar en cualquier lugar que considerase apropiado y que el Tribunal Arbitral determinaría, previa consulta a las Partes, el lugar en que se desarrollarían las audiencias, que podría ser el lugar de la sede o cualquier otro que estimase pertinente.

24.   En el apartado 47 del Acta de Misión las Partes también convinieron que, en caso de que las circunstancias lo justificaran, el Tribunal Arbitral, previa consulta de las Partes, podría acordar que las audiencias se celebraran en forma no presencial o virtual, como realmente ocurrió.

#### VI.   LEY APLICABLE A LA CONTROVERSIA

25.   En cuanto a las normas jurídicas aplicables al fondo del asunto, las Partes acordaron en la cláusula 22.9 del Contrato que las controversias derivadas de su celebración, interpretación, ejecución, validez y eficacia se regirían por "*las normas legales de la República del Perú*".

26.   En relación con las normas aplicables al procedimiento, las Partes acordaron en el Acta de Misión que el procedimiento arbitral se regiría por el Reglamento de la CCI [el "**Reglamento CCI**"] (párrafo 49) y que El Tribunal Arbitral podría guiarse por las Reglas de la *International Bar Association* [la "**IBA**"] sobre Práctica de Prueba en el Arbitraje Internacional, aprobadas el 29 de mayo de 2010 por Resolución del Consejo de la IBA y por las Reglas de la IBA sobre Representación de Partes en el Arbitraje Internacional adoptadas el 25 de mayo de 2013 por Resolución del Consejo de la IBA. También podrían tomarse en consideración las Directrices de la IBA sobre Conflictos de Intereses en el Arbitraje Internacional, aprobadas por el Consejo de la IBA el 23 de octubre de 2014. Finalmente, el Tribunal Arbitral podría

utilizar como guía interpretativa las recomendaciones incluidas en el Código de Buenas Prácticas aprobado por el Club Español del Arbitraje [el **"CEA"**] en junio de 2019.

27. En el curso del arbitraje se han respetado, en todo momento, las disposiciones aplicables de la Ley peruana de Arbitraje, así como las del Reglamento CCI.

## VII. PROCEDIMIENTO ARBITRAL

### A. Inicio del procedimiento y constitución del Tribunal Arbitral

28. El 15 de mayo de 2019 la Demandante presentó una Solicitud de Arbitraje[6] [la "**Solicitud**"] en contra de las Demandadas.

29. El 3 de julio de 2019 las Demandadas presentaron una Contestación a la Solicitud de Arbitraje y una Demanda Reconvencional[7] [la "**Contestación a la Solicitud**"].

30. El 9 de septiembre de 2019 la Demandada Reconvencional presentó su Contestación a la Demanda Reconvencional[8] [la "**Contestación a la Demanda Reconvencional**"].

### B. Acta de Misión y Orden Procesal No. 1

31. El 9 de octubre de 2020 la Secretaría hizo entrega del expediente a los miembros del Tribunal Arbitral y se les recordó que en un plazo de 30 días desde la recepción de aquél debían preparar el Acta de Misión.

32. Tras recibir el 16 de octubre de 2020 sendos sumarios de los reclamos y pretensiones de las Partes -con una precisión de las Demandadas de 19 de octubre siguiente-, así como sus propuestas para el calendario del procedimiento, el 22 de octubre de 2020 el Tribunal Arbitral envió a las Partes un borrador de Acta de Misión y otro de Orden Procesal n°1.

33. El 27 de octubre de 2020 tuvo lugar la reunión del Tribunal Arbitral con las Partes en la que se abordó el texto del Acta de Misión y la OP 1.

34. Tras recibir el 30 de octubre de 2020 los comentarios de las Partes sobre los aspectos en que había acuerdo entre ellas, el 6 de noviembre de 2020 el Tribunal Arbitral envió a las Partes el Acta de Misión que incorporaba los cambios propuestos por las Partes de común acuerdo y la decisión del Tribunal Arbitral en lo que las Partes no alcanzaron consenso. Este texto fue aceptado por las Partes.

---

[6] Escrito Nº 1 de la Demandante.

[7] Este documento no tiene una numeración especial.

[8] Escrito Nº 2 de la Demandante.

35. El 6 de noviembre de 2020 las Partes y el 7 de noviembre de 2020 el Tribunal Arbitral firmaron el Acta de Misión, que fue remitida a la CCI en la misma fecha.

36. El 8 de noviembre de 2020 el Presidente del Tribunal Arbitral firmó la OP 1 incluyendo el calendario procesal. El mismo día remitió ambos documentos firmados a la CCI.

37. El 16 de noviembre las Demandadas enviaron una nueva dirección para notificaciones a añadir a las que ya constaban en el Acta de Misión, que fue aceptada por el Tribunal Arbitral el 26 de noviembre posterior.

38. El 9 de noviembre de 2020 la Secretaría acusó recibo de los dos documentos antes mencionados. El 19 de noviembre de 2020 el Acta de Misión fue remitida a la Corte de la CCI por la Secretaría.

39. El 20 de noviembre de 2020 la Corte remitió documentación a las Partes sobre la conducción del procedimiento.

## C.     Medidas cautelares

40. El 19 de noviembre de 2020 las Partes presentaron sus respectivas solicitudes cautelares[9] con los correspondientes documentos.

41. La Demandante solicitó:

> - "*PETITORIO CAUTELAR NO. 1: Que se ordene a los Demandados se abstengan de disponer y de incorporar al presupuesto institucional del MTC la suma de US$ 52,360,000.00 (Cincuenta y Dos Millones Trescientos Sesenta Mil con 00/100 Dólares de los Estados Unidos), proveniente de la indebida e injustificada ejecución de la Garantía de Adelanto, los mismos que deberán mantenerse en custodia hasta que se haya expedido el respectivo laudo que resuelva la presente controversia.*
>
> - *PETITORIO CAUTELAR ACCESORIO AL PETITORIO CAUTELAR NO. 1: Que, en consecuencia, se ordene a los Demandados cumplan con consignar la suma de US$ 52,360,000.00 (Cincuenta y Dos Millones Trescientos Sesenta Mil con 00/100 Dólares de los Estados Unidos), proveniente de la indebida e injustificada ejecución de la Garantía de Adelanto, en el Banco de la Nación a través de un Certificado de Depósito a nombre del Juzgado Civil con Subespecialidad Comercial de la Corte Superior de Justicia de Lima, quien conforme a ley será el órgano jurisdiccional competente que conocerá de la ejecución de laudo que se expida en el presente arbitraje.*
>
> *Asimismo, solicitamos que ordene a los Demandados que cumplan con entregar en custodia el Certificado de Depósito emitido por el Banco de la*

---

[9]  La Solicitud cautelar de la Demandante [ la "**Solicitud cautelar de la Demandante**"] es el Documento C-1; la solicitud de medida cautelar y provisional de las Demandadas [la "**Solicitud cautelar de las Demandadas**"] aparece mencionado como Escrito Nº 1.

*Nación en la Notaria Laos de Lama ubicada en Jr. Santo Domingo N° 291 Jesús María, o cualquier otra notaria de elección de los Demandados, mientras dure el presente proceso arbitral.*

*-PETITORIO CAUTELAR NO. 2: Que se ordene a los Demandados se abstengan de disponer y de incorporar al presupuesto institucional del MTC la suma de US$ 14,960,000.00 (Catorce Millones Novecientos Sesenta Mil con 00/100 Dólares de los Estados Unidos), proveniente de la indebida e injustificada ejecución de la Garantía de Fiel Cumplimiento, los mismos que deberán mantenerse en custodia hasta que se haya expedido el respectivo laudo que resuelva la presente controversia.*

*- PETITORIO CAUTELAR ACCESORIO AL PETITORIO CAUTELAR NO. 2: Que, en consecuencia, se ordene a los Demandados cumplan con consignar la suma de US$ 14,960,000.00 (Catorce Millones Novecientos Sesenta Mil con 00/100 Dólares de los Estados Unidos), proveniente de la indebida e injustificada ejecución de la Garantía de Fiel Cumplimiento, en el Banco de la Nación a través de un Certificado de Depósito a nombre del Juzgado Civil con Subespecialidad Comercial de la Corte Superior de Justicia de Lima, quien conforme a ley será el órgano jurisdiccional competente que conocerá de la ejecución de laudo que se expida en el presente arbitraje.*

*Asimismo, solicitamos que ordene a los Demandados que cumplan con entregar en custodia el Certificado de Depósito emitido por el Banco de la Nación en la Notaria Laos de Lama ubicada en Jr. Santo Domingo N° 291 Jesús María, o cualquier otra notaria de elección de los Demandados, mientras dure el presente proceso arbitral*".

42.   Las Demandadas solicitaron:

a)   "*Se ordene una afectación en vía de retención en las cuentas bancarias y/o cualquier instrumento bancario o financiero bajo titularidad de Redes Andinas en el sistema bancario del Perú y/o se exija la entrega de una garantía bancaria incondicional y de ejecución inmediata a favor del MTC y PRONATEL por la suma de USD. 7´365.200.00 (Siete millones trescientos sesenta y cinco mil doscientos con 00/100 Dólares Americanos) correspondiente al monto transferido por concepto de Segundo Desembolso (25% Red de Transporte) no devuelto a la fecha.*

b)   *Se ordene una afectación en vía de retención en las cuentas bancarias y/o cualquier instrumento bancario o financiero bajo titularidad de Redes Andinas en el sistema bancario del Perú y/o se exija la entrega de una garantía bancaria incondicional y de ejecución inmediata a favor del MTC por la suma de S/. 102´868.839.50 (Ciento dos millones, ochocientos sesenta y ocho mil ochocientos treinta y nueve con 50/100 Soles) por concepto de penalidades liquidadas derivada del incumplimiento contractual de Redes*

21

> *Andinas.*
>
> c) *Se ordene una afectación en vía de retención en las cuentas bancarias y/o cualquier instrumento bancario o financiero bajo titularidad de Redes Andinas en el sistema bancario del Perú y/o se exija la entrega de una garantía bancaria incondicional y de ejecución inmediata a favor del MTC hasta por la suma de USD. 750.000.00 (Setecientos cincuenta mil y 00/100 Dólares Americanos) para garantizar los costos (gastos originados por el desarrollo del presente proceso arbitral)".*

43. El 2 de diciembre de 2020 las Demandadas solicitaron a la Demandante la exhibición de un documento. La Demandante se opuso mediante escrito de 7 de diciembre de 2020. El 9 de diciembre de 2020 el Tribunal Arbitral emitió la Orden Procesal nº 2 [la "**OP 2**"] por la que, por unanimidad, desestimó la petición de exhibición de documento planteada por las Demandadas y no se pronunció sobre los costos de esta petición por dejar el pronunciamiento para el momento de dictar laudo.

44. El 7 de diciembre de 2020 las Partes presentaron sus respectivos escritos de oposición a la solicitud cautelar de la contraparte[10] con los documentos correspondientes.

45. El 10 de diciembre de 2020 las Demandadas designaron abogados defensores al Estudio Paitan Abogados y facilitaron los datos del Estudio y de los abogados con los que se deberían entender los siguientes pasos del procedimiento.

46. El 15 de diciembre de 2020 las Partes informaron al Tribunal Arbitral de los acuerdos alcanzados sobre la conducción de la audiencia de cautelares.

47. El mismo 15 de diciembre de 2020 el Tribunal Arbitral aceptó las propuestas de las Partes y realizó alguna precisión al respecto.

48. El 17 de diciembre de 2020 las Partes remitieron las presentaciones que iban a utilizar en la audiencia de cautelares a celebrar ese día.

49. En la fecha indicada se celebró la audiencia de cautelares que no fue grabada, por decisión de las Partes, y que se desarrolló sin incidencias. Las Partes tuvieron ocasión de presentar sus solicitudes en el tiempo pactado, de contradecir a la contraparte en la forma igualmente prevista y acordada entre ellas y el Tribunal Arbitral tuvo la oportunidad de plantear preguntas a las Partes.

50. Tras la oportuna deliberación, el 28 de diciembre de 2020 el Tribunal Arbitral, por unanimidad, dictó la Orden Procesal nº 3 [la "**OP 3**"] en la que resolvió:

---

[10] La oposición de la Demandante [ la "**Oposición cautelar de la Demandante**"] es el Documento C-2; la oposición de las Demandadas [la "**Oposición cautelar de las Demandadas**"] es el Documento R-2.

(i)   "*Estimar el Petitorio principal n° 1 y 2 de la Demandante y el Petitorio accesorio al principal n° 1 y el accesorio al principal n° 2 en el sentido de que las cantidades resultantes de la ejecución de las Garantías de Fiel Cumplimiento del contrato de financiamiento (US$ 14,960,000,00 – Catorce Millones Novecientos Sesenta Mil con 00/100 Dólares de los Estados Unidos-) y de Adelanto (US$ 52,360,000,00 -Cincuenta y Dos Millones Trescientos Sesenta MIL con 00/100 Dólares de los Estados Unidos-), deben ser depositados por Pronatel en una "cuenta especial- Ejecución  de cartas fianzas por garantías" en el Banco de la Nación conforme a lo establecido por la Resolución Directoral N° 011-2018-EF/52.03.*

(ii)  *Desestimar todos los demás petitorios de ambas Partes.*

(iii) *No pronunciarse en este momento sobre los costos de los petitorios cautelares de ninguna de las Partes porque el pronunciamiento se hará al dictar el laudo*".

51. El 5 de febrero de 2021 las Demandadas presentaron escrito y documentos para acreditar el cumplimiento del mandato cautelar de la Orden Procesal nº 3.

## D.   Escritos rectores de alegaciones escritas de las Partes

52. El 9 de febrero de 2021 la Demandante presentó su Memorial de Demanda[11] ["**Demanda**"] acompañado de documentos, una declaración testimonial y tres informes periciales.

53. El 7 de mayo de 2022 las Demandadas presentaron su Memorial de contestación a la demanda y reconvención[12] ["**Contestación y Reconvención**"] acompañado de documentos y tres informes periciales.

54. El 23 de julio de 2021 la Demandante presentó su Memorial de Réplica y Contestación a la Reconvención de las Demandadas[13] ["**Contestación a la Reconvención**"] con documentos, una nueva declaración testimonial y cuatro informes periciales.

55. El 9 de agosto de 2021 las Partes acordaron una modificación del calendario procesal en relación con la presentación de los memoriales de Dúplica de la Demanda y Réplica de la Reconvención por las Demandadas (7 de septiembre de 2021) y de Dúplica de la Reconvención por la Demandante (25 de octubre de 2021). El Tribunal Arbitral aceptó estas modificaciones el 10 de agosto de 2021.

56. El 7 de septiembre de 2021 las Demandadas presentaron su Memorial de Dúplica a

---

[11]  Documento C-4.

[12]  Documento R-6.

[13]  Documento C-5.

la Demanda y Réplica de la Reconvención[14] [ la "**Dúplica de la Demanda**"], junto con documentos y tres informes periciales.

57. El 25 de octubre de 2021 la Demandante presentó el Memorial de Dúplica de la Reconvención[15] [la **"Dúplica de la Reconvención"**] junto con cuatro informes periciales.

## E.   Prueba

### E.1.   Prueba documental y trámite de exhibición documental

58. La Demandante ha aportado, junto a sus sucesivos escritos en el arbitraje, la siguiente prueba documental:

- Documentos C001 al C037 con la Solicitud arbitral, la Solicitud cautelar y la Contestación a la Reconvención.

- Documentos C-038 a C-050 con la Oposición cautelar de la Demandante.

- Documento C-051 con la Oposición de la Demandante a la Exhibición solicitada por las Demandadas.

- Documentos C-052 al C-208 con la Demanda.

- Documentos C-209 al C-776 con la Contestación a la Reconvención.

- Documentos C-777 al C-803 con la Dúplica de la Reconvención.

- Documentos C-804 al C-815 con el Escrito de Alegatos Finales.

59. Las Demandadas han aportado, junto a sus sucesivos escritos en el arbitraje, la siguiente prueba documental:

- Documentos R-01 a R-026 con los Escritos de Oposición a la Solicitud de arbitraje, Solicitud cautelar y Oposición cautelar de las Demandadas.

- Documentos R-027 a R-071 con la Contestación y Reconvención.

- Documentos R-072 a R-096 con la Dúplica de la Demanda.

- Documentos R- 097 al R-100 con el Escrito de Alegatos Finales.

### E.2.   Prueba testifical

60. La Demandante presentó el testimonio del señor Mario Saona mediante dos

---

[14]  Documento también numerado como R-6.

[15]  Documento C-6

declaraciones escritas: la de 9 de febrero de 2021[16] [ la "**Primera Declaración de Mario Saona**"] y la de 21 de julio de 2021 [ la "**Segunda Declaración de Mario Saona**"].

61.   En la audiencia el señor Saona prestó su declaración oralmente y pudo ser contrainterrogado.

### E.3.   Prueba pericial

62.   La Demandante ha aportado doce informes periciales emitidos por:

   (i)   El señor Philip J. Innes, de Ernst & Young (**EY**) presentó tres informes: los de 7 de febrero de 2021 [el "**Primer Informe de EY**"], 22 de julio de 2021 [ el "**Segundo Informe de EY**"] y 22 de octubre de 2021 [el "**Tercer Informe de EY**"][17].

   (ii)   Los señores Brandon Chaney y Diego Costa, expertos de FTI Consulting (**FTI Construcción**) presentaron tres informes: los de 8 de febrero de 2021[18] [el "**Primer Informe de FTI Construcción**"], 23 julio de 2021 [el "**Segundo Informe de FTI Construcción**"] y 25 de octubre de 2021 [el "**Tercer Informe de FTI Construcción**"][19].

   (iii)   Los señores José María Piñeiro, David Aliaga y Juan Manuel Siles, de FTI Consulting (**FTI Quantum**) presentaron tres informes: los de 8 de febrero de 2021 [ el "**Primer Informe de FTI Quantum**"], 23 de julio de 2021 [el "**Segundo Informe de FTI Quantum**"] y 25 de octubre de 2021 [ el "**Tercer Informe de FTI Quantum**"][20].

   (iv)   Los señores Luis Gonzalo Díaz y Yury Escobar, expertos de GYGA Consulting (**GYGA**) presentaron tres informes: los de 8 de febrero de 2021 [ el "**Primer Informe de GYGA**"], 22 de julio de 2021 [el "**Segundo Informe de GYGA**"] y 22 de octubre de 2021 [el "**Tercer Informe de GYGA**"][21].

63.   Las Demandadas han aportado seis informes periciales emitidos por:

   (i)   Los señores Andrés Alva, Antonio Vieira y David González, de BRG Construcción (**BRG Construcción**), presentaron dos informes: el de 9 de mayo de 2021 [ el "**Primer Informe de BRG Construcción**"] y el de 31 de

---

[16]   La portada de la declaración contiene un error al aparecer como fecha del documento el 9 de febrero de 2020, pero en la firma aparece la fecha correcta que es el 9 de febrero de 2021.

[17]   Sus denominaciones son PER. C-1, PER. C-4 y PER: C-8, respectivamente. Las traducciones al español aparecen como Documentos PER.C-1 ESP, PER.C-4 ESP y PER.C-8 ESP, respectivamente.

[18]   El documento aparece erróneamente fechado el 8 de febrero de 2020 pero la fecha de presentación no deja duda de que se refiere al año 2021.

[19]   Sus denominaciones son PER. C-2, PER. C-5 y PER.C-9, respectivamente.

[20]   Sus denominaciones son PER. C-3, PER. C-6 y PER: C-10, respectivamente.

[21]   Sus denominaciones son Anexo del PER. C-3, PER. C-7 y PER. C-11, respectivamente.

agosto de 2021 [ el "**Segundo Informe de BRG Construcción**"].

(ii)   El señor Roberto Daniel Campo, de BRG Contabilidad (**BRG Contabilidad**) presentó dos informes: el de 3 de mayo de 2021[22] [el "**Primer Informe de BRG Contabilidad**"] y el de 31 de agosto de 2021 [ el "**Segundo Informe de BRG Contabilidad**"].

(iii)   Los señores Andrés Ferraris, Andrés Alva y Andrés Chambouleyron, expertos de BRG Finanzas (**BRG Finanzas**) presentaron dos informes: el de 9 de mayo de 2021 [ el "**Primer Informe de BRG Finanzas**"] y el de 27 de agosto de 2021 [el "**Segundo Informe de BRG Finanzas**"].

### F.   Conferencia y preparativos pre-audiencia

64.   El 10 de agosto de 2021 el Tribunal Arbitral planteó la posibilidad de una reunión virtual con las Partes para valorar las distintas opciones existentes de cara a la celebración de la audiencia de prueba. Finalmente, no se celebró la reunión virtual pero el 16 de agosto de 2021 el Tribunal Arbitral abrió plazo a las Partes para que se pronunciaran sobre la celebración de una audiencia presencial o virtual y, en el primer caso, el lugar en que se celebraría.

65.   El 19 de agosto de 2021 las Partes informaron al Tribunal Arbitral de los acuerdos alcanzados sobre estos extremos y de los puntos sobre los que las posiciones eran discrepantes.

66.   El 30 de agosto de 2021 el Tribunal Arbitral solicitó a las Partes que se pronunciaran sobre diversas cuestiones relacionadas con la audiencia. El 31 de agosto posterior las Partes trasladaron sus posiciones en relación con estas materias. A la vista de ello, el 3 de septiembre de 2021 el Tribunal Arbitral decidió que se mantuvieran las fechas previstas inicialmente para la audiencia (del 15 al 24 de noviembre de 2021), que la audiencia fuera virtual y que sería necesaria la contratación de una empresa especializada para hacerse cargo de las cuestiones técnicas y logísticas.

67.   El 21 de septiembre de 2021 las Partes comunicaron al Tribunal Arbitral los acuerdos alcanzados sobre "Reglas procesales" para la celebración de la audiencia.

68.   El 23 de septiembre de 2021 el Tribunal Arbitral propuso a las Partes dos opciones: consolidar los casos CC 24471 y CCI 24472 a petición de las Partes y dictar un solo laudo o mantener los dos casos por separado y celebrar dos audiencias.

69.   El 6 de octubre de 2021 las Partes remitieron al Tribunal Arbitral un nuevo documento con los acuerdos alcanzados sobre la audiencia y los puntos de desacuerdo.

70.   El 7 de octubre de 2021 se celebró la reunión virtual preparatoria de la audiencia en

---

[22]   El documento aparece erróneamente fechado de 3 de mayo de 2020 pero la fecha de presentación no deja duda de que se refiere al año 2021.

la que se adoptaron nuevos acuerdos y se resolvieron por el Tribunal Arbitral los aspectos sobre los que no había sido posible obtener el consenso de las Partes. Las Partes y el Tribunal Arbitral acordaron que la audiencia de cada caso se celebraría los días 15 a 19, 22 y 24 de noviembre de 2021.

71. En ella las Partes mostraron su preferencia por una audiencia virtual.

72. Durante el curso de la conferencia se examinaron las distintas cuestiones organizativas (calendario, horario, orden de intervención de partes, testigos y peritos, pantallas, grabación, transcripción, apoyo al Tribunal Arbitral y a las partes, ubicación de los testigos y peritos antes de su intervención, entre otras).

73. Las Partes alcanzaron acuerdos sobre la mayor parte de los extremos señalados, que se plasmaron en sus correos de 11 y 12 de octubre de 2021.

74. El 13 de octubre de 2021 el Tribunal Arbitral comunicó a las Partes sus decisiones sobre algunos extremos en los que las Partes no habían alcanzado un acuerdo.

75. En los días posteriores las Partes y el Tribunal Arbitral cruzaron correos sobre cuestiones puntuales de la celebración de la audiencia, incluida la facilitación del manejo del expediente arbitral.

76. El 8 de noviembre de 2021 tuvieron lugar las pruebas técnicas con resultado positivo.

77. El 10 de noviembre de 2021 las Partes facilitaron la lista de asistentes a la audiencia.

## G.  **Audiencia para la práctica de la prueba**

78. Los días 15 a 19, 22 y 24 de noviembre de 2021 se celebró la audiencia según lo previsto.

79. El 15 de noviembre de 2021 comenzó la audiencia con los asistentes y el desarrollo que resulta de la grabación y transcripción realizadas.

80. El mismo 15 de noviembre de 2021 las Partes realizaron sus alegatos de apertura para lo que hicieron uso de sendas presentaciones en *power point* que fueron aportadas en el mismo día.

81. Al final de cada sesión el Tribunal Arbitral y las Partes recibieron la transcripción de lo acontecido en la sesión correspondiente.

82. En la jornada del 16 de noviembre de 2021 las Partes aportaron las presentaciones utilizadas por los expertos de EY y BRG Contabilidad.

83. El 17 de noviembre de 2021 las Partes entregaron la presentación utilizada por FTI Construcción.

84. En la sesión del 18 de noviembre de 2021 las Partes remitieron la presentación de

BRG Construcción.

85. El 19 de noviembre de 2021 las Partes hicieron llegar la presentación de GYGA Consulting y FTI Daños.

86. El 22 de noviembre de 2022 las Partes enviaron las presentaciones de BRG Finanzas.

87. En la audiencia del 24 de noviembre de 2021 las Partes formularon sus alegatos de cierre y remitieron las presentaciones utilizadas al efecto.

88. Finalizada la audiencia, que se desarrolló sin incidencias destacables, en un clima de colaboración de las Partes y con un muy correcto apoyo de los equipos técnicos, las Partes manifestaron su satisfacción por su desarrollo.

89. Al finalizar la audiencia, el Tribunal Arbitral agradeció a las Partes el trabajo realizado durante los siete días de audiencia y les planteó si consideraban que se habían respetado sus derechos durante el curso de la audiencia y del procedimiento hasta ese momento a lo que las partes respondieron afirmativamente y agradecieron la labor del Tribunal Arbitral[23].

| | Testigo cuya declaración oral se produjo durante la audiencia | |
|---|---|---|
| 1 | Mario Saona | 16 de noviembre de 2021 |
| **Peritos cuya ratificación oral se produjo durante la audiencia, agrupados por materias y fecha de la declaración** | | |
| 1 | Philip J. Innes (EY) | 16 de noviembre de 2021 |
| 2 | Roberto Daniel Campo (BRG Contabilidad) | 16 y 17 de noviembre de 2021 |
| 3 | Brandon Chaney y Diego Costa (FTI | 17 de noviembre de 2021 |

---

[23] Manifestaciones de las partes durante la sesión del 24 de noviembre de 2.021, al acabar los alegatos finales de las Partes, en la fase de cuestiones procedimentales (páginas 1755 a 1758;1765 y 1766).

| | Construcción) | |
|---|---|---|
| 4 | Andrés Alva, Antonio Vieira y David González (BRG Construcción) | 18 de noviembre de 2021 |
| 5 | José María Piñeiro, David Aliaga y José Manuel Siles (FTI Quantum) | 19 de noviembre de 2021 |
| 6 | Luis Gonzalo Díaz y Yury Escobar (GYGA) | 19 de noviembre de 2021 |
| 7 | Andrés Ferraris, Andrés Alva y Andrés Chambouleyron (BRG Finanzas) | 22 de noviembre de 2021 |

## H.    Escritos de Alegatos Finales

90.  El 7 de diciembre de 2021, tras oír a las Partes, el Tribunal Arbitral planteó fechas para las fases finales del calendario, que no fueron objetadas por las Partes.

91.  Las Partes se encargaron de las grabaciones de la audiencia. Las Partes y el Tribunal Arbitral recibieron las grabaciones de las sesiones de la audiencia celebrada en noviembre de 2021 según ya se ha explicado[24].

92.  El 20 de diciembre de 2021 se recibieron las transcripciones finales de las grabaciones de la audiencia.

93.  El 10 de enero de 2022 el Tribunal Arbitral remitió a las Partes un listado de preguntas sobre cuestiones fácticas y jurídicas para que fueran respondidas en los escritos de Alegatos Finales.

94.  El 15 de enero de 2022 las Demandadas solicitaron aclaración en relación con las

---

[24]   Párrafos 78 y 79 de este Laudo.

C-0368-SPA

preguntas 7 y B13 del Tribunal Arbitral. El mismo 15 de enero de 2022 la Demandante formuló objeciones a la solicitud de aclaración planteada por las Demandadas. El 17 de enero de 2021 el Tribunal Arbitral contestó a la solicitud de aclaración de las Demandadas.

95.   El 10 de marzo de 2022 las Partes presentaron sendos escritos de Alegatos Finales.

### I.   Escritos relativos a la liquidación de honorarios y listado de gastos incurridos por la defensa en el arbitraje

96.   Las Partes presentaron sus respectivos escritos de declaración de costas y costos el 17 de marzo de 2022.

97.   La Demandante no presentó alegaciones en cuanto a la relación de gastos de las Demandadas.

98.   Las Demandadas formularon alegaciones sobre la declaración de costas y costos de la Demandante mediante su escrito de 29 de marzo de 2022.

### J.   Escrito sobre intereses

99.   A petición del Tribunal Arbitral, las Partes presentaron sus escritos sobre las cuestiones relacionadas con los intereses los días 19 y 25 de mayo de 2022, respectivamente.

### K.   Cierre de la instrucción

100.   De conformidad con el artículo 27 del Reglamento, mediante la Orden Procesal Nº. 4 de 30 de mayo de 2022, el Tribunal Arbitral declaró el cierre de la instrucción del procedimiento, informando a la Secretaría de la Corte y a las Partes de que era su intención enviar el proyecto de laudo a la Corte para su aprobación el 10 de junio de 2022.

101.   El 15 de abril de 2022 la Secretaría de la Corte comunicó que las provisiones de fondos de las partes fijadas por la Corte habían sido pagadas íntegramente por las Partes.

### VIII.   PLAZO PARA DICTAR EL LAUDO

102.   La cláusula 22.5 del Contrato establecía que el Tribunal Arbitral tendría un plazo de noventa días para dictar el laudo desde su constitución.

103.   El párrafo 22 del Acta de Misión firmada por las Partes el 6 de noviembre de 2020 amplió el plazo para laudar, en función del calendario acordado por ellas en ese momento, hasta el 30 de abril de 2022.

104.   Por su parte, la OP 1, de 8 de noviembre de 2020, establece en su párrafo 58 que

"*el plazo para laudar será de tres meses, a partir de la declaración del Tribunal por la que se declare el cierre de instrucción*". El párrafo 59 de la misma OP 1 declara que "*el Tribunal Arbitral tiene la facultad de prorrogar dicho plazo por un periodo no superior a dos meses, para así concluir su misión, mediante decisión motivada*". Finalmente, el párrafo 60 de la OP 1 acepta que, "*sin perjuicio de lo anterior, cuando concurran circunstancias excepcionales, la Corte podrá, a solicitud motivada de los árbitros, de las Partes o de oficio prorrogar el plazo para dictar laudo*".

105. El 24 de febrero de 2022 la Secretaría informó a las Partes que, el 17 de febrero de 2022, la Corte había prorrogado el plazo para dictar el laudo final hasta el 30 de septiembre de 2022 ex artículo 31 (2) de su Reglamento.

106. El 27 de junio de 2022 la Corte aprobó el proyecto de laudo sometido por el Tribunal Arbitral y manifestó que sería notificado una vez que hubiera sido finalizado y firmado por el Tribunal Arbitral.


## IX.   PRETENSIONES DE LAS PARTES

### A.   Pretensiones de la Demandante

107. En la Demanda[25], la Demandante solicitó al Tribunal Arbitral que dictase Laudo, mediante el cual emitiera las siguientes pretensiones:

> "*PETITORIO PRINCIPAL NO. 1: Que se declare que los Demandados han resuelto el Contrato de Financiamiento de manera indebida, en consecuencia, se declare ineficaz la resolución contractual realizada por los Demandados*
>
> *PETITORIO PRINCIPAL NO. 2: Que se declare que el Contrato de Financiamiento ha quedado resuelto de pleno derecho por causa imputable a los Demandados.*
>
> *PETITORIO PRINCIPAL NO. 3: Que se declare que los Demandados incumplieron el Contrato de Financiamiento al no colaborar con el Proyecto, causar retrasos, negarse a otorgar las ampliaciones de plazo solicitadas por Redes Andinas, resolver indebidamente el mismo, ejecutar indebidamente la Garantía de Fiel Cumplimiento y la Garantía de Adelanto, y oponerse a la entrega de los Bienes.*
>
> *PETITORIO PRINCIPAL NO. 4: Que se declare que los Demandados han ejecutado indebidamente la Garantía de Fiel Cumplimiento*
>
> *PETITORIO ACCESORIO: Que se ordene a los Demandados restituir a Redes Andinas las sumas de dinero indebidamente cobradas como consecuencia de la ejecución de la Garantía de Fiel Cumplimiento por US$ 14,960,000.00, más los*

---

[25]   Páginas 9 y 10.

*intereses correspondientes*

*PETITORIO ACCESORIO: Que se declare que los Demandados no podrán compensar las sumas de dinero que el Tribunal Arbitral les ordene restituir como consecuencia de la ejecución indebida de la Garantía de Fiel Cumplimiento, contra cualquier potencial suma de dinero que el Tribunal Arbitral ordene pagar a Redes Andinas a favor de los Demandados bajo el Contrato o contra cualquier otra posible acreencia que en el futuro pudiera generarse a favor de los Demandados frente a Redes Andinas*

*PETITORIO PRINCIPAL NO. 5: Que se declare que los Demandados han ejecutado indebidamente la Garantía de Adelanto.*

*PETITORIO ACCESORIO: Que se ordene a los Demandados restituir a Redes Andinas las sumas de dinero indebidamente cobradas a consecuencia de la ejecución de la Garantía de Adelanto por US$52,360,000.00, más los intereses correspondientes.*

*PETITORIO ACCESORIO: Que se declare que los Demandados no podrán compensar las sumas de dinero que el Tribunal Arbitral les ordene restituir como consecuencia de la ejecución indebida de la Garantía de Adelanto, contra cualquier potencial suma de dinero que el Tribunal Arbitral ordene pagar a Redes Andinas a favor de los Demandados bajo el Contrato o contra cualquier otra posible acreencia que en el futuro pudiera generarse a favor de los Demandados frente a Redes Andinas*

*PETITORIO PRINCIPAL NO. 6: Que se declare desestimada la oposición de las Demandadas a la entrega de los Bienes del Contrato de Financiamiento ofrecida y ejecutada por Redes Andinas.*

*PETITORIO PRINCIPAL NO. 7: Que se declare que Redes Andinas ha entregado los Bienes objeto del Contrato de Financiamiento a los Demandados en cumplimiento del Contrato de Financiamiento, y que la entrega es válida y eficaz para todos los fines del Contrato de Financiamiento a partir de la fecha de cada ofrecimiento.*

*PETITORIO PRINCIPAL NO. 8: Que se declare que la liquidación del Contrato de Financiamiento que han pretendido realizar los Demandados es inválida al no sustentarse en el Contrato de Financiamiento ni en las leyes aplicables y, en consecuencia, no surte efectos.*

*PETITORIO PRINCIPAL NO. 9: Que se declare que no corresponde aplicar penalidad alguna bajo el Contrato contra Redes Andinas.*

*PETITORIO PRINCIPAL NO. 10: Que se apruebe la liquidación del Contrato de Financiamiento propuesta por Redes Andinas y, en consecuencia, se ordene a los Demandados pagar solidariamente a Redes Andinas la suma de US$ 11,451,632.00 más los intereses correspondientes.*

*PETITORIO PRINCIPAL NO. 11: Que se ordene a Pronatel y el MTC pagar solidariamente la suma de US$ 30,315,592.00 más los intereses correspondientes a Redes Andinas, por concepto de indemnización por los daños derivados de su incumplimiento contractual*

*PETITORIO PRINCIPAL NO. 12: Que se condene a Pronatel y el MTC solidariamente a pagar todos los costos, costas y gastos del presente arbitraje, más intereses a partir de la fecha del laudo".*

108. En su Contestación a la Reconvención[26], la Demandante presentó las siguientes pretensiones:

    (i)    En relación con la Demanda las pretensiones se mantuvieron si bien variaron las cantidades reclamadas que pasaron a ser: i) US$ 11´570,893.00 en concepto de liquidación del Contrato de Financiamiento; ii) US$ 32´008,445.00 como indemnización por los daños derivados del incumplimiento contractual de las Demandadas.

    (ii)   En relación con la Reconvención, la Demandante solicitó la íntegra desestimación de los petitorios de la Reconvención.

109. En su Dúplica de la Reconvención[27] la Demandante reiteró la petición de que las pretensiones de las Demandadas fueran rechazadas.

110. En sus Alegatos finales[28] la Demandante ha plasmado sus pretensiones en los siguientes términos

    **"*PETITORIO PRINCIPAL NO. 1*:** *Que se declare que los Demandados han resuelto el Contrato de Financiamiento de manera indebida y, en consecuencia, se declare ineficaz la resolución contractual realizada por los Demandados.*

    ***PETITORIO PRINCIPAL NO. 2*:** *Que se declare que el Contrato de Financiamiento ha quedado resuelto de pleno derecho por causa imputable a los Demandados.*

    ***PETITORIO PRINCIPAL NO. 3*:** *Que se declare que los Demandados incumplieron el Contrato de Financiamiento al no colaborar con el Proyecto Cajamarca, causar retrasos, negarse a otorgar las ampliaciones de plazo solicitadas por Redes Andinas, resolver indebidamente el mismo, ejecutar indebidamente la Garantía de Fiel Cumplimiento y la Garantía de Adelanto, y oponerse injustificadamente a la entrega de los bienes del Proyecto Cajamarca.*

---

[26]  Páginas 11 a 13.

[27]  Página 116.

[28]  Páginas 151 a 153.

**PETITORIO PRINCIPAL NO. 4**: *Que se declare que los Demandados han ejecutado indebidamente la Garantía de Fiel Cumplimiento.*

*PETITORIO ACCESORIO: Que se ordene a los Demandados restituir a Redes Andinas las sumas de dinero obtenidas como consecuencia de la ejecución indebida de la Garantía de Fiel Cumplimiento por US$ 14'960,000.00 (catorce millones novecientos sesenta mil y 00/100 dólares de los Estados Unidos de América), más los intereses correspondientes,* **mediante la devolución a favor de Redes Andinas del importe depositado por dicho monto en la cuenta especial del Banco de la Nación No. 06068002824**.

*PETITORIO ACCESORIO: Que se declare que los Demandados no podrán compensar las sumas de dinero que el Tribunal Arbitral les ordene restituir como consecuencia de la ejecución indebida de la Garantía de Fiel Cumplimiento, contra cualquier potencial suma de dinero que el Tribunal Arbitral ordene pagar a Redes Andinas a favor de los Demandados bajo el Contrato o contra cualquier otra posible acreencia que en el futuro pudiera generarse a favor de los Demandados frente a Redes Andinas.*

**PETITORIO PRINCIPAL NO. 5**: *Que se declare que los Demandados han ejecutado indebidamente la Garantía de Adelanto.*

*PETITORIO ACCESORIO: Que se ordene a los Demandados restituir a Redes Andinas las sumas de dinero obtenidas a consecuencia de la indebida ejecución de la Garantía de Adelanto por US$ 52'360,000.00 (cincuenta y dos millones trecientos sesenta mil y 00/100 dólares de los Estados Unidos de América), más los intereses correspondientes* **mediante la devolución a favor de Redes Andinas del importe depositado por dicho monto en la cuenta especial del Banco de la Nación No. 06068002824**.

*PETITORIO ACCESORIO: Que se declare que los Demandados no podrán compensar las sumas de dinero que el Tribunal Arbitral les ordene restituir como consecuencia de la ejecución indebida de la Garantía de Adelanto, contra cualquier potencial suma de dinero que el Tribunal Arbitral ordene pagar a Redes Andinas a favor de los Demandados bajo el Contrato o contra cualquier otra posible acreencia que en el futuro pudiera generarse a favor de los Demandados frente a Redes Andinas.*

**PETITORIO PRINCIPAL NO. 6**: *Que se declare desestimada la oposición de los Demandados a la entrega de los bienes del Contrato de Financiamiento ofrecida y ejecutada por Redes Andinas.*

**PETITORIO PRINCIPAL NO. 7**: *Que se declare que Redes Andinas ha entregado los bienes objeto del Contrato de Financiamiento a los Demandados en cumplimiento del Contrato de Financiamiento, y que la entrega es válida y eficaz para todos los fines del Contrato de Financiamiento a partir de la fecha de cada ofrecimiento de la entrega de bienes,*

*respectivamente.*

*PETITORIO PRINCIPAL NO. 8: Que se declare que la liquidación del Contrato de Financiamiento que han pretendido realizar los Demandados es inválida al no sustentarse en el Contrato de Financiamiento ni en las leyes aplicables y, en consecuencia, no surte efectos.*

*PETITORIO PRINCIPAL NO. 9: Que se declare que no corresponde aplicar contra Redes Andinas penalidad alguna bajo el Contrato de Financiamiento.*

*PETITORIO PRINCIPAL NO. 10: Que se apruebe la liquidación del Contrato de Financiamiento propuesta por Redes Andinas y, en consecuencia, se ordene a los Demandados pagar solidariamente a Redes Andinas la suma de US$ 11'855,049.00 (once millones ochocientos cincuenta y cinco mil cuarenta y nueve y 00/100 dólares de los Estados Unidos de América) más los intereses que se devenguen a partir del 10 de junio de 2022.*

*PETITORIO PRINCIPAL NO. 11: Que se ordene a Pronatel y el MTC pagar solidariamente a Redes Andinas la suma de US$ 37'518,577.00 (treinta y siete millones quinientos dieciocho mil quinientos setenta y siete y 00/100 dólares de los Estados Unidos de América) más los intereses que se devenguen a partir del 10 de junio de 2022, por concepto de indemnización por los daños derivados de su incumplimiento contractual neto de cualquier impuesto que resulte aplicable.*

*PETITORIO PRINCIPAL NO. 12: Que se condene a Pronatel y el MTC solidariamente a pagar todos los costos, costas y gastos del presente arbitraje, más intereses a partir de la fecha del laudo.*

*Redes Andinas solicita también que todas las pretensiones de los Demandados sean rechazadas*"

## B.   **Pretensiones de las Demandadas**

111. En su Contestación y Reconvención[29], las Demandadas solicitaron al Tribunal Arbitral que dictase Laudo en los siguientes términos:

   a.   En relación con la Demanda:

      "*PETITORIO 01. La improcedencia de los incumplimientos imputados por Redes al Pronatel que habrían causado la resolución de contrato, toda vez que Pronatel ha demostrado haber actuado dentro de los términos que el Contrato de Financiamiento le permite.*

---

[29]  Páginas 177 a 179.

*PETITORIO 02. Declarar la validez de la ejecución de la carta fianza de Fiel Cumplimiento de acuerdo a lo pactado en el Contrato de Financiamiento y ser de libre disponibilidad de Pronatel.*

*PETITORIO 03. Declarar la validez de la ejecución de la carta fianza de Adelanto efectuadas de acuerdo a lo pactado en el Contrato de Financiamiento siendo parte de la liquidación del Contrato de Financiamiento y de ser compensada contra toda acreencia a favor de Redes.*

*PETITORIO 04. Que, se declare que si corresponde aplicar las penalidades a Redes bajo el Contrato de Financiamiento.*

*PETITORIO 05. Que, se rechace la liquidación del Contrato de Financiamiento propuesta por Redes.*

*PETITORIO 06. Que, se rechace toda pretensión indemnizatoria de carácter solidaria contra Pronatel y/o MTC al no haber existido incumplimiento contractual y si el Tribunal declara la responsabilidad de Pronatel los daños son inciertos y especulativos*".

b.   En relación con la Reconvención:

"*PETITORIO 01. Declarar la validez y eficacia de la Resolución Contractual de Pronatel comunicada el 23 de abril de 2019, notificada a Redes Andinas el 24 de abril de 2019.*

*PETITORIO 02. Declarar que Pronatel manifestó su oposición legítima a la recepción de los bienes de la Red de Transporte y Red de Acceso.*

*PETITORIO 03. Declare el incumplimiento de la prestación a cargo de Redes respecto de la entrega de los Bienes de la Red de Acceso y Red de Transporte de acuerdo con el procedimiento establecido en el Contrato de Financiamiento.*

*PETITORIO 04. Se ordene a Redes la devolución de la totalidad de los fondos desembolsados por el Pronatel para la ejecución de la Red de Transporte y de la Red de Acceso.*

*PETITORIO 05. Que, en caso el Tribunal decida efectuar la liquidación del Contrato de Financiamiento este deberá ser en los términos del Contrato, excluyéndose los fondos de la carta fianza de fiel cumplimiento.*

*PETITORIO 06. Se ordene a Redes el pago de todos los costos, costas y gastos arbitrales más intereses que ha generado este proceso*".

112. En su Dúplica de la Demanda, las Demandadas reiteraron la petición de desestimación de todas las pretensiones de la Demandante.

113. En sus Alegatos Finales las Demandadas no modificaron sus pretensiones.

## X.   POSICIONES DE LAS PARTES

### A.   Posición de la Demandante

114. En el Contrato las Partes acordaron que Redes implementaría dos redes de telecomunicaciones: una red de fibra óptica que se conectase a la red nacional llevando la señal hacia las capitales distritales [la "**Red de Transporte**"] y una red inalámbrica que permitiera llevar la señal vía microondas a zonas rurales más alejadas [la "**Red de Acceso**"][30].

115. Redes sostiene que planificó y ejecutó las obligaciones a su cargo de manera diligente[31].

116. Sin embargo, Redes se encontró con una problemática legal para la adquisición de terrenos para la construcción de los nodos. Redes debía adquirir en propiedad estos terrenos, pero determinar con un nivel razonable de certeza que un terreno sería susceptible de adquisición fue muy difícil en las zonas rurales en las que se ejecutaba este Proyecto [el "**Proyecto**"] porque las zonas no estaban adecuadamente catastradas e identificar a los propietarios era complejo y en muchos casos imposible[32].

117. Esas mismas dificultades fueron identificadas en todos los proyectos regionales similares que se implementaron en otras regiones del país. El trato que recibió Redes como contratado [el "**Contratado**"] frente a estas dificultades fue muy distinto al que recibieron los otros contratados. Mientras que a estos se les permitió continuar con los proyectos con significativos retrasos hasta completarlos y beneficiarse del Decreto de Urgencia 041-2019, de 27 de diciembre de 2019 [el "**Decreto de Urgencia**"], que otorgó flexibilidades para garantizar la continuidad de estos proyectos, PRONATEL rechazó la última solicitud de ampliación de plazo planteada por Redes impidiéndole terminar la construcción y operar la Red de Acceso, sin concederle el tratamiento que el Decreto de Urgencia dio a los demás contratados pese a que el Proyecto  se utilizó en la Exposición de Motivos de esta norma para justificar la aplicación de estos nuevos criterios[33].

118. Las demoras en el Proyecto no le eran imputables a Redes. PRONATEL conocía las causas de las demoras y había reconocido que no le eran imputables a Redes. La Demandante había adquirido la propiedad de los predios sobre los que están

---

[30]  Escrito de Alegatos Finales de la Demandante, párrafo 5.

[31]  Escrito de Alegatos Finales de la Demandante, párrafo 5. En el PER C-2, páginas 27 y 33 se explica el estado de avance de las redes alcanzado por Redes y se sitúa en el 100% de la Red de Transporte (113 nodos) y el 68,8% de la Red de Acceso (372 nodos), con un total de 2,115.2 kilómetros de fibra óptica, 3 centros de mantenimiento, 1 NOCs (Centro de Operaciones de Red), 168 Hot Spots (Plazas) y 397 instalaciones de Instituciones Abonadas Obligatorias.

[32]  Escrito de Alegatos Finales de la Demandante, párrafo 6.

[33]  Escrito de Alegatos Finales de la Demandante, párrafos 7 y 8.

instalados los nodos a pesar de que la transferencia de propiedad no era un requisito para entregar las redes en el nivel de avance alcanzado en el momento en que se produjo la resolución contractual. Las Demandadas alegaron que Redes no había obtenido la transferencia de la propiedad porque, en el caso de los inmuebles, el consentimiento no es suficiente para producir la transmisión del dominio, sino que es necesaria la inscripción en el Registro de la Propiedad Inmueble (saneamiento registral)[34].

119.   PRONATEL sostiene que la última solicitud de ampliación de plazo de Redes adolecía de defectos que Redes considera que no son ciertos[35] .

120.   Tras la reunión celebrada por Redes y PRONATEL el 3 de abril de 2019, en la que se exigió a Redes la constitución de una nueva fianza monetaria de cumplimiento adicional, a lo que Redes se negó por resultar improcedente, PRONATEL decidió resolver el Contrato[36] [la "**Resolución del Contrato**"], lo que ocurrió el 23 de abril de 2019[37].

121.   La terminación del Contrato por PRONATEL fue arbitraria e ilegal[38].

122.   PRONATEL no se limitó a la terminación del Contrato, sino que ejecutó las Cartas Fianza de Fiel Cumplimiento [la "**Garantía de Fiel Cumplimiento**"] y de Adelanto [ la "**Garantía de Adelanto**"] sin observar siquiera el procedimiento establecido para ello. Las garantías tenían todavía un plazo de vigencia y se podían haber renovado sin problema[39].

123.   PRONATEL se negó a hacer una liquidación de las supuestas penalidades y negó a Redes toda posibilidad de presentar su posición y defenderse frente a la ejecución de las garantías[40].

124.   PRONATEL no solo impidió a Redes terminar el Proyecto, sino que se negó a recibir las redes sin importarle el elevado nivel de avance alcanzado (100% de la Red de Transporte y algo más del 68 % de la Red de Acceso)[41] y sin reconocer valor

---

[34]   Escrito de Alegatos Finales de la Demandante, párrafos 9, 16 y 17.

[35]   Escrito de Alegatos Finales de la Demandante, párrafo 10. El Informe PER C-2, párrafo 92, considera que la Red de Acceso habría estado operativa el 31 de marzo de 2020 de no mediar la resolución del Contrato mientras que el Segundo Informe BRG Finanzas, párrafo 148, considera que la instalaciones y puesta en condiciones de funcionamiento de las redes no habría ocurrido antes del 5 de agosto de 2021.

[36]   La resolución del Contrato se produjo por carta de 23 de abril de 2019, que fue notificada a Redes el 24 de abril de 2019.

[37]   Escrito de Alegatos Finales de la Demandante, párrafo 11.

[38]   Escrito de Alegatos Finales de la Demandante, párrafo 11.

[39]   Escrito de Alegatos Finales de la Demandante, párrafo 12.

[40]   Escrito de Alegatos Finales de la Demandante, párrafo 12.

[41]   Escrito de Alegatos Finales de la Demandante, párrafo 13.

alguno al avance alcanzado[42]. PRONATEL justificó su postura en que no estaba obligada a recibir las redes hasta que estuvieran completas, lo que es contrario al Contrato, a la práctica de los contratos para la construcción de infraestructura destinada a la prestación de servicios públicos y a la obligación de actuar de buena fe en la ejecución contractual[43].

125. PRONATEL debe indemnizar a Redes no solo por los costes adicionales que su conducta generó durante la ejecución del proyecto y para el proceso de entrega de las redes, sino también por la pérdida de la utilidad que se hubiese generado con la explotación de la Red de Acceso de la que fue privada Redes por la ilícita conducta de las Demandadas[44].

126. Redes solicita la liquidación del Contrato ordenando que Redes sea adecuadamente compensada por el nivel de avance alcanzado en la construcción del Proyecto, que no está del todo cubierto por los desembolsos recibidos, y que Redes sea indemnizada por los daños causados por la conducta de las Demandadas[45].

### B.    Posición de las Demandadas

127. El Contrato fue válidamente resuelto por PRONATEL puesto que Redes había vencido largamente el plazo para la etapa de instalación de la Red de Acceso[46].

128. A lo largo de la vida del proyecto, Redes había venido ejecutando con negligencia su prestación de mayor complejidad: la adquisición de los terrenos en los que debían instalarse nodos[47].

129. Redes sabía que la actividad de adquisición predial iba a tener que desarrollarse sobre áreas de escasa inmatriculación registral, que pertenecían a diversas comunidades campesinas y cuyos propietarios, por desconocimiento, desconfiaban de la instalación de nodos. Redes cometió dos errores que demuestran su negligencia: i) no permitir que su subcontratista, Quanta Services Perú ["**Quanta Perú**"], utilizara una herramienta fundamental cual era el Plan de Sensibilización y Difusión del Proyecto [ el "**Plan de Sensibilización**"], y ii) se autoimpuso la innecesaria carga de efectuar el saneamiento predial como condición para la adquisición de los terrenos, cuando tenía toda una década de plazo para efectuar dicha formalización[48].

130. Redes gestionó tardíamente la obtención del certificado medioambiental [la

---

[42] Escrito de Alegatos Finales de la Demandante, párrafo 14.

[43] Escrito de Alegatos Finales de la Demandante, párrafo 15.

[44] Escrito de Alegatos Finales de la Demandante, párrafo 20.

[45] Escrito de Alegatos Finales de la Demandante, párrafo 22.

[46] Escrito de Alegatos Finales de las Demandadas, párrafos 1 y 9 i).

[47] Escrito de Alegatos Finales de las Demandadas, párrafos 1 y 9 iii).

[48] Escrito de Alegatos Finales de las Demandadas, párrafo 2.

"**Certificación Ambiental**"] sin el que no podía iniciar la obra[49].

131. Redes obtuvo cuatro extensiones de plazo y dispuso del tiempo adicional que pidió en su quinta y última extensión de plazo, pero en ninguna de las cinco solicitudes de extensión de plazo presentó un análisis de impacto en la ruta crítica[50] [la "**Ruta Crítica**"].

132. Redes pudo haber pedido una extensión de plazo adicional entre el 3 y 24 de abril de 2019 que son las fechas en que se le comunicó que estaba incurso en causal resolutoria y el vencimiento del plazo subsanatorio que se le concedió, pero no lo hizo[51].

133. Redes solicita una entrega forzada de bienes del Proyecto a PRONATEL, una liquidación de saldos del Contrato y una compensación de daños y perjuicios sobre la base de un cumplimiento parcial del Contrato que no es posible según el Código Civil peruano salvo cuando el acreedor lo acepta, lo que no ocurre en este caso porque PRONATEL rechaza que se le entreguen bienes que no sirven para la finalidad para la cual se suscribió el Contrato[52].

134. La adquisición de los bienes que Redes pretende entregar no se ha acreditado y la transferencia de propiedad no se ha perfeccionado. Según el Contrato, cuando la adquisición de la totalidad de los bienes necesarios para el funcionamiento de las redes no se ha logrado, Redes tiene que devolver a PRONATEL todos los desembolsos recibidos[53].

135. La liquidación del Contrato que pretende Redes es inaceptable porque el Contrato solo admite la entrega de la totalidad de los bienes, no una entrega parcial como la que propugna la Demandante[54]

136. No procede reconocer daños a Redes porque son consecuencia de su propio incumplimiento[55].

137. En el caso de que se le reconocieran daños a Redes deberían limitarse a los sobrecostos por la entrega tardía de unos bienes, quedando excluidos los daños que, en su caso, habría sufrido la subcontratista Quanta y no Redes. Tampoco se le podría reconocer a Redes lucro cesante porque la actividad de Redes solo arrojaba pérdidas[56].

---

[49]   Escrito de Alegatos Finales de las Demandadas, párrafo 2.

[50]   Escrito de Alegatos Finales de las Demandadas, párrafo 3.

[51]   Escrito de Alegatos Finales de las Demandadas, párrafos 4 y 5.

[52]   Escrito de Alegatos Finales de las Demandadas, párrafo 8.

[53]   Escrito de Alegatos Finales de las Demandadas, párrafo 8.

[54]   Escrito de Alegatos Finales de las Demandadas, párrafo 8.

[55]   Escrito de Alegatos Finales de las Demandadas, párrafo 8.

[56]   Escrito de Alegatos Finales de las Demandadas, párrafo 8.

### XI. DECISIÓN DEL TRIBUNAL ARBITRAL

#### A. Reclamaciones de Redes en la demanda principal

138. Para seguir un orden lógico en la resolución de las numerosas pretensiones planteadas por las Partes, muchas de ellas íntimamente vinculadas entre sí, es aconsejable seguir el orden de las peticiones de las Partes según la posición típica en una controversia, es decir, empezando por las formuladas por la Demandante, continuando con las de las Demandadas que constituyen la respuesta a las de la Demandante, y terminando por las que se plantean en la Reconvención, por ambas Partes.

139. La íntima relación entre las pretensiones formuladas obliga a una necesaria coherencia al resolver las de la demanda principal y la reconvencional. Los argumentos del Tribunal Arbitral se explicarán en detalle al referirnos a la Demanda, es decir, en la primera ocasión en que se aborde el problema, y se operará por remisión en las sucesivas partes del laudo [ el **Laudo**"] en que se tenga que volver sobre el mismo tema para evitar repeticiones innecesarias o alargar artificialmente el Laudo.

140. El primer bloque de pretensiones a las que vamos a atender está compuesto por: i) la primera y principal petición que formula la Demandante es que se declare que las Demandadas han resuelto el Contrato de manera indebida y, por tanto, que tal resolución es ineficaz; ii) vinculadas con ella están las peticiones segunda y tercera que giran sobre la declaración de determinados incumplimientos contractuales que Redes atribuye a PRONATEL, determinantes de que la resolución contractual opere por incumplimientos atribuibles a PRONATEL.

141. Para pronunciarnos sobre este punto es necesario partir del propio Contrato y de la causal invocada por las Demandadas para operar la discutida resolución.

142. El 2 de abril de 2019 PRONATEL comunica a Redes que está incumpliendo injustificadamente los plazos establecidos en el Cronograma Definitivo de Actividades de la Red de Acceso en el desarrollo de una serie de actividades: a) implementación de la red de acceso; b) instalación de los servicios en las Instituciones Abonadas; c) actividades de sensibilización y difusión; d) contratación de Pólizas de Seguros; e) instalación de los Centros de Atención a los Usuarios. Considera que el retraso injustificado alcanza los 217 días[57].

143. En la misma comunicación se invoca la causal establecida en el literal c) del numeral 19.2.1 del Contrato que establece:

> "*19.2.1. EL FITEL podrá resolver el CONTRATO DE FINANCIAMIENTO de pleno derecho por alguna de las siguientes causales:*
>
> *c) Por incumplimiento injustificado del CRONOGRAMA DEFINITIVO DE*

---

[57] Documento C-005, Oficio Nº 087-2019-MTC/24.

> *ACTIVIDADES DE LA RED DE ACCESO o del CRONOGRAMA DEFINITIVO DE LA RED DE TRANSPORTE; siempre que dicho incumplimiento evaluado por el FITEL conlleve a que no se cumplan con las actividades dentro del PERIODO DE INVERSION DE LA RED DE ACCESO[58] o dentro del PERIODO DE INVERSION DE LA RED DE TRANSPORTE a que se refiere las ESPECIFICACIONES TECNICAS.*"

144. En la propia comunicación se requería a Redes para que, en el plazo de 15 días calendario, "*satisfagan las prestaciones objeto de incumplimiento; bajo apercibimiento de resolver de pleno derecho el Contrato de Financiación "Instalación de Banda Ancha para la Conectividad Integral y Desarrollo Social de la Región Cajamarca", conforme a lo dispuesto por el artículo 1429 del Código Civil*".

145. El 23 de abril de 2019 PRONATEL remite un Oficio a Redes en el que, tras dejar constancia de que ha transcurrido el plazo otorgado sin que Redes haya revertido la situación de incumplimiento contractual imputada el 2 de abril anterior "*por medio de la presente le comunicamos que el Contrato de Financiamiento "Instalación de Banda Ancha para la Conectividad Integral y Desarrollo Social de la Región Cajamarca" suscrito el 28 de diciembre de 2015, ha quedado resuelto de pleno derecho desde el vencimiento del plazo otorgado*"[59].

146. Redes no aceptó la existencia de los incumplimientos contractuales que PRONATEL le atribuía. Su carta de 15 de abril de 2019[60], contestando al Oficio de PRONATEL de 2 de abril de 2019, deja constancia de ello. En esta comunicación se da respuesta detallada a todas las imputaciones de incumplimiento, negando su existencia, se indica que el requerimiento de PRONATEL contraviene los requisitos legales y contractuales de una comunicación que pretenda intimar la ejecución contractual bajo apercibimiento de resolución, por lo que es ineficaz a efectos de una eventual resolución contractual, y acusa a PRONATEL de ser quien se encuentra en situación de incumplimiento de sus obligaciones bajo el Contrato.

147. Interesan especialmente en esta carta las razones aducidas por Redes según las

---

[58]   La definición de la etapa de instalación, periodo de inversión de la red de transporte, periodo de inversión de la red de acceso y periodo de operación se encuentra en las cláusulas 2.15, 2.30, 2.29 y 2.31 del Contrato, respectivamente (Documento C-001). La etapa de instalación tenía una duración de 13 meses desde la Fecha de Cierre destinados a desplegar la infraestructura, equipamiento y demás elementos de las dos redes cumpliendo las disposiciones establecidas en las Especificaciones técnicas. El periodo de inversión de la Red de Transporte y de la Red de Acceso era de 15 meses desde la misma Fecha de Cierre y abarcaba las mismas actividades que la Etapa de instalación y la supervisión para dar conformidad a las instalaciones realizadas, contempladas en las Especificaciones técnicas de cada una de las redes. En ambos casos culminaban con sendas actas de conformidad de instalación y prueba de servicio de la red correspondiente. Por su parte, el periodo de operación es un tiempo de duración de 120 meses contados a partir del día siguiente de la culminación del periodo de inversión de la Red de Acceso, en el que el Contratado operará y mantendrá la Red de Acceso y se brindarán los servicios comerciales.

[59]   Documento C- 007, Oficio N° 0244-2019-MTC/24.

[60]   Documento C-006, Carta RAC-GG-0164-2019.

cuales Redes había pedido una ampliación de plazo máximo para la instalación de la Red de Acceso el 26 de junio de 2018[61] como consecuencia de "*causas ajenas a la responsabilidad de REDES ANDINAS DE COMUNICACIONES*" entre las que se encontraban las "*contingencias en la adquisición de terrenos*" que PRONATEL no había evaluado, porque el Oficio de 26 de julio de 2018 por el que PRONATEL rechazaba esa ampliación[62] lo hacía en base a que los hechos alegados no se podían calificar como caso fortuito o fuerza mayor, circunstancias no invocadas por Redes.

148. Ante esa situación Redes reiteró su pedido[63]. La falta de respuesta de PRONATEL se calificaba por Redes en su carta de 15 de abril de 2019 como un incumplimiento por PRONATEL de lo dispuesto en la cláusula 8.5 del Contrato que obliga a PRONATEL a pronunciarse por escrito sobre las materias previstas en el Contrato en los plazos establecidos en el mismo.

149. En su carta de 15 de abril de 2019 Redes terminaba señalando que "*el hecho de que la implementación de la red de acceso haya sufrido una demora como consecuencia de hechos no imputables a Redes Andinas, determina que no pueda considerarse que nuestra empresa se encuentra en situación de incumplimiento (cláusula 18 del Contrato de Financiamiento). Es PRONATEL quien se encuentra en incumplimiento del Contrato de Financiamiento*".

150. También resulta relevante la interpretación que Redes ofrece sobre la causal de resolución invocada de contrario (cláusula 19.2.1. c) del Contrato). Redes destaca que solo se puede resolver el Contrato si el incumplimiento aludido es "*injustificado*" y que tal situación no existe en este caso por las razones expuestas en el párrafo anterior.

151. Además, Redes, entre otros argumentos expuestos, denuncia la insuficiencia del plazo de quince días para cumplir con las obligaciones reclamadas por PRONATEL.

152. La oposición de Redes se reitera el 2 de mayo de 2019[64]: "*les comunicamos que rechazamos categóricamente la resolución del Contrato de Financiamiento que mantiene nuestra empresa con su representada en la medida que (i) Redes Andinas no se encuentra en situación de incumplimiento y (ii) el requerimiento efectuado mediante el Oficio N° 0087-2019-MTC/24 contraviene los requisitos legales y contractuales de una comunicación que pretende intimar la ejecución contractual bajo apercibimiento de resolución*". En esta misma carta se indica que redes iniciará "*un proceso arbitral para discutir la ineficaz resolución realizada por vuestra institución*".

153. Así las cosas, PRONATEL inició la ejecución de las Garantías de Fiel

---

[61]   Documento C- 041, Carta RAC N° 0271-2018.

[62]   Documento C- 037, Oficio N° 998-2018-MTC/24.

[63]   Documento C-069, Carta RAC-GG-342-2018.

[64]   Documento C-009, Carta RAC-GG-0193-2019.

Cumplimiento y Adelanto[65] y Redes, el procedimiento arbitral que ha dado origen al presente laudo.

154. Vayamos, pues, al análisis de los incumplimientos atribuidos por PRONATEL a Redes y de las razones esgrimidas por ésta en su descargo.

155. Como ya sabemos, lo que PRONATEL imputa a Redes es el incumplimiento injustificado del Cronograma Definitivo de Actividades de la Red de Acceso. Una primera precisión que conviene destacar es que PRONATEL no atribuye a Redes incumplimiento generador de resolución contractual en relación con la Red de Transporte.

156. En efecto, el Contrato[66] tenía por objeto la instalación de Banda Ancha en la Región Cajamarca, lo que suponía la implementación de dos redes de telecomunicaciones, una de fibra óptica conectada a la red nacional que debería llevar la señal a las capitales distritales (la Red de Transporte) y una inalámbrica que permitiera llevar la señal a las zonas rurales más alejadas (la Red de Acceso).

157. Redes inició el cumplimiento del Contrato y durante los años 2016, 2017 y 2018 se produjeron avances en diversas áreas. Es relevante que, en el curso de esos años, entre otros eventos significativos, se produjeron cuatro ampliaciones de los plazos del Contrato[67].

158. Redes invocó importantes dificultades para la adquisición de terrenos para la construcción de los nodos[68]. Aquí radica la problemática esencial sobre la que gira este arbitraje. Sobre este punto no hay controversia entre las Partes[69].

159. Las cuestiones que se han debatido y que van a ser objeto de análisis en este Laudo

---

[65] Sobre la ejecución de las Garantías volveremos al pronunciarnos sobre las pretensiones que se refieren a ellas.

[66] El Contrato se firmó el 28 de diciembre de 2018 tras un proceso de adjudicación que se extendió desde el mes de julio hasta el de diciembre de ese año, recogido en Documentos C-086, C-054 y C-104, que no es objeto de discrepancias.

[67] La primera ampliación es de 27 de octubre de 2016 (Documento C-028): la segunda, de 12 de abril de 2017 (Documento nº C-031); la tercera, de 15 de septiembre de 2017 (Documento nº C-033); y la cuarta, de 26 de enero de 2018 (Documento nº C-034).

[68] Además de la problemática específica de la adquisición de cada nodo, Redes ha incidido en la importancia de los "*cluster*". En la presentación utilizada por Redes para hacer sus alegaciones iniciales de la audiencia el 15 de noviembre de 2021, Redes dice que "*se denomina cluster a cada grupo de nodos correspondientes a la Red de Acceso que están **interconectados entre sí** a través de la señal inalámbrica. La Red de Acceso se encuentra diseñada por clusters. Debido a la correlación entre nodos que integran un cluster, una contingencia o retraso en la adquisición de un terreno determinado, 1. Impacta en la secuencia constructiva de ese nodo específico; y 2. Impacta la secuencia constructiva de todos los nodos que integran el mismo cluster del nodo impactado directamente*:". A continuación, ofrecía los ejemplos del Nodo Asunción y del Nodo Chirinos (páginas 30 a 32 de la presentación).

[69] Escrito de Alegatos Finales de la Demandante, párrafo 44, que remite a Secciones de diversos escritos de Redes: "*la problemática de la adquisición de terrenos afectó la ruta crítica del Proyecto Cajamarca*". Escrito de Alegatos Finales de las Demandadas, párrafo 1, aunque PRONATEL atribuye también negligencia a Redes en relación con otras materias relacionadas (párrafo 2).

son las siguientes:

(i) Si el conocimiento previo de estas dificultades por parte de Redes le impide invocarlo posteriormente.

(ii) Si Redes hizo lo posible para evitar estos problemas cumpliendo con el Plan de Sensibilización en la Región.

(iii) Si Redes tenía obligación de adquirir la propiedad de los terrenos.

(iv) Cuándo se produce la transmisión de la propiedad de bienes inmuebles en el Derecho peruano.

(v) Qué se entiende por saneamiento registral en el Derecho peruano.

(vi) Si los demás proyectos regionales similares sufrieron los mismos problemas.

(vii) Si PRONATEL era consciente de que estos problemas impedían a Redes cumplir con los plazos contractualmente acordados en la implementación de la Red de Acceso.

(viii) Si en los demás proyectos se concedieron ampliaciones de plazos a los contratados que no fueron concedidas a Redes en la ejecución de este Contrato.

(ix) Si Redes pidió una ampliación de plazo que le permitiera concluir sus trabajos.

(x) Si PRONATEL tenía que haber concedido esa ampliación.

(xi) Si la obtención del Certificado Ambiental afectó a la ejecución del Proyecto.

160. Empecemos por *la primera cuestión: si el conocimiento previo de estas dificultades por parte de Redes le impedía invocarlo posteriormente*.

161. Se trata de una materia que ha sido tratada abundantemente por las Demandadas[70]. Su planteamiento es que Redes conocía la compleja situación predial y la conflictividad social que existía en las zonas en las que se desplegaría el Proyecto porque en junio de 2014 la Secretaría Técnica de Fitel había desarrollado el Estudio de factibilidad del Proyecto y había informado de los "*Peligros comunes que pueden afectar la implementación de ambas redes*"[71]entre los que se encontraban los conflictos sociales permanentes en algunas  zonas de la región, los problemas judiciales con propiedades compradas para ubicar los nodos por no encontrarse debidamente registradas en el Registro de la Propiedad Inmueble de la Superintendencia Nacional de Registros Públicos, y los diferentes requisitos para la obtención de permisos y licencias municipales, además de los fenómenos

---

[70] Escrito de Alegatos Finales de las Demandadas, párrafos 268 y ss.

[71] Documento C-055 Estudio de preinversión a nivel de factibilidad, pág. 51.

climatológicos que se pueden presentar de forma inesperada.

162.   Redes no niega que conociera los datos disponibles antes del Contrato, pero recuerda que los riesgos asumidos tenían sus límites y que, por ello, el plazo de ejecución podría verse afectado por los supuestos de caso fortuito, fuerza mayor y hechos no imputables a Redes. En tales casos Redes tenía derecho a solicitar una ampliación de plazo. Redes invoca la cláusula decimoctava, incisos 1.2.4. y 4.5 del Contrato[72] y el artículo 1314 del Código Civil peruano[73] [el "**CC**"] para justificar la limitación de riesgos que se aplica en este caso. También se ampara en los informes periciales[74].

163.   Redes siempre ha invocado que los problemas relacionados con la adquisición de terrenos eran "*hechos no imputables*" a ella. Por tanto, es imprescindible determinar si esa declaración es correcta.

164.   Para ello, nada mejor que acudir a la documentación obrante en el procedimiento. La Demandante alega que "*todas las veces que Pronatel se pronunció respecto de la problemática de adquisición de terrenos -menos en la última solicitud- reconoció que no era imputable a Redes Andinas*"[75].

---

[72]   La cláusula 18.1.2.4 dice en sus dos primeros párrafos:

"*En caso el incumplimiento de las actividades a realizar durante el PERÍODO DE INVERSIÓN DE LA RED DE ACCESO se deba a un supuesto de caso fortuito o fuerza mayor, o hechos no imputables a EL CONTRATADO, éste deberá remitir al FITEL la documentación que acredite ello, como máximo dentro del mes siguiente de producido el hecho generador del incumplimiento. Además, a fin de poder evaluar el hecho, EL CONTRATADO deberá de comunicar la ocurrencia del hecho, así como proponer su estimado de días requeridos para el cumplimiento de dichas actividades, dentro de los primeros quince (15) días de ocurrido el hecho.*

*Sin dicha documentación, no será posible acreditar el caso fortuito y fuerza mayor, o hechos no imputables a EL CONTRATADO, en consecuencia, no se ampliará el plazo y se aplicarán las penalidades conforme a los numerales precedentes de la presente Cláusula del CONTRATO DE FINANCIAMIENTO, según corresponda.*"

La cláusula 18.4.5 tiene la siguiente redacción:

"*En caso el incumplimiento de las actividades a realizar durante el PERÍODO DE INVERSIÓN DE LA RED DE TRANSPORTE se deba a un supuesto de caso fortuito o fuerza mayor, o hechos no imputables a EL CONTRATADO, éste deberá remitir al FITEL la documentación que acredite ello, como máximo dentro del mes siguiente de producido el hecho generador del incumplimiento. Además, a fin de poder evaluar el hecho, EL CONTRATADO deberá de comunicar la ocurrencia del hecho, así como proponer su estimado de días requeridos para el cumplimiento de dichas actividades, dentro de los primeros quince (15) días de ocurrido el hecho.*

*Sin dicha documentación, no será posible acreditar el caso fortuito y fuerza mayor, o hechos no imputables a EL CONTRATADO, en consecuencia, no se ampliará el plazo y se aplicarán las penalidades conforme a los numerales precedentes de la presente Cláusula del CONTRATO DE FINANCIAMIENTO, según corresponda.*"

[73]   "*Quien actúa con la diligencia ordinaria requerida, no es imputable por la inejecución de la obligación o por su cumplimiento parcial, tardío o defectuoso*".

[74]   Contestación a la Reconvención, párrafos 185 a 201.

[75]   Escrito de Alegatos Finales de la Demandante, párrafo 49, en el que se remite a los documentos R-038, R-040, R-042 y R-044.

165. Los documentos a los que se remite la Demandante son los Informes del Área de Asesoría Legal de FITEL dirigidos al Secretario Técnico del propio FITEL. En ellos, se examinan las distintas ampliaciones de plazo solicitada por Redes en base a unas determinadas circunstancias entre las que se encuentran las contingencias que afectan la adquisición de terrenos. Los informes evalúan la procedencia legal de la solicitud de Redes para la ampliación y consiguiente modificación del contrato en ejecución en base a la cláusula 24. 3 del Contrato. La verificación realizada por el Área Legal de FITEL tras la previa comprobación del Área de Supervisión de Proyectos, concluye que "*se ha cumplido con el supuesto señalado en los numerales 18.1.2.4 y 18.4.5 del Contrato de Financiamiento en relación a la comunicación al FITEL de la ocurrencia y acreditación del hecho generador del incumplimiento*". Las cláusulas mencionadas se refieren precisamente a "*hechos no imputables a EL CONTRATADO*", que es la cuestión debatida.[76]

166. Estos documentos tienen indudable importancia en varios sentidos. El primero y más obvio es que la calificación procede del propio FITEL (hoy PRONATEL), el ente que, en el arbitraje que nos ocupa, niega el mismo tratamiento a ese tipo de contingencias.

167. El segundo es que los Informes proceden del Áreal Legal, pero vienen precedidos de Informes del Área de Supervisión, lo que significa que Fitel constató la existencia de esas contingencias a través de técnicos y que sus expertos jurídicos coincidieron en que se trataba de hechos no imputables a Redes.

168. El tercero es que se produjeron cuatro ampliaciones de plazo, de mayor o menor extensión, lo que significa que Fitel aceptó que había causa justificativa para modificar el Contrato. En definitiva, estamos ante verdaderos actos propios de Fitel que acreditan que, mientras no existió conflicto, aceptó tratar los problemas relacionados con la adquisición de terrenos como hechos no imputables a Redes.

169. Para poder justificar al Tribunal Arbitral que estamos ante contingencias distintas que justificaran tratamientos diferentes, las Demandadas tendrían que haberlo alegado y probado y no ha sido así ni en un sentido ni en otro.

170. De los documentos analizados resulta que, contractualmente, Redes no asumía todos los riesgos del Proyecto, sino que los que procedieran de hechos no imputables al Contratado le eximían de responsabilidad.

171. El precepto del CC invocado por la Demandante en su apoyo (artículo 1314º) también conduce a la conclusión de que Redes no tenía que asumir cualquier riesgo que no le fuera imputable por la circunstancia de que pudiera estar entre los previsibles. La clave es la diligencia con la que Redes actuó.

---

[76] En las citadas cláusulas también se menciona el caso fortuito y la fuerza mayor, pero el supuesto al que se remite el Informe es el de "*los hechos no imputables a EL CONTRATADO*", como resulta con claridad del texto y del hecho de que esas palabras son las que se subrayan en el texto del Informe referido (véase R-044, página 9).

C-0368-SPA

172. Las acusaciones de falta de diligencia formuladas por las Demandadas se centran en el cumplimiento del Plan de Sensibilización y en la innecesaridad de efectuar el saneamiento predial como requisito necesario para adquirir la propiedad[77].Vamos a referirnos a continuación a ambas materias.

173. La *segunda cuestión* es *si Redes hizo lo posible para evitar estos problemas cumpliendo con el Plan de Sensibilización en la Región*.

174. Las Demandadas han sostenido que los retrasos en la adquisición de terrenos tenían su origen en el incumplimiento de Redes de su obligación de ejecutar las actividades de sensibilización. El vínculo establecido por las Demandadas entre estos dos factores ha sido constante a lo largo del procedimiento[78] y se ha enfatizado notablemente.

175. Para evitar cualquier duda al respecto, el Tribunal Arbitral formuló una pregunta al respecto que fue abordada por las Partes en sus escritos de Alegatos Finales. La pregunta fue: "*¿Cuál era la finalidad de las actividades de sensibilización que debía realizar Redes Andinas? Explicación detallada de cuáles y cuántas se realizaron, cuándo y cuál fue el nivel de adecuación al fin perseguido*".

176. Las Partes, por tanto, tuvieron cumplida ocasión de hacer valer sus puntos de vista sobre esta cuestión. La posición de las Demandadas se resume de esta manera:

> "*Es importante comenzar indicando que la finalidad de las Actividades de Sensibilización estaba destinada a lograr un acceso pacífico, reduciendo el nivel de rechazo de los terrenos que eran parte de la ejecución de contrato, es decir, para lograr un adecuado plan de Adquisición de Terrenos. Es por ello que se plantea como una etapa necesariamente previa al acceso de los terrenos (site acquisition)*"[79].

177. La posición de las Demandadas se sustenta en ciertos documentos. El primero recoge los "*Lineamientos para la Ejecución de las Actividades de Sensibilización y Difusión*"[80]. En ellos aparece informar a la población sobre el proyecto, sus beneficios y "*desmitificar los peligros que usualmente acarrean la instalación de este tipo de tecnologías*"[81].

178. El segundo es la Propuesta Detallada del Programa de Construcción de

---

[77] Estos son los dos "*hechos comprobados*" que "*demuestran la negligencia con la que Redes Andinas acometió esta prestación*". Escrito de Alegatos Finales de las Demandadas, párrafo 2.

[78] Documento R-6 Contestación y Reconvención, párrafo 16; escrito de Alegatos Finales, párrafo 264 y ss; informes de BRG Construcción (Primer Informe, párrafo 8; Segundo Informe, párrafo 266); declaraciones del perito de BRG Construcción, Sr. Alva, (transcripción del día 4, páginas 826 a 829, entre otras; alegaciones de apertura de la audiencia (transcripción de la audiencia del Día 1 de la audiencia, página 192, líneas 9-20)

[79] Escrito de Alegatos Finales de las Demandadas, párrafo 135.

[80] Apéndice Nº 14 del Anexo Nº 8-B de las Bases.

[81] Escrito de Alegatos Finales de las Demandadas, párrafo 138.

Capacidades[82]. Las Demandadas señalan que tal documento "*recoge el entendimiento de la ejecución de estas actividades por parte de Redes como paso previo necesario para acceder a los terrenos*"[83]. En sus finalidades estaba "*Influir en el comportamiento*" de la sociedad para obtener su "*apoyo para el despliegue del proyecto*" y "*persuadir en los diferentes actores de la sociedad*" para vencer el "*rechazo natural al cambio*".

179. Finalmente, las Demandadas citan un documento elaborado por el perito de la Demandante, FTI Construcción[84] en el que la Lógica Constructiva de la Red de Acceso establece una secuencia en que la sensibilización precede a la ingeniería general del proyecto y al *site acquisition.*

180. Por su parte, la Demandante plantea sus argumentos sobre la base de tres ideas principales:

    (i)    la posición de las Demandadas sobre las actividades de sensibilización no tiene sustento en los documentos contemporáneos;

    (ii)    la finalidad de estas actividades no es la adquisición de terrenos, sino generar un mayor entendimiento de los pobladores respecto a los beneficios del proyecto, de tal manera que lo vean como algo importante y de beneficio para ellos; y

    (iii)    Redes fue más allá de sus obligaciones contractuales para obtener la aprobación de la población[85].

181. Es forzoso destacar una doble conclusión resultante de los documentos y de los interrogatorios del perito de BRG Construcción, Sr. Alva. La primera es que el mencionado perito, que cuestiona la correcta actuación de Redes, reconoció no haber tenido en cuenta los documentos elaborados por PRONATEL sobre esta cuestión[86].

182. Tales documentos ponen de manifiesto que PRONATEL no mostró discrepancia con las actividades realizadas por Redes.

183. El Oficio 1892-2017-MTC/24 de 14 de noviembre de 2017 es sumamente revelador[87]. En él se recoge el "*Resultado de la revisión a la entrega de actas correspondientes a las actividades de sensibilización y difusión del proyecto "Instalación de Banda Ancha para la Conectividad Integral y Desarrollo Social de la Región Cajamarca*". Se refiere a diecinueve entregas de actas y la subsanación

---

[82]    Carta RAC-GG-0053-2016, de 8 de marzo de 2016 (Documento R-084).

[83]    Escrito de Alegatos Finales de las Demandadas, párrafo 140.

[84]    Apéndice C del Informe de FTI PER C-2 Construcción, pág. 9.

[85]    Escrito de Alegatos Finales, párrafos 189 y ss.

[86]    Transcripción del Día 4 de la audiencia, página 969, líneas 20 y 22.

[87]    Documento C- 120.

de observaciones de las cuatro primeras entregas. Se da por aceptada la entrega de las actas correspondientes y se acompaña el resultado de la evaluación hecha por PRONATEL. En el Anexo 01 titulado "*Resultado de la evaluación de las actas entregadas*", se puede ver que todas las entregas (que incluyen un elevado número de actas -la que menos 5 y la que más 45, pero la mayoría están entre 30 y 40-) han sido revisadas y las observaciones son 0, por lo que el resultado final es "*conforme*".

184. No es posible concebir que PRONATEL revisara cientos de actas sin encontrar motivos de discrepancia en el momento en que las actividades se estaban realizando o se acababan de realizar y que, sin embargo, pensara que Redes estaba actuando incorrectamente.

185. PRONATEL tuvo cumplida información de lo que Redes estaba haciendo porque ésta le comunicó la empresa a la que contrató para realizar estas tareas (Idea Rural)[88]. Adicionalmente PRONATEL recibía informes mensuales de Redes[89], que tampoco consta que fueran objetados en relación con esta materia.

186. Aún más. Los documentos contractuales muestran que el programa de sensibilización tenía un ámbito limitado (vinculado a la Red de Acceso, no a la de Transporte pese a que en ambas había que realizar compra de terrenos y construcción[90]) y que Redes debía someter a PRONATEL el Programa de Construcción de Capacidades -que debía incluir la propuesta de actividades de sensibilización y difusión- que debía ser aprobado por PRONATEL para permitir su implementación[91]. Esa aprobación se produjo mediante un documento que acredita con detalle las diversas actividades que se tenían que realizar, las observaciones que hizo el PRONATEL a la propuesta inicial y la aprobación final de este organismo[92].

187. Respecto al contenido del plan de sensibilización, PRONATEL no ha demostrado que estuviera dirigido a facilitar la compra de terrenos. Por el contrario, Redes sí ha probado que los términos de la propuesta aceptada por PRONATEL se referían a dar a conocer los beneficios que la red de telecomunicaciones aportaría a la población de las localidades beneficiarias mediante el uso de internet. Todo ello resulta de los propios documentos citados por PRONATEL en su apoyo.

188. En el apéndice 14 del Anexo 8-B de las Bases[93] (Lineamientos de ejecución de las actividades de sensibilización y difusión) no se contiene la menor referencia a la compra de terrenos mientras que aparecen menciones a los beneficios que tendrán

---

[88]   Documento FTI-D-31. Informe Mensual de abril de 2016.

[89]   Documento FTI-D-31. Informes mensuales desde marzo de 2016.

[90]   Documento C-001, Contrato de Financiamiento, cláusula 7.1.

[91]   Documento C-063, Anexo 8-B de las Bases (Especificaciones técnicas de la Red de Acceso), cláusula 4.1.2.

[92]   Documento C-119, Oficio 1889-2016-MTC/24 de 14 de septiembre de 2016.

[93]   Documento C-063.

C-0368-SPA

para la comunidad los servicios que se van a instalar y la inexistencia de peligros de las radiaciones de las torres para el servicio, así como que no causarán daño al terreno usado, pero no se hace mención alguna a la adquisición de terrenos:

"*A través de la sensibilización y difusión se deberá informar sobre:*

*- EL PROYECTO ADJUDICADO*

*- Los servicios a brindar e instalar*

*- Los beneficios que tendrá la comunidad con el uso de estos*

*- Las entidades participantes (EL CONTRATADO Y FITEL)*

*- El no peligro de las radiaciones no ionizantes (RNI), relacionado a la implementación de las torres para el servicio y que estas no causarán daño al terreno usado*

*-Entre otros*".

189. Además, se habla de las distintas actividades a realizar (anuncios en radio y televisión, talleres) con el siguiente contenido de las charlas, seminarios o talleres, que tampoco incluye referencias a la adquisición de terrenos:

"*-En qué consiste la instalación y su duración*

*-Dónde se instalarán los equipos*

*-Para qué servirán los equipos*

*-Cómo se prestaré el servicio y quién será el responsable*

*-Cómo comunicarse con el CONTRATADO (número telefónico de central de atención de reclamos y correo electrónico) y en qué casos acudir a él*

*-Tarifas de los servicios*

*-La existencia de FITEL, cuáles son sus objetivos y mecanismos de atención, indicando quién financia el PROYECTO ADJUDICADO*

*-Aplicaciones prácticas de los servicios instalados en la localidad, de acuerdo a los intereses y actividades de los pobladores, capital social existente, entre otros*

*- Números de FITEL a fin de atender quejas y reclamos*

*-Otros que proponga FITEL como parte de la aprobación del plan de CONSTRUCCIÓN DE CAPACIDADES*".

190. Tampoco puede aceptarse la tesis de PRONATEL en el sentido de que estas actividades tenían que realizarse antes de la compra de los terrenos.

191. En el caso de los talleres en las localidades beneficiarias dirigidos a la población en general de cada localidad se dice que se realizarán "*durante el período de inversión de la red de acceso*", lo que supone que se puede hacer en paralelo con la fase de instalación que, necesariamente, es posterior a la compra de terrenos.

192. Redes añade que incluso fue más allá de lo que le era exigible porque realizó visitas que no estaban entre sus obligaciones. Es cierto que constan tales visitas[94]. Es más difícil concluir que esas visitas fueran una suerte de plus añadido por Redes a sus obligaciones contractuales porque parece razonable y conforme a la buena fe que la parte encargada de la sensibilización de la población en el sentido señalado, completara su actividad realizando los esfuerzos necesarios para obtener una actitud positiva de la población cuando aparecieron contingencias, que es la razón aducida por Redes para justificar esas visitas.

193. En conclusión, se debe afirmar que Redes no incumplió el Contrato en la realización de las tareas del Plan de sensibilización y que su trabajo en este ámbito no fue la causa determinante de los retrasos alegados por PRONATEL para terminar el Contrato.

194. Otro punto debatido de la máxima relevancia es <u>*la tercera cuestión: si Redes tenía obligación de adquirir la propiedad de los terrenos y*</u>, en caso afirmativo, <u>*la cuarta cuestión, cuándo se produce la transmisión de la propiedad de bienes inmuebles en el Derecho peruano*</u>.

195. No hay duda alguna de que Redes tenía obligación de comprar los terrenos[95] y tampoco hay discusión sobre el hecho de que precisamente la problemática derivada de las dificultades de adquisición de los terrenos es la que causó los retrasos en el Proyecto[96].

---

[94] Escrito C-6, Dúplica de la Reconvención, párrafo 130 y siguientes.

[95] La obligación contractual de adquirir la propiedad de los terrenos de la Red de Acceso, que es sobre la que gira, en esencia, este arbitraje, está recogida en la cláusula séptima, inciso 31 del Contrato cuando establece entre las obligaciones de Redes "*Transferir en propiedad a FITEL, LOS BIENES DE LA RED DE ACCESO de acuerdo a las condiciones establecidas en el presente contrato y en las ESPECIFICACIONES TÉCNICAS de la RED DE ACCESO contenidas en el Anexo Nº 8-B de las BASES*". PRONATEL también lo ha reconocido en su Oficio Nº 1452-2017/MTC/24 de 7 de agosto de 2017 (Documento C-065) en el que dice: "*Para el desarrollo del presente procedimiento, se ha tomado en cuenta el esquema de financiamiento utilizado desde las bases del contrato, el mismo que contempla que el CONTRATADO debe adquirir la propiedad de los bienes de acceso, para su posterior transferencia e inscripción en los registros públicos, a nombre de FITEL*".

[96] Párrafo 158 de este Laudo. Su nota a pie de página contiene detalles sobre este extremo. El PER C-2, Apéndice B, párrafo 118.2 señala, en relación con la Red de Transporte, que "*La ruta crítica recorre la totalidad de la actividad destinada a la adquisición de terrenos, encargada de la búsqueda, validación y compra de los terrenos en los que se construirán los nodos y el tendido de fibra óptica…*". Ese mismo documento, en el Apéndice C, párrafo 42, en referencia a la Red de Acceso, dice: "*La adquisición de terrenos es una actividad crítica dentro de la secuencia constructiva de cada cluster dado que, una vez adquiridos los terrenos, es posible (i) finalizar la ingeniería; (ii) comenzar las obras civiles de acuerdo con lo que se ha explicado en la sección 2.1.2 precedente*". Los informes de supervisión de PRONATEL que analizaron las peticiones de ampliación de plazos (C-038, C-039 y C-040) reconocen expresamente (copiamos a modo de ejemplo el texto del C-038, pero es casi idéntico en los demás casos señalados): "*Las casuísticas señaladas anteriormente impiden a REDES ANDINAS poder cumplir, dentro de los*

196. Una de las cuestiones que también ha resultado de la prueba practicada y sobre la que volveremos más adelante es si Redes hubiera tenido derecho a que se le diera el mismo trato que a otros contratados de PRONATEL a los que se les ampliaron los plazos de ejecución y se les suavizaron los requisitos de obtención de títulos sobre los terrenos[97].

197. Por lo que se refiere a la cuestión de cómo se adquiere la propiedad de los inmuebles en Derecho peruano, que es relevante para este procedimiento en la medida en que se debate sobre si Redes llegó a adquirir la propiedad de los inmuebles, el Tribunal ha examinado las tesis enfrentadas de las Partes al respecto.

198. La de la Demandante es que la transmisión de la propiedad se produce por el simple acuerdo de voluntades en virtud del artículo 949 del CC del Perú (tesis consensualista)[98].

199. La postura de las Demandadas es que hace falta que concurran dos requisitos: "*que exista un contrato y que la transmisión de la propiedad se perfeccione mediante la inscripción del derecho del adquirente en el registro público*"[99].

200. Del texto del Código Civil, la jurisprudencia y la doctrina peruana resulta una conclusión inequívoca: la transmisión de la propiedad se produce por la voluntad de las partes.

201. Empecemos por el derecho positivo. El artículo 949 del CC peruano dice:

> "*La sola obligación de enajenar un inmueble determinado hace al acreedor propietario de él, salvo disposición legal diferente o pacto en contrario*"[100].

202. PRONATEL admite que este artículo es aplicable y no ha alegado que concurra excepción legal a su aplicación. Por ello debemos centrarnos, exclusivamente, en su primer inciso. En un momento posterior nos referiremos al pretendido pacto de exclusión contenido en el Contrato según las Demandadas.

203. El artículo citado no incluye exigencia alguna de que se tenga que producir la

---

plazos actualmente vigentes, lo establecido en EL CONTRATO respecto a que el operador deberá tener la titularidad de los terrenos, donde se implementarán los nodos de la red de transporte y acceso. Dicha titularidad deberá ser transferida posteriormente a favor del Ministerio de Transportes y Comunicaciones, una vez culminado el periodo de inversión, en el caso de la RED DE TRANSPORTE, y culminado el periodo de operación, para el caso de la RED DE ACCESO".

[97] También aquí es importante destacar que PRONATEL igualmente reconoció en sus Informes de Supervisión (C-038, C-039, C-040) de 10 de abril de 2017, 13 de septiembre de 2017 y 26 de enero de 2018 que "*La problemática de la adquisición de terrenos para la construcción de los nodos de las redes de acceso y transporte, no solo afecta a PR-CAJAMARCA, sino también a todos los contratos de financiamiento de los proyectos de banda ancha, que a la fecha se encuentran en supervisión del Área de Supervisión de Proyectos*".

[98] Escrito de Alegatos Finales de la Demandante, párrafo 319.

[99] Escrito de Alegatos Finales de las Demandadas, párrafo 10.

[100] Documento C-050.

inscripción de la propiedad en el registro público como requisito constitutivo de la adquisición de la propiedad del inmueble sobre el que ha recaído el acuerdo de voluntades de las partes.

204. Los tribunales peruanos se han pronunciado sobre este precepto legal. Destacamos la sentencia de la Corte Suprema en Pleno Casatorio de 5 de noviembre de 2015[101].

205. Esta sentencia tiene la categoría de precedente judicial y vincula a los órganos jurisdiccionales de la República del Perú[102].

206. En esta sentencia se señala la aplicación del artículo 949 del CC por ser el que regula el sistema de transmisión de la propiedad inmueble y se declara:

> "*De acuerdo a esta norma, respecto a la propiedad en nuestro sistema jurídico se puede afirmar que ésta se adquiere por el solo consentimiento de las partes contratantes (adquirente y transferente), y no necesariamente se exige la entrega de posesión del bien, menos aún su inscripción en el Registro Público*".

207. Redes ha aportado numerosas sentencias dictadas en sede casacional, anteriores y posteriores a la de 5 de noviembre de 2015, que siguen el mismo criterio[103].

208. PRONATEL no ha presentado fallos judiciales que desvirtúen la doctrina jurisprudencial fijada por la tan citada sentencia.

209. La doctrina del título y el modo que invoca PRONATEL es bien conocida.  .

210. Las Demandadas sostienen que la función de modo la realiza la inscripción en el Registro Público.,

211. PRONATEL sostiene también que la perfección del contrato se produce con la inscripción en el Registro de la propiedad inmueble[104].

212. Todo lo expuesto supondría aceptar que el derecho peruano consagra la teoría del título y el modo, que la perfección del contrato es lo que produce la transmisión de la propiedad y que la inscripción registral es constitutiva de la transmisión del dominio.

213. En la exposición de las Demandadas se afirma que la inscripción registral configura el requisito del modo y que ello resulta de los artículos 1135º, 2014º, 2016º y 2022º del CC[105].

---

[101]  Documento C-811, Casación nº 3671-2014-LIMA.

[102]  C-049, artículo 400 del Código Procesal Civil de Perú.

[103]  Documentos C- 273 a C- 279.

[104]  Escrito de Alegatos Finales de las Demandadas, párrafos 17 a 37.

[105]  El artículo 1135 dice: "*Cuando el bien es inmueble y concurren diversos acreedores a quienes el mismo deudor se ha obligado a entregarlo, se prefiere al acreedor de buena fe cuyo título ha sido*

214. Este Tribunal Arbitral no puede coincidir con esa afirmación. Ninguno de los preceptos legales citados por PRONATEL recogen el requisito del modo ni configuran a la inscripción registral como tal. Lo que hacen es establecer mecanismos de protección del propietario registral que, en definitiva, operan como incentivos para la inscripción en el Registro, algo totalmente habitual en los sistemas en que la inscripción es voluntaria y tiene que aportar ventajas que consignan atraer a los propietarios al Registro.

215. Tampoco las citas doctrinales de las Demandadas sustentan su tesis. Las Demandadas citan a los profesores Gastón Fernández Cruz y Alfredo Bullard[106], figuras bien conocidas de la academia peruana.

216. Con independencia de que la opinión de un sector doctrinal, por respetable que sea, no podría dejar sin efecto la interpretación jurisprudencial ya analizada, no es menos cierto que las opiniones de los expertos a los que se remite PRONATEL encajan en el terreno de la legítima crítica a la *lege data* y en la formulación de propuestas que son igualmente válidas en términos de *lege ferenda*, pero no son fuente del Derecho.

217. En suma, concluimos que la transmisión de la propiedad de inmuebles en el Derecho peruano vigente se produce por el simple consentimiento. La inscripción registral mejora la protección del propietario, pero no es elemento constitutivo de la propiedad.

218. Veamos, pues, como *quinta cuestión, qué se entiende por saneamiento registral en el Derecho peruano*.

219. Empecemos por reiterar que las partes coinciden en que Redes asumió la obligación de adquirir los bienes inmuebles y de transmitirlos a PRONATEL[107].

---

primeramente inscrito o, en defecto de inscripción, al acreedor cuyo título sea de fecha anterior. Se prefiere, en este último caso, el título que conste de documento de fecha cierta más antigua"; el 2014 tiene esta redacción: "*El tercero que de buena fe adquiere a título oneroso algún derecho de persona que en el registro aparece con facultades para otorgarlo, mantiene su adquisición una vez inscrito su derecho, aunque después se anule, rescinda, cancele o resuelva el del otorgante por virtud de causas que no consten en los asientos registrales y los títulos archivados que lo sustenten. La buena fe del tercero se presume mientras no se pruebe que conocía la inexactitud del registro*"; el 2016 reza: "*La prioridad en el tiempo de la inscripción determina la preferencia de los derechos que otorga el registro*"; finalmente el 2022 establece: "*Para oponer derechos reales sobre inmuebles a quienes también tienen derechos reales sobre los mismos, es preciso que el derecho que se opone esté inscrito con anterioridad al de aquél a quien se opone. Si se trata de derechos de diferente naturaleza se aplican las disposiciones de derecho común*".

[106] Escrito de Alegatos Finales de las Demandadas, párrafo 25.

[107] Escrito de Alegatos Finales de la Demandante, párrafo 363: el numeral 3.1.6 del Anexo 8-A (Especificaciones Técnicas de la Red de Transporte) del Contrato de Financiamiento señala que Redes debe adquirir los terrenos durante el periodo de inversión de la Red de Transporte. Posteriormente tienen que ser transferidos en propiedad al MTC de acuerdo con la cláusula séptima, inciso 32, del Contrato. Concluido el periodo de inversión y cuando el MTC haya seleccionado al concesionario que vaya a operar esa Red de Transporte, Redes debe transferir a PRONATEL los inmuebles adquiridos con la

220. La diferencia fundamental entre los inmuebles de la Red de Transporte y los de la Red de Acceso es que los primeros deben transmitirse por Redes a PRONATEL al concluir el Período de Inversión mediante el Acta de Adjudicación correspondiente[108], mientras que los segundos se transmitirían mediante el Acta de Adjudicación que se tendría que firmar al cierre del Contrato de Financiamiento, que es tanto como decir, después de los diez años de operación de la Red de Acceso[109] por Redes.

221. El Contrato establece la obligación de Redes de acometer el saneamiento físico legal tanto para los bienes de la Red de Transporte como para los de la Red de Acceso[110].

222. El saneamiento físico legal es el conjunto de acciones que conducen a la regularización del predio mediante la correcta identificación de la finca (saneamiento físico) y la obtención de un título de propiedad que permita su acceso al registro predial (saneamiento legal). La inscripción es, por tanto, la manifestación última de que se ha conseguido el saneamiento.

223. El saneamiento es una obligación asumida por Redes, como ya sabemos. Por tanto, es lógico que la adquisición de la propiedad, aun siendo independiente de la obligación de saneamiento, y, por tanto, siendo posible que haya transmisión de la propiedad sin saneamiento, se haga con miras a evitar las contingencias que puedan frustrar el saneamiento.

224. No obstante, la primera y fundamental conclusión es que no se puede afirmar que Redes incumplió su obligación de compra de los terrenos porque no los inscribió en el Registro.

225. El saneamiento era una actividad posterior a la compra que tenía que hacerse en momentos diferentes según la red de que se hablara: antes de la entrega de los bienes al operador de la Red de Transporte[111] y antes de la entrega de la Red de Acceso al final de su fase de operación por Redes durante 10 años[112].

226. Ninguno de esos momentos se alcanzó: en el caso de la Red de Transporte,

---

suscripción del Acta de Adjudicación de los Bienes de la Red de Transporte, como dispone la cláusula decimosexta, inciso 1, del Contrato.

En el caso de la Red de Acceso, la obligación de adquirir los terrenos está recogida en la Sección V del Apéndice Nº 21 del Anexo B-8 (Especificaciones Técnicas de la Red de Acceso) del Contrato. La obligación de transmitir la propiedad está en la cláusula séptima, inciso 31, del Contrato. Esa transferencia debe realizarse al final del período de 10 años de operación de la Red de Acceso por parte de Redes, con la firma del Acta de Adjudicación de los Bienes de la Red de Acceso, como dispone la cláusula segunda, inciso 1, del Contrato.

[108] Documento C-001, Contrato de Financiamiento, cláusula séptima, inciso 32.

[109] Documento C-001, Contrato de Financiamiento, cláusula séptima, inciso 31.

[110] Documento C-001, Contrato de Financiamiento, cláusulas 7.33 y 7.38.

[111] Documento C-001, Contrato de Financiamiento, cláusula 7.33.

[112] Documento C-001, Contrato de Financiamiento, cláusula 7.38.

PRONATEL no llegó a designar operador y, en el caso de la Red de Acceso, nunca se llegó a iniciar siquiera la operación de esa red.

227. En todo caso, la condición establecida en el Contrato para que los terrenos puedan ser entregados a PRONATEL no es un pacto que, al amparo del artículo 949 del CC, impida la adquisición de la propiedad por Redes.

228. Por tanto, debe aceptarse que el listado de contratos suscritos por Redes para la adquisición de los terrenos en los que se instalaron los nodos[113] es un instrumento válido para la acreditación de la adquisición de los predios.

229. La no realización del saneamiento no supuso un incumplimiento contractual de Redes.

230. Como colofón del análisis realizado en relación con las cinco cuestiones mencionadas es conveniente referirse a la voluntad de entrega de los bienes que mostró Redes.

231. Constan las actuaciones de Redes tendentes a realizar la entrega de los bienes que eran de su propiedad. Redes remitió múltiples cartas de invitación a PRONATEL ofreciéndole la entrega de los bienes que ya eran de su propiedad[114].

232. En el final del año 2018, antes de la terminación del Contrato, Redes ya había ofrecido e iniciado la entrega de la Red de Transporte[115]que, si no culminó, fue debida a la falta de supervisión y pruebas que debía realizar PRONATEL.[116]

233. En los meses de mayo a agosto del año 2019, con el Contrato formalmente terminado por PRONATEL, las Partes se cruzaron correspondencia y mantuvieron conversaciones sobre la entrega, tanto de la Red de Transporte como de la Red de Acceso[117].

234. Entre octubre de 2019 y diciembre de 2020 Redes ofreció la entrega de los bienes comprendidos en el Primer Avance (Fase I) y en el Segundo Avance (Fase II), llevó a cabo las diligencias de entrega del Primer y Segundo Avance y remitió la información correspondiente a cada una de las diligencias de entrega realizadas y procedió a la entrega de bienes que estaban en almacén[118].

235. Alcanzado este estadio argumentativo, corresponde dar respuesta a las *cuestiones sexta, séptima y octava*:

---

[113] Documento C- 250.

[114] Documento C- 135.

[115] El Anexo FTI-D-023, citado en PER.C-2 se refiere al 28 de diciembre de 2018.

[116] Carta RAC-GG-206-2019, de 23 de mayo de 2019, Documento C-126.

[117] Documentos C-126, C-205, C-046, C-044, C-045, C-147.

[118] Documentos C-135, C-136, C-139 y C-146.

(i)  *si los demás proyectos regionales similares sufrieron los mismos problemas*;

(ii) *si PRONATEL* era *consciente de que estos problemas impedían a Redes cumplir con los plazos contractualmente acordados en la implementación de la Red de Acceso*;

(iii) *si en los* demás *proyectos se concedieron ampliaciones de plazos a los contratados que no fueron concedidas a Redes en la ejecución de este Contrato.*

236. No se ha suscitado controversia alguna sobre la identidad de los problemas aparecidos en otros proyectos regionales en el Perú[119]. La mejor prueba es el Decreto de Urgencia de 27 de diciembre de 2019[120] que "*aprueba disposiciones que facilitan la ejecución de los proyectos de redes e infraestructura de telecomunicaciones*".

237. En su Exposición de Motivos se cita a "*los 21 Proyectos de Instalación de Banda Ancha para la conectividad integral y desarrollo social en las regiones*" y se recuerda que "*los predios y bienes inmuebles sobre los cuales se instalarían los nodos de las redes deben ser adquiridos y saneados por los concesionarios y los contratados en los proyectos*".

238. A continuación, se describe la problemática que conocemos en los siguientes términos:

> "*Que existen zonas rurales en las que se desarrollan los proyectos donde la posesión es informal y precaria, lo cual estaría afectando, principalmente, la ejecución de los contratos de financiamiento correspondientes a los proyectos regionales, respecto de las obligaciones y riesgos de la adquisición y saneamiento de los predios y los bienes inmuebles sobre los cuales se desarrolla la infraestructura de telecomunicaciones.*
>
> *Que la problemática antes escrita en el marco de los contratos de financiamiento, podría dar lugar a la imposibilidad del Estado para recibir los predios y los bienes inmuebles que poseerían los contratados, al no estar debidamente adquiridos y saneados y consecuentemente, se produciría el retraso en la culminación de los proyectos, lo que pondría en grave riesgo la continuidad de los mismos y, por tanto, no se logre brindar los servicios de conectividad de Banda Ancha a nivel nacional, lo que implicaría contar con infraestructura financiada por el Estado sin ser utilizada, mantener bajos los niveles de conectividad de Banda Ancha y no atender la necesidad de la población respecto de esos servicios públicos de telecomunicaciones*".

239. Continúa diciendo que:

---

[119] Párrafo 196 de este Laudo y nota a pie de página 98.

[120] Documento C- 067.

"*Que, a fin de evitar esos perjuicios, resulta necesario contar con mecanismos que permitan la transferencia y recepción de los predios y los bienes inmuebles que comprenden los citados proyectos de redes e infraestructura de telecomunicaciones por parte del Estado, para que sobre ellos se puedan aplicar todos los procedimientos previstos en el Texto Único Ordenado del Decreto Legislativo Nº 1192, Ley Marco de Adquisición y Expropiación de Inmuebles, Transferencia de Inmuebles de Propiedad del Estado, Liberación de Interferencias y dicta otras medidas para la ejecución de obras de infraestructura, probado con Decreto Supremo Nº 011-2019-VIVIENDA, con la finalidad de dar continuidad a los proyectos regionales, y lograr el desarrollo y masificación de la Banda Ancha a nivel nacional*".

240. En función de la problemática descrita, decía el Decreto de Urgencia, "*se requiere habilitar legalmente al Ministerio de Transportes y Comunicaciones a realizar las acciones destinadas a la adquisición (bajo las diferentes modalidades o mecanismos previstos en la normativa vigente) y el saneamiento de predios y bienes inmuebles en los proyectos de redes e infraestructura contenidos en el presente Decreto de Urgencia*". Su artículo 1 "Objeto" destaca que "*El presente Decreto de Urgencia tiene por objeto estableces disposiciones que facilitan la ejecución de los proyectos de Redes e Infraestructura de Telecomunicaciones...*".

241. El Decreto de Urgencia se convirtió en un poderoso instrumento facilitador de la adquisición y el saneamiento de los terrenos del que se beneficiaron todos los proyectos regionales menos el de Cajamarca -que se examina en el presente arbitraje- y el de Tumbes-Piura -que es objeto del arbitraje CCI 24472/JPA-.

242. El Decreto de Urgencia se dictó después de la terminación del Contrato y ya no se le aplicó, al igual que ocurrió con el de Tumbes-Piura. Es llamativo que el Decreto de Urgencia se refiera en más de una ocasión a los 21 proyectos de Banda Ancha pero su ámbito de aplicación se limita a 19.

243. La similitud entre los contratos a los que se aplicó el Decreto de Urgencia y el que nos ocupa resulta tanto del tratamiento igualitario que esta norma da a todos los proyectos regionales como de la explicación del perito de FTI Construcción, Sr. Chaney,  sobre su conocimiento de estos contratos y su comparación con el de Cajamarca[121].

244. Redes, apoyándose en los informes periciales de FTI Construcción, ha desarrollado un amplio estudio de los proyectos regionales y los ha comparado con el de Cajamarca[122].

---

[121] Transcripción del Día 3 de audiencia, páginas 634, líneas 6 a 14; 636, líneas16 a 22; 637, líneas 1 a 8; 663, línea 1 a 667, línea 2 en las que el perito describe detalladamente otros proyectos regionales, los compara con el de Cajamarca y concluye, en base a datos muy concretos, la diferencia de trato otorgada por las autoridades al Proyecto Cajamarca respecto a otros proyectos regionales..

[122] Documento PER. C-5 Segundo Informe  de FTI Construcción. Es sumamente indicativo el cuadro que aparece en la página 77 de este documento, que fue utilizado como página 54 de la presentación de Redes en las alegaciones iniciales de la audiencia. En él se pueden ver las duraciones y alcances de los

245. Además, ha expuesto casos en los proyectos de Apurímac, Ayacucho, Cuzco y Lambayeque que manifiestan de forma palpable las diversas fórmulas utilizadas por las autoridades peruanas para solucionar los problemas surgidos en los terrenos necesarios para la construcción de los nodos[123].

246. El Tribunal Arbitral considera que la prueba aportada a la que nos acabamos de referir -muy singularmente el Segundo Informe de FTI Construcción- es suficiente para acreditar el diferente trato recibido por el proyecto Cajamarca en relación con los otros proyectos regionales sin que se haya ofrecido por PRONATEL una explicación plausible de ese diferente trato más allá de la fecha de entrada en vigor del Decreto de Urgencia[124].

247. Por tanto, la respuesta a la primera pregunta que nos formulamos es que los problemas que se presentaban en todos los proyectos regionales eran, básicamente, los mismos en cuanto a la adquisición y saneamiento de los terrenos.

248. A su vez, no hay duda de que la contestación a la tercera pregunta planteada es que PRONATEL concedió ampliaciones de plazo a otros contratados que no fueron admitidas en el caso de Redes.

249. Lo hasta aquí expuesto nos lleva a la única cuestión pendiente de contestar que es si PRONATEL era consciente de que estos problemas impedían a Redes cumplir los plazos contractualmente pactados.

250. Tampoco aquí caben dudas. Redes enviaba correos y cartas explicando las contingencias relacionadas con la adquisición de terrenos, que fueron analizados por PRONATEL en la fase de examen de las peticiones de ampliaciones de plazo[125].

251. En el procedimiento también se ha discutido si las solicitudes de ampliación de plazo de Redes estaban suficientemente documentadas y si contenían un examen de ruta crítica que permitiera a PRONATEL conocer el impacto de las contingencias en los plazos de ejecución de los proyectos.

252. Para entender la virtualidad de esta objeción es necesario conocer qué se entiende por "ruta crítica" de un proyecto. El Tribunal Arbitral preguntó a las Partes sobre la importancia de la ruta crítica en el Contrato.

---

Proyectos Regionales. De una simple lectura se observa que en los demás contratos firmados en 2015 el número de ampliaciones de plazos fueron mayores que en Cajamarca, como también lo fueron los meses adicionales, pese a que el número de localidades beneficiadas era mucho mayor en Cajamarca que en los demás proyectos.

[123] Escrito de Alegatos Finales de la Demandante, párrafos 166 a 184.

[124] Incluso en ese aspecto llama la atención la opinión del Ingeniero Gold Araoz que considera que el Decreto de Urgencia permitiría renegociar con Redes la aceptación de las instalaciones (Anexo BRG-R1-C-051).

[125] Nos remitimos al párrafo 164 de este Laudo y a su nota al pie de página que se remite a los documentos R-038, R-040, R-042 y R-044, así como a los demás párrafos de este Laudo concordantes con el señalado.

253. El perito de la Demandante, FTI Construcción, lo explicó en términos fácilmente comprensibles como la secuencia de actividades de trabajo que constituye la mayor duración del trabajo a través del Proyecto, es decir, si la ruta crítica se ve afectada, el proyecto se extiende en su duración.

254. En el seno del arbitraje no ha habido disputa sobre cuáles eran los hechos que afectaban a la ruta crítica. El perito de FTI Construcción, Sr. Chaney, fue muy explícito al declarar que los retrasos sufridos por redes que impactaron la ruta crítica del Proyecto "*se encuentran en la adquisición de terrenos*"[126].

255. El perito de las Demandadas, BGR Construcción, mantuvo la misma posición en su Primer Informe[127].

256. Lo que las Demandadas han objetado es que Redes no presentó análisis CPM[128] en sus peticiones de ampliación de plazos.

257. El primer dato que hay que considerar es que el Contrato no exige la aportación de este análisis, sino que se remita la documentación que acredite que el incumplimiento de actividades a realizar durante el período de inversión se debe a fuerza mayor, caso fortuito o hechos no imputables a Redes.[129]

258. En efecto, Redes solicitó cuatro ampliaciones de plazo que le fueron concedidas. Estas peticiones se fundamentaban en la cláusula 18.1.2.4 del Contrato de Financiamiento. En tres de ellas se hacía referencia a las contingencias que afectan a la adquisición de terrenos[130]. En ninguna de ellas se adujo por PRONATEL que la petición no se hubiera basado en un análisis CPM, lo que podemos considerar un verdadero acto propio de PRONATEL. Pero lo más destacable es que las ampliaciones de plazo concedidas por causas no imputables a Redes nunca incluyeron las contingencias legales de la adquisición de terrenos, que quedaron pendientes de cuantificación.

259. Es más, en la documentación se puede encontrar algún ejemplo en el que PRONATEL reconoció que la documentación enviada –que no incluía el análisis

---

[126] Transcripción del Día 3 de la audiencia, página 633, líneas 12 y ss.

[127] Primer Informe de BRG Construcción, capítulo XIV.

[128] *Critical Path Method*. Es una metodología que utiliza el software Primavera y proporciona una secuencia lógica a través del software. Lo que se utilizó fue el software Microsoft Project que identifica una ruta crítica básica en base a un cronograma, como indicó el Perito Chaney en su declaración (transcripción del Día 3 de la audiencia, página 791, líneas 21 y 22 y página 792, líneas 1-13). Las Partes coinciden en que la metodología "*as planned vs. as built por ventanas*" es la correcta, como aparece en la presentación de alegatos finales orales al final de la audiencia utilizada por la Demandante, pero la diferencia es que BRG utiliza los cronogramas utilizados en cada adenda como "*as built*'" mientras que FTI elabora el "*as built*" en base a documentación contemporánea (página 12).

[129] Documento C-001, cláusula 18.1.2.4.

[130] Documentos C-097 (7 de abril de 2017), C-098 (6 de septiembre de 2017) y C-099 (11 de enero de 2018).

CPM- cumplía con el Contrato[131] .

260. La conclusión lógica de lo expuesto es que PRONATEL era perfectamente consciente de las consecuencias de las contingencias vinculadas a la adquisición de terrenos que impedían la terminación de los trabajos en los plazos contractuales y no llegó a cuantificar su impacto en el Proyecto.

261. Esta conclusión se ve reforzada por el hecho de que en las tres solicitudes mencionadas se emitió un informe del Área de Supervisión de PRONATEL favorable a la ampliación de plazo por diferentes razones[132].

262. También las tres peticiones generaron el correspondiente informe del Área Legal de PRONATEL[133] que consideraba los hechos analizados como hechos no imputables a Redes.

263. Adicionalmente, PRONATEL estaba al tanto de que en todos los proyectos regionales se planteaban similares problemas con la adquisición de terrenos y, por tal razón, dictó el Decreto de Urgencia. Antes de ese Decreto de Urgencia PRONATEL había reconocido que, en ocasiones, no era posible comprar los terrenos y por ello "*El Área de Supervisión de Proyectos ha propuesto nuevas figuras para la adquisición de terrenos*[134]" y que "*el Área de Supervisión de Proyectos de FITEL, viene evaluando procedimientos alternativos para la solución de contingencias legales y sociales*[135].

264. En suma, solo se puede concluir que PRONATEL era perfectamente consciente de las dificultades que enfrentaba el Proyecto y su trascendencia en cuanto a la imposibilidad de cumplimiento de los plazos del Contrato y que, pese a ello, no quiso dispensar el mismo tratamiento a este Proyecto - y al de Tumbes Piura- que a los demás proyectos regionales.

265. Ahora corresponde el examen de las *cuestiones novena y décima*:

    (i)   *Si Redes pidió una ampliación de plazo que le permitiera concluir sus trabajos*;

    (ii)  *Si PRONATEL tenía que haber concedido esa ampliación*.

266. La disputa gira sobre la quinta ampliación de plazo, que se planteó el 26 de junio

---

[131] Documento C-038.

[132] Documentos C-038 (10 de abril de 2017), C-039 (13 de septiembre de 2017) y C-40 (6 de febrero de 2018).

[133] Documentos R- 040 (12 de abril de 2017), R-042 (15 de septiembre de 2017) y R-044 (26 de enero de 2018).

[134] Documento C- 038, página 10, Documento C-039.

[135] Documento C-040, página 13.

de 2018[136].

267. El 20 de julio de 2018 él Área de Asesoría Legal de PRONATEL[137] recomienda "*no otorgar la ampliación de plazo de la ETAPA DE INSTALACIÓN y del PERIODO DE INVERSIÓN de la RED DE ACCESO y de la RED DE TRANSPORTE del Proyecto Cajamarca solicitada por Redes Andinas*".

268. En el análisis realizado se puede observar que las problemáticas suscitadas se examinan, exclusivamente, a la luz de las figuras del caso fortuito y la fuerza mayor, para concluir que los hechos descritos no pueden ser calificados como tales. No se hace la menor mención a la opción de los hechos no imputables a Redes, también incluida en la Cláusula 18.1.2.4 del Contrato.

269. La postura de PRONATEL en el Informe aludido se ha mantenido en el arbitraje. PRONATEL considera que Redes solicitó la ampliación de plazo por razones de fuerza mayor.

270. La fuerza mayor aparece recogida en el artículo 1315 del CC, que dice:

"*Caso fortuito o fuerza mayor es la causa no imputable, consistente en un evento extraordinario, imprevisible e irresistible, que impide la ejecución de la obligación o determina su cumplimiento parcial, tardío o defectuoso*".

271. La jurisprudencia citada por PRONATEL[138] reitera la concurrencia de los tres requisitos de extraordinariedad, imprevisibilidad e irresistibilidad.

272. La tesis de la Demandante se basa en que su petición de ampliación de plazo de junio de 2018 no fue tratada adecuadamente por PRONATEL. La petición se basó en "*causas ajenas a la responsabilidad de REDES ANDINAS DE COMUNICACIONES*", no en la fuerza mayor.

273. El Informe del Área Legal de PRONATEL de 20 de julio de 2018 concluyó que la problemática que justificaba la solicitud de ampliación de plazo, incluidas las contingencias en la adquisición de terrenos, "*no puede ser calificada como caso fortuito o fuerza mayor*". Sin embargo, ese mismo Informe copiaba las cláusulas 18.1.2.4 y 18.4.5 del Contrato aplicables a la Red de Acceso y a la de Transporte, respectivamente, en las que se distingue entre "*el incumplimiento de las actividades a realizar durante el PERIODO DE INVERSIÓN DE LA RED DE ACCESO [TRANSPORTE] se deba a un supuesto de caso fortuito o fuerza mayor, o hechos no imputables a EL CONTRATADO*" (el subrayado es nuestro), lo que significa que el hecho no imputable es una categoría distinta al caso fortuito y a la fuerza mayor.

---

[136] Documento C-041.

[137] Documento C-042.

[138] Escrito de Alegaciones Finales de las Demandadas, párrafos 60 a 75.

274. El 2 de agosto de 2018[139] Redes envió una carta a PRONATEL en la que denunciaba que sus informes habían omitido toda referencia al supuesto de los hechos no imputables al contratado, amparado en el artículo 1314º del CC[140].

275. En esa carta se concluía pidiendo que PRONATEL reconsiderase su postura sobre la petición denegada, se formulaban peticiones específicas de ampliación de plazos y se recordaba que PRONATEL tenía pendiente la cuantificación del impacto de causales admitidas en informes anteriores en relación con la adquisición de terrenos en la ampliación solicitada.

276. Desde este momento PRONATEL no podía albergar duda de que las categorías jurídicas que empleaba no eran las que utilizaba Redes. PRONATEL tendría que haberse pronunciado sobre la concurrencia de hechos no imputables a Redes distintos al caso fortuito y la fuerza mayor.

277. El 10 de octubre de 2018 Redes reiteró su posición ante la ratificación de PRONATEL en su decisión de no otorgar la ampliación de plazo[141].

278. Redes intentó encontrar una solución desde el mes de septiembre de 2018 hasta marzo de 2019[142], sin que se produjeran resultados positivos. Al margen de la valoración que pueda hacerse de las posiciones de ambas partes durante esos meses, lo que es evidente es que Redes no cejó en su intento de encontrar un acuerdo y no renunció a sus derechos.

279. Por lo expuesto, debe concluirse que PRONATEL conocía perfectamente la problemática de la adquisición de los terrenos, su influencia en los plazos que Redes tenía que cumplir y las peticiones de Redes para ampliar esos plazos.

280. Dicho de otro modo, la postura de PRONATEL en el sentido de que Redes no fue proactiva en la presentación de peticiones de ampliación de plazo que hubieran dado a la propia PRONATEL ocasión de conceder nuevos plazos, no se sustenta en los hechos probados documentalmente.

281. La pregunta sobre si Redes pidió una ampliación de plazo que le permitiera concluir sus trabajos está ya parcialmente contestada.

282. No cabe duda de que Redes solicitó una nueva ampliación de plazos en junio de 2018. También es indubitado que esa petición fue rechazada en ese momento. Se volvió a rechazar cuando se pidió por Redes la reconsideración de la primera negativa de PRONATEL. Mas no cabe duda de que la discusión siguió abierta entre las partes hasta el momento en que se produjo la terminación del Contrato por

---

[139] Documento C-069.

[140] "*Quien actúa con la diligencia ordinaria requerida, no es imputable por la inejecución de la obligación o por su cumplimiento parcial, tardío o defectuoso*".

[141] Documento C-801.

[142] Documentos C-070 (carta de 19 de septiembre de 2018), C-072 (carta de 26 de diciembre de 2018), C-75 (acta de la reunión de 7 de marzo de 2019) y C-076 (acta de la reunión de 25 de marzo de 2019).

PRONATEL. En definitiva, aunque no hubo una nueva petición formal de Redes tras los rechazos por PRONATEL, no es menos cierto que Redes reiteró su posición y que las Partes mantuvieron abiertos sus cauces de comunicación para intercambiar posiciones. En definitiva, Redes mantuvo una actitud diligente en busca de una solución acordada y PRONATEL no puede alegar desconocimiento.

283. Llegados a este momento temporal, es forzoso hacer una referencia a la reunión de 2 de abril de 2019 sobre la que el Tribunal Arbitral preguntó expresamente a las Partes.

284. Las Demandadas sostienen que su confianza en Redes se quebró al recibir el informe de marzo de 2019 en el que los datos mostraban la pobreza del avance[143].

285. Redes da su explicación sobre una base muy diferente. A su juicio, el problema se produjo porque PRONATEL exigió una carta fianza para garantizar penalidades que no estaba prevista en el Contrato[144].

286. No es posible alcanzar una conclusión clara sobre lo ocurrido en esa reunión, pero hay algunos datos que son comprobables. Empezando por la tesis de las Demandadas, sorprende que PRONATEL pretenda no haber tenido conocimiento del estado de avance de las redes hasta el 29 de marzo de 2019 cuando lo cierto es que las Partes mantenían una comunicación constante y fluida sobre la petición de Redes de ampliación de plazos y la entrega de la Red de Transporte. Hay que concluir que los datos ofrecidos por Redes permitían calcular el impacto de las contingencias de la adquisición de terrenos.

287. Tampoco se pueden aceptar los datos de avance que PRONATEL menciona (26 % en la Red de Acceso) [145] porque no es un dato que resulte de la información facilitada por la carta de 29 de marzo de 2019[146].

288. En ella, y en lo que se refiere a la adquisición de terrenos, aparecen como predios adquiridos 578 de un total de 706 requeridos en la Red de Acceso y la totalidad de los requeridos en la Red de Transporte (117). Es cierto que los peritos de las Partes discrepan sobre el nivel de avance de las respectivas redes, pero lo que parece claro es que había un avance completo o muy cercano a ese punto en la Red de Transporte y uno menor, aunque no despreciable, en la Red de Acceso.

289. Por el contrario, sí consta que en la reunión de 25 de marzo de 2019 ya se había mencionado una posible nueva carta fianza y que esa opción no estaba en el Contrato, lo que hace probable que esta cuestión pudiera centrar la discusión de la reunión del 2 de abril.

---

[143] Escrito de Alegatos Finales de las Demandadas, párrafos 125 y ss.

[144] Escrito de Alegatos Finales de la Demandante, párrafos 139 y ss.

[145] Escrito de Alegatos finales de las Demandadas, párrafo 125.

[146] Documento R-069.

290. Sea como fuera, el Tribunal Arbitral está convencido de que había una petición de ampliación de plazo de Redes que estaba viva y que, por tanto, no había un obstáculo para PRONATEL consistente en no poder ampliar plazos por falta de petición de Redes. Si ése hubiera sido el problema y PRONATEL hubiera querido conceder la ampliación habría bastado con que le hubiera advertido a Redes de que hiciera una nueva petición.

291. El debate se centra en si PRONATEL debía haber concedido un nuevo plazo o hacer al Proyecto beneficiario de las ventajas que supondría pocos meses más tarde el Decreto de Urgencia o había razones para tratar de manera diferente al Proyecto

292. Ya hemos señalado la gran similitud entre las dificultades que enfrentaban todos los proyectos regionales y la igualdad de trato que recibieron todos esos proyectos menos los que tenían como contratado a Redes.

293. También hemos mencionado que el dato temporal de la aprobación del Decreto de Urgencia con posterioridad a la terminación del Contrato Cajamarca no puede ser el que justifique la diferencia de trato ya que la Exposición de Motivos de la norma citada se refiere a la coincidencia de los problemas de los proyectos regionales y la necesidad de solventarlos mediante nuevas medidas como la utilización del instituto de la expropiación.

294. Si en Cajamarca existían los mismos problemas y necesidades, hubiera sido esperable que se hubieran aplicado las mismas soluciones, lo que solo hubiera exigido que se demorara la terminación del Contrato para que siguiera vivo al dictarse el Decreto de Urgencia.

295. No debemos olvidar que tanto la terminación del Contrato como la aprobación de la norma estaban en manos de las autoridades peruanas que podían haber acompasado ambas decisiones, si lo hubieran querido, para incluir a Cajamarca entre los proyectos regionales beneficiados por el Decreto de Urgencia.

296. Frente a lo expuesto, PRONATEL no ha ofrecido una explicación de la desigualdad de trato suficientemente convincente a la luz de las pruebas aportadas al procedimiento. La existencia de un Decreto de Urgencia que incluye a todos los proyectos regionales y les aplica las mismas reglas, salvo a Cajamarca y a Tumbes-Piura, demuestra que las propias autoridades peruanas consideraban que los proyectos tenían importantes elementos en común que ameritaban un trato igualitario. No haber dispensado el mismo trato a un proyecto, que, además, es de mayor complejidad, como ocurre con Cajamarca, tendría que haberse justificado en sólidas razones que deberían haberse explicado convincentemente en el procedimiento, lo que no ha ocurrido.

297. Otro tema planteado por PRONATEL es que las Adendas del Contrato son irrevisables en el sentido de que "*todos los eventos que pudieron haber afectado el plazo, que fueron invocados por Redes Andinas en respectiva solicitud y cuyo impacto fue remediado mediante la extensión de plazo concedida en dichas*

*adendas, están zanjados contractualmente*"[147].

298. No obstante, "*Pronatel no pretende sostener que aquel evento que, habiendo sido invocado por Redes Andinas en sus solicitudes pero que no fue estimado (ni desestimado) en la respectiva adenda, caiga dentro de la categoría de lo irrevisable. Nos referimos concretamente a la contingencia legal en la adquisición de terrenos, evento cuyo impacto quedó pendiente de pronunciamiento para la segunda solicitud de extensión de plazo por Pronatel y que Redes Andinas presentó para el Proyecto Cajamarca y que volvió a invocar en la tercera y cuarta solicitudes*"[148].

299. Por su parte, Redes especifica que su intención es "*acreditar que: i) existieron demoras no atribuibles a Redes Andinas reconocidas por Pronatel: ii) estas demoras no fueron cuantificadas por Pronatel; y iii) de haber cuantificado estas demoras, debió haber concedido ampliaciones de plazo mayores*"[149], pero que "*estas Adendas, como documentos contractuales bilaterales que reflejan acuerdos, no son revisables unilateralmente. Sin embargo, todos y cada uno de los aspectos que no fueron abordados en tales acuerdos seguirían estando pendientes de resolver entre las partes*"[150].

300. No hay, por tanto, discusión sobre la irrevisibilidad de las Adendas.

301. El debate gira sobre si PRONATEL incumplió el Contrato al no conceder las ampliaciones solicitadas en aquellos aspectos que quedaron pendientes de cuantificar sin llegar nunca a hacerlo[151].

302. Redes defiende que nunca renunció a reclamar su derecho a un plazo adicional por el impacto de las contingencias que no le fueron imputables y que tenían su origen en la adquisición de terrenos[152].

303. El Tribunal Arbitral considera que la posición de Redes es correcta porque no obra en el expediente arbitral ningún documento en el que Redes renunciara a tal derecho, siendo así que para que la renuncia de derechos de este Contrato tenga validez debe hacerse por escrito y con notificación a la otra parte[153].

---

[147] Escrito de Alegatos Finales de las Demandadas, párrafo 76.

[148] Escrito de Alegatos Finales de las Demandadas, párrafo 83.

[149] Escrito de Alegatos Finales de la Demandante, párrafo 226.

[150] Escrito de Alegatos Finales de la Demandante, párrafo 229.

[151] Escrito de Alegatos Finales de la Demandante, párrafos 234 y 237.

[152] Escrito de Alegatos Finales de la Demandante, párrafo 241.

[153] Documento C-001, cláusula 24.2: "*Renuncia de Derechos. La renuncia de cualquiera de las PARTES a uno o más de los derechos que le correspondan conforme al CONTRATO DE FINANCIAMIENTO solo tendrá efecto si ésta se realiza por escrito y con la debida notificación a la otra PARTE. Si en cualquier momento una de las PARTES renuncia o deja de ejercer un derecho específico consignado en el CONTRATO DE FINANCIAMIENTO, dicha conducta no podrá ser considerada por la otra*

304. La trascendencia de este tema es que PRONATEL no llegó a cuantificar las ampliaciones de plazo que procedieran en virtud de las contingencias legales en las sucesivas ampliaciones de plazo que Redes planteó. Este es un incumplimiento contractual atribuible a PRONATEL porque el Contrato establece la posibilidad de las ampliaciones de plazo[154] y, para que ello sea posible, PRONATEL tenía que examinar las solicitudes que se le formularan en ese sentido

305. El segundo incumplimiento contractual que pesa sobre PRONATEL es no haber aceptado la última ampliación de plazo solicitada por Redes y que, en vista de los precedentes de las ampliaciones de plazo concedida en este Proyecto y de los propios actos de PRONATEL consistentes en aceptar que había problemas legales en la adquisición de terrenos y que eran coincidentes con los presentados en otros proyectos regionales, era procedente.

306. Además, la Resolución es errónea porque si PRONATEL hubiera examinado la última petición de ampliación de plazo de Redes como un caso de hechos no imputables a Redes y no como un supuesto de fuerza mayor, habría tenido que concluir que estaba justificada la causal de ampliación de plazo y se hubiera evitado toda la fase de desencuentro que desembocó en la improcedente terminación del Contrato por PRONATEL[155].

307. El corolario de todo lo expuesto hasta ahora es que la causal de incumplimiento invocada por PRONATEL para justificar la terminación del Contrato no es aplicable y, por ello, debe concluirse que la terminación no se ajusta a Derecho.

308. Por el contrario, es PRONATEL quien incumplió el Contrato.

309. La única *cuestión* que resta por examinar es la *undécima*: *si la obtención del Certificado Ambiental afectó a la ejecución del Proyecto.*

310. Esta materia ha dado lugar a posturas enfrentadas de las Partes que el Tribunal Arbitral intentó clarificar mediante la pregunta que les fue formulada: ¿qué permisos ambientales debía obtener cada parte contractual?

---

PARTE *como una renuncia permanente para hacer valer el mismo derecho o cualquier otro que le corresponda conforme al CONTRATO DE FINANCIAMIENTO*".

[154] El incumplimiento de PRONATEL deriva de no haber cumplido con las cláusulas 18.1.2.4. y 18.4.5 ya recogidas en el párrafo 162 de este Laudo, pie de página 73. También hay que tener en cuenta las cláusulas 6.2 ("*El PERIODO DE INVERSIÓN DE LA RED DE ACCESO y EL PERIODO DE INVERSIÓN DE LA RED DE TRANSPORTE serán como máximo de quince (15) meses cada una, contados desde la FECHA DE CIERRE. Sin embargo, podrá ser prorrogado previa aprobación de FITEL y formalizado mediante adenda al presente CONTRATO DE FINANCIAMIENTO*") y 6.4 ("*El plazo de vigencia del CONTRATO DE FINANCIAMIENTO podrá ser ampliado siempre que se justifique debidamente y en aras del cumplimiento del objeto señalado en la cláusula quinta del presente contrato, mediante adenda suscrita por el FITEL y EL CONTRATADO*").

[155] En los párrafos 140 a 336 de este Laudo se recogen los razonamientos que han llevado al Tribunal Arbitral a concluir que la terminación del Contrato por PRONATEL en base a supuestos incumplimientos de Redes no se ajustan a Derecho y que, por el contrario, es PRONATEL quien ha incumplido el Contrato.

311. La Demandante contestó a ella de manera extensa en el escrito de Alegatos Finales[156].

312. Las Demandadas también ofrecieron una amplia explicación de su postura en su escrito de Alegatos Finales[157].

313. La primera cuestión a aclarar son los diferentes permisos medioambientales que son preceptivos en una obra como la que supone el Proyecto Cajamarca.

314. Uno de ellos es el Certificado de Compatibilidad y otro es la Certificación Ambiental.

315. El documento clave es la Certificación Ambiental[158] que se puede definir como la aprobación gubernamental del Instrumento de Gestión Ambiental[159].

316. Ambas Partes coinciden en que, además, cuando la implementación de nuevos proyectos de inversión se efectúe sobre Áreas Naturales Protegidas, hay que solicitar al Servicio Nacional de Áreas Naturales Protegidas por el Estado [el "**SERNANP**"] la emisión de un Certificado de Compatibilidad, que es una opinión técnica vinculante de este ente sobre si la infraestructura es compatible con el nivel de protección de la zona específica del área natural en la que va a ser instalada.

317. Una primera disputa al efecto es si Redes tenía que conseguir el Certificado de Compatibilidad o éste ya se había conseguido por el PRONATEL.

318. El Contrato es muy claro al establecer que el Contratado asume la obligación de gestionar, obtener y mantener vigentes todas las autorizaciones que sean necesarias para el despliegue de la infraestructura[160].

319. Realmente Redes no disputa su obligación de obtener esta certificación, sino que afirma que un documento en base al que se llevó a cabo la licitación, el Estudio de Preinversión a Nivel Factibilidad, hacía referencia al Proyecto en su conjunto, lo

---

[156] Escrito de Alegatos Finales de la Demandante, párrafos 62 a 89 en los que se explica que Redes debía obtener la DIA, que actuó diligentemente en su tramitación pero que el retraso en la obtención obedeció a causas atribuibles a las Demandadas y que, en todo caso, ese retraso no fue la causa de la demora en el Proyecto.

[157] Escrito de Alegatos Finales de las Demandadas, párrafos 184 a 202 en los que señalan que Redes tenía que obtener todos los permisos necesarios para construir el Proyecto: el Certificado de Compatibilidad del SERNANP y la posterior Certificación Ambiental.

[158] La terminología es de las Demandadas, Escrito de Alegaciones Finales de las Demandadas, párrafo 185. En la Dúplica de la Demanda las Demandadas explican en detalle las distintas modalidades de la Certificación Ambiental (párrafo 244 y siguientes). La categoría que correspondía en este caso es la más simple, la Declaración de Impacto Ambiental ["**DIA**"]. A la DIA se refiere también la Demandante en el párrafo 66 del Escrito de Alegatos Finales.

[159] Escrito de Alegatos Finales de las Demandadas, párrafo 185, y Escrito de Alegatos Finales de la Demandante, párrafo 71.

[160] Cláusula 7.12 del Contrato.

que le llevó a pensar que se había obtenido la compatibilidad para las dos redes[161].

320. Las Demandadas han explicado que lo que se había obtenido por las autoridades peruanas era la compatibilidad parcial para la Red de Transporte, cuya ubicación ya estaba definida, pero que no se podía obtener para la Red de Acceso porque no se conocía la ubicación de los nodos[162].

321. En cualquier caso, parece claro que Redes asumió erróneamente la existencia de una compatibilidad parcialmente inexistente y que era de su responsabilidad obtener, por lo que la inexistencia de la compatibilidad es de responsabilidad de Redes.

322. La segunda cuestión es si la obtención de los permisos ambientales por Redes se vio perjudicada por causas atribuibles a las Demandadas, cuestión que suscita la Demandante.[163]

323. Sobre esta materia la base documental más segura para llegar a una conclusión objetiva nos la proporcionan los documentos de PRONATEL que evaluaron las peticiones de ampliación de plazo planteadas por Redes por diferentes causas entre las que se encontraban los retrasos en obtener los permisos medioambientales.

324. En tales documentos[164] se comprueba que los distintos servicios de PRONATEL, incluida el Área Legal, consideraron que el proceso de obtención de la Certificación Ambiental se había demorado en exceso pese a que "*Redes Andinas ha actuado oportunamente coordinando con DGASA y SERNANP*[165]".

325. Es contradictorio que en documentos contemporáneos del retraso PRONATEL no reprochara a Redes demoras en su actuación, sino que valorara que la actuación de las Administraciones hubiera "*dilatado el proceso de obtención de la certificación ambiental considerablemente*"[166], con que, en un momento posterior, en el curso del arbitraje, se quiera atribuir toda la responsabilidad de las demoras a Redes.

326. En todo caso el dato irrefutable es que las valoraciones anteriormente mencionadas concluyeron con la concesión de ampliaciones de plazo a Redes por este motivo, entre otros[167].

327. La última discusión, más allá de a quién debe atribuirse el retraso en la Certificación

---

[161] Escrito de Alegatos Finales de la Demandante, párrafo 75 (i).

[162] Dúplica de la Demanda, párrafos 200 a 203.

[163] Escrito de Alegatos Finales de la Demandante, párrafo 64.

[164] C-038, C-039, R-038, R-040 y R-042.

[165] Documentos C-038, de 10 de abril de 2017, y C-039, de 13 de septiembre de 2017.

[166] Documentos C-038, de 10 de abril de 2017, y C-039, de 13 de septiembre de 2017.

[167] PER. C-5, en su tabla 7 y en el párrafo 177, establece que, de los 805 días transcurridos para la Certificación Ambiental, 524 se debieron a demoras no atribuibles a Redes y que BRG no consideró parte de la información, lo que es cierto, y ese dato influye en la credibilidad de su informe.

Ambiental, es si esta demora afectó a la ruta crítica del Proyecto.

328. La postura de la Demandante es muy clara:

"*La ruta crítica siempre pasó por la problemática en la adquisición de terrenos. Así lo ha demostrado FTI al realizar el análisis real del Proyecto Cajamarca. En otras palabras, aun si la certificación ambiental se hubiese obtenido sin demora, Redes Andinas no habría podido adquirir los terrenos y la demora en la ejecución del Proyecto Cajamarca sería la misma[168]*".

329. Su perito, FTI Construcción, considera que la ruta crítica no se vio afectada por la obtención de la DIA[169].

330. Por el contrario, el perito de Las Demandadas, BRG Construcción, sostiene que hay una cierta afectación de la ruta crítica por el retraso en obtener la DIA[170].

331. No hay una prueba suficiente como para acreditar la afectación de la ruta crítica.

332. Las razones técnicas aducidas por BRG Construcción no parecen suficientemente convincentes tras la lectura de la opinión de FTI Construcción[171], pero, adicionalmente, no podrían ser imputable a Redes por las razones ya expuestas.

333. Aún más, existe una disputa sobre el plazo que tendrían las autoridades administrativas para resolver. Redes considera que las normas del Código Procesal Civil son de aplicación supletoria a los procedimientos administrativos[172] y que esta disposición supondría que todo retraso superior a dos días sería imputable a las autoridades y no a Redes[173].

334. Las Demandadas no han contradicho estas afirmaciones.

335. En cualquier caso, la suma de factores mencionados impide afirmar que la demora en obtener la Certificación Ambiental haya podido afectar a la ruta crítica y, en caso de haberlo hecho, que fuera imputable a Redes.

336. Por todo lo expuesto, los petitorios 1, 2 y 3 de la Demandante deben ser estimados, si bien algunas de las razones por las que la conducta de las Demandadas puede considerarse incumplidora (ejecución de las Garantías, la inaceptación de la entrega de los bienes) serán analizadas juntamente con otras pretensiones que se refieren directamente a estas materias. En todo caso, la imposibilidad de continuar

---

[168] Escrito de Alegatos Finales de la Demandante, párrafo 81.

[169] PER.C-5, párrafo 59.

[170] Primer Informe de BRG Construcción y Segundo Informe de BRG Construcción.

[171] Véanse el Segundo Informe de FTI Construcción , párrafos 56 a 59 y la completa explicación contenida en los párrafos  114 a 180 y el Tercer Informe de FTI Construcción (PER.C-9), párrafos 99 a 101.

[172] Disposición Final Primera del Código Procesal Civil [el "**CPC**"], R-049.

[173] Escrito de Alegatos Finales de la Demandante, párrafos 85 a 89.

ejecutando las prestaciones a cargo de Redes, como consecuencia de los incumplimientos previos a la Resolución, en particular, la no ampliación de los plazos necesarios para que Redes pudiera completar el Proyecto[174],y a la propia Resolución operada por las Demandadas, hace que el Contrato haya quedado resuelto de pleno derecho[175] y que Redes tenga derecho a la contraprestación correspondiente y a exigir los daños y perjuicios causados por la Resolución.

337. **El segundo bloque de peticiones de Redes versa sobre la Garantía de Fiel Cumplimiento (petitorio principal nº 4 y petitorios accesorios a éste).**

338. La Demandante sostiene que la Garantía de Fiel Cumplimiento [la "**GFC**"] fue ejecutada indebidamente por las Demandadas[176] y que, por tanto, el monto obtenido en la ejecución[177] debe ser íntegramente devuelto a Redes.

339. La razón en la que Redes funda que la ejecución fue indebida es que PRONATEL no cumplió con el procedimiento previo exigible contractualmente para la

---

[174] Los párrafos 140 a 336 de este Laudo explican en detalle el proceso argumental seguido por el Tribunal Arbitral para alcanzar sus conclusiones en materia de cumplimiento o incumplimiento contractual por Redes y las Demandadas, salvo en las cuestiones que se tratan en los párrafos 337 y siguientes.

[175] Los artículos del CC que regulan esta materia son los 1155 y el 1432. El primero de ellos dice: "*Si la prestación resulta imposible por culpa del acreedor, la obligación del deudor queda resuelta, pero éste conserva el derecho a la contraprestación, si la hubiere. Igual regla se aplica cuando el cumplimiento de la obligación depende de una prestación previa del acreedor y, al presentarse la imposibilidad, éste hubiera sido constituido en mora. Si el deudor obtiene algún beneficio con la resolución de la obligación, su valor reduce la contraprestación a cargo del acreedor*". Por su parte, el artículo 1432 dispone: "*Si la prestación resulta imposible por culpa del deudor, el contrato queda resuelto de pleno derecho y éste no puede exigir la contraprestación y está sujeto a la indemnización de daños y perjuicios. Cuando la imposibilidad sea imputable al acreedor, el contrato queda resuelto de pleno derecho. Sin embargo, dicho acreedor deberá satisfacer la contraprestación, correspondiéndole los derechos y acciones que hubieren quedado relativos a la prestación*".

[176] En relación con la GFC y con la GA la Demandante plantea pretensiones que afectan a las dos Demandadas sin que se explique en detalle cuál es el rol de cada una de ellas en relación con las mencionadas Garantías. Ya ocurrió así en sede cautelar en la que se solicitó que las medidas cautelares propuestas afectaran a las dos Demandadas. Las Demandadas no se opusieron objeción en relación con esta cuestión en esa fase. Además, la Solicitud cautelar formulada por las Demandadas también pedía medidas cautelares contra la Demandante y a favor de ambas entidades demandadas. La OP 3 adoptó medidas cautelares que afectaban a ambas Demandadas sin que fuera objetada. En el curso del procedimiento las referencias a PRONATEL y MTC son continuas y en ellas no se hace especial distinción en cuanto al papel que juegan una u otra, lo que lleva a la conclusión de que las Demandadas no cuestionan que ambas asumen obligaciones conjuntas en relación con el Contrato, su ejecución, resolución y efectos de ella. Parece lógico que así sea en la medida que el Decreto Supremo No. 018-2018-MTC publicado en el Diario Oficial "El Peruano" aprobó la fusión por absorción del FITEL con el MTC como entidad absorbente y estableció que corresponde al MTC la administración de lo que era el FITEL, para lo que creó el PRONATEL en el ámbito del MTC y dependiente del Viceministerio de Comunicaciones, como se explica en la Solicitud de arbitraje de 15 de mayo de 2019. Así pues, el FITEL, organismo que firmó el Contrato, se integró por fusión en el MTC, pero éste ha actuado continuamente a través de PRONATEL en la relación con la Demandante, como demuestra la carta de terminación del Contrato en la que aparece PRONATEL. Este dato es relevante a la hora de la decisión sobre las pretensiones, en particular las de condena formuladas por la Demandante en términos de solidaridad, porque es un hecho no controvertido la actuación conjunta de las dos Demandadas que han admitido su responsabilidad solidaria frente a la Demandante.

[177] US$ 14´960,000.00 (Cláusulas 15.1 y 15.5 del Contrato, Documento C-001)

ejecución.

340. Redes sostiene que solo hay dos ocasiones en las que se puede ejecutar esta garantía: cuando procede el cobro de penalidades (clausula 18.11. 2 del Contrato) y cuando se produce la resolución del contrato por las causas de la cláusula 19.2.1 salvo la letra m (cláusula 19.2.2 del Contrato)[178].

341. No hay controversia sobre el modo en que fue ejecutada la GFC[179]. PRONATEL la ejecutó sin seguir procedimiento alguno porque, a su juicio, "*la resolución del Contrato por incumplimiento del Contratado faculta a Pronatel a ejecutar la Garantía de Fiel Cumplimiento de forma inmediata y sin recurrir a procedimiento adicional alguno*"[180].

342. Dejando al margen las distintas interpretaciones sobre la cláusula 18.11.2 sobre las penalidades puesto que no es ésta la cláusula habilitante invocada por PRONATEL, nos centraremos en la previsión de la estipulación 19.2.2 del Contrato.

343. No hay duda de que los casos de resolución contenidos en la cláusula 19.2.1 del Contrato, entre los que se cuenta la causa utilizada por PRONATEL para proceder a la resolución – la contenida en su letra c)- [181], facultan a PRONATEL para ejecutar la GFC.

344. El problema se plantea al analizar si esa ejecución debiera haber venido precedida de un procedimiento concreto. Como ya hemos visto, las posturas de las Partes son antagónicas: PRONATEL cree que no y Redes opina todo lo contrario.

345. Este debate es, hasta cierto punto, innecesario en la medida en que, si la resolución contractual operada por PRONATEL fue incorrecta, también debe calificarse como tal la ejecución de la GFC que encuentra su base en esa resolución.

346. No obstante, el Tribunal Arbitral no quiere eludir la cuestión planteada por las Partes, dada su importancia.

347. Una lectura aislada de la cláusula 19.2.2. parece abonar la tesis de PRONATEL, pero el Contrato debe ser interpretado de manera sistemática en función de la totalidad de las cláusulas que lo integran.

348. Si bien la cláusula 19 se refiere a la "*Conclusión y resolución del Contrato de Financiamiento*", la 20 lleva por título el "*Procedimiento para la resolución del*

---

[178] Escrito de Alegatos finales de la Demandante, párrafo 254.

[179] Documentos C-008, C-009 y C-010.

[180] Contestación y Reconvención de las Demandadas, párrafo 434.

[181] "*Por incumplimiento injustificado del CRONOGRAMA DEFINITIVO DE ACTIVIDADES DE LA RED DE ACCESO o del CRONOGRAMA DEFINITIVO DE LA RED DE TRANSPORTE, siempre que dicho incumplimiento evaluado por el FITEL conlleve a que no se cumplan con las actividades dentro del PERIODO DE INVERSIÓN DE LA RED DE ACCESO o dentro del PERIODO DE INVERSIÓN DE LA RED DE TRANSPORTE a que se refiere las ESPECIFICACIONES TÉCNICAS*".

*Contrato de Financiamiento*", lo que ya de por sí es significativo porque de forma evidente manifiesta la estrecha vinculación que existe entre las dos cláusulas.

349. La cláusula 20.5 es clara: "*En todos los casos de resolución del CONTRATO DE FINANCIAMIENTO se realizará una conciliación de saldos hasta la fecha de la resolución*[182]".

350. De su lectura se desprende, sin género de duda, que no puede interpretarse correctamente la cláusula 19.2.2 en relación con la 19.2.1. c) sin tomar en consideración la 20.5 o, dicho de otro modo, que no puede concluirse que la resolución amparada en la causal del inciso 19.2.1.c) no exija condición o procedimiento previo alguno, puesto que nada se menciona en tal sentido en el texto de la cláusula 19.2.2 y, en cambio, en la cláusula 20.5 se impone una conciliación de saldos como parte del procedimiento para la resolución del Contrato, sin excepción alguna.

351. Consecuentemente, aunque la resolución hubiera sido ajustada a Derecho, *quod non*, la ejecución de la GFC hubiera sido improcedente.

352. La consecuencia de lo expuesto es que debemos declarar que la ejecución de la GFC fue indebida y que procede la reintegración por PRONATEL a Redes del monto a que se elevaba la GFC (US$ 14´960,000.00) mediante la devolución a favor de Redes del importe depositado por dicho monto en la cuenta especial del Banco de la Nación No. 06068002824.

353. Redes solicita también que la devolución no se limite al principal de la GFC sino que se extienda a los intereses. Sin embargo, no solicita el pago de intereses sino una compensación por vía de daño emergente sobre la que volveremos más adelante[183].

354. El último petitorio relacionado con la GFC es que se declare que las Demandadas no podrán compensar las sumas de dinero que el Tribunal Arbitral les ordene restituir como consecuencia de la ejecución indebida de la Garantía de Fiel Cumplimiento, contra cualquier potencial suma de dinero que el Tribunal Arbitral ordene pagar a Redes Andinas a favor de las Demandadas bajo el Contrato o contra cualquier otra posible acreencia que en el futuro pudiera generarse a favor de las Demandadas frente a Redes

355. La Demandante apoya esta petición en la aplicación del numeral 1 del artículo 1290 del CC peruano que prohíbe la compensación "*en la restitución de bienes de los que el propietario haya sido despojado*".

356. El carácter imperativo de esta norma no es cuestionable.

357. Por tanto, la única cuestión debatible es si la actuación de PRONATEL puede

---

[182] El subrayado es nuestro.

[183] Párrafos 459 y 460 de este Laudo.

considerarse como un "*despojo*". Redes reconoce que no existe una definición legal de "despojo" pero aporta una definición doctrinal como "*cualquier conducta que suponga la desposesión ilegítima de un bien*"[184].

358. PRONATEL defiende la posibilidad de la compensación, en caso de que Redes fuera condenada a pagar alguna cantidad a PRONATEL[185] sobre la base de la aplicación del artículo 1288º del CC peruano[186].

359. El argumento no puede ser acogido porque se basa en que previamente al surgimiento de las obligaciones compensables exista una conciliación de saldos que precisamente PRONATEL nunca llegó a realizar.

360. Consecuentemente la petición de Redes en este sentido debe ser acogida, tanto en lo que se refiere al petitorio principal como a los accesorios, salvo en lo relativo a intereses, que será una cuestión abordada más adelante.

361. **El tercer bloque de peticiones de Redes se refiere a la Garantía de Adelanto (petitorio principal nº 5 y petitorios accesorios a éste).**

362. Al igual que el caso anterior, la Demandante sostiene que la Garantía de Adelanto [la "GA"] fue ejecutada indebidamente y, por tanto, el monto obtenido en la ejecución[187] debe ser íntegramente devuelto a Redes.

363. Coinciden las Partes en que para concluir sobre la ejecución de la GA debe aplicarse lo previsto en la cláusula 19.2.4 del Contrato[188], es decir, hay que firmar un acta de adjudicación y acordar la liquidación de desembolsos y pagos para saber si Redes utilizó en la adquisición e implementación de los bienes de las dos redes la totalidad del primer desembolso del Financiamiento Adjudicado, que es en lo que consiste el Adelanto[189],

364. Es un hecho indiscutido que en la carta de resolución contractual[190] no se mencionó

---

[184] Demanda, párrafo 396.

[185] Dúplica de la Reconvención, párrafos 598 al 602.

[186] "*Por la compensación se extinguen las obligaciones recíprocas, líquidas, exigibles y de prestaciones fungibles y homogéneas hasta donde respectivamente alcancen, desde que hayan sido opuestas la una a la otra…*"

[187] US$ 52´360,000.00. (Cláusula 15.2 del Contrato).

[188] "*En caso que EL CONTRATADO haya adquirido los BIENES DE LA RED DE ACCESO o BIENES DE LA RED DE TRANSPORTE sin haber procedido a su instalación y el CONTRATO DE FINANCIAMIENTO se resolviera durante el PERIODO DE INVERSIÓN DE LA RED DE ACCESO o PERIODO DE INVERSIÓN DE LA RED DE TRANSPORTE correspondiente, en virtud de los literales a) hasta el literal o) del Numeral 19.2.1 precedente, con excepción de los literales e) y m), las PARTES suscribirán el acta de adjudicación correspondiente y EL CONTRATADO endosará a favor de FITEL las pólizas de seguro a que se refieren el numeral 7.21 de la Cláusula Séptima del CONTRATO DE FINANCIAMIENTO y devolverá la parte no ejecutada del desembolso del FINANCIAMIENTO ADJUDICADO o, en su defecto, se ejecutará las garantías a que diera lugar*".

[189] Cláusulas 15.2 y 2.20 del Contrato.

[190] Documento C-007.

como causa de esta decisión el mal uso del Adelanto[191], lo que acredita que no se estaba acusando a Redes de su utilización inapropiada.

365. Las Demandadas defienden que la referencia que hace la carta resolutoria a la Cláusula 19 del Contrato es el inicio del procedimiento de ejecución de la GA. El Tribunal Arbitral no comparte esta postura poque, además de lo expuesto en el párrafo anterior, tampoco encontramos en la carta y su anexo nada que tenga que ver con lo que la cláusula 19.2.4 dice que hay que hacer.

366. Es importante destacar que la carta resolutoria tiene fecha 24 de abril de 2019 y, por tanto, había sido precedida de la carta de Redes de 15 de abril de 2019[192] en la que Redes advertía expresamente que no procedía la ejecución de las cartas fianza. En particular, en relación con la GA se decía que ésta solo garantiza "*el correcto uso del primer desembolso…no encontrándose dentro de su ámbito situaciones como las invocadas en el Oficio*".

367. Si PRONATEL hubiera querido justificar la ejecución de la GA, tendría que haber especificado en la carta de 24 de abril de 2019 que Redes había utilizado indebidamente el primer adelanto y que se iba a procedes a dar los pasos que la cláusula 19.2.4 dispone para legitimar la ejecución de esta garantía. Nada de ello ocurrió.

368. Por el contrario, PRONATEL realizó el segundo desembolso en enero de 2019[193]. Este hecho prueba que PRONATEL, en un momento tan avanzado del Contrato como es enero de 2019, no ponía objeción a que se hubiera dado el uso adecuado al primer desembolso.

369. Redes ha justificado el gasto en el proyecto de una cantidad superior al Adelanto mediante los informes periciales de EY[194] que no han sido desvirtuados de contrario[195]. En ellos se demuestra el uso por Redes de una cantidad muy superior a la del primer desembolso garantizado por la GA[196].

370. La ejecución de la GA, en consecuencia, fue improcedente y es obligado que se ordene a las Demandadas restituir a Redes las sumas de dinero obtenidas a consecuencia de la indebida ejecución de la Garantía de Adelanto por US$

---

[191] Se habla de que "*se les imputó el incumplimiento injustificado de los plazos contenidos en el Cronograma de Actividades de la RED DE ACCESO*".

[192] Documento C-006.

[193] Documento C-004.

[194] Documentos PER C-1, PER C-4 y PER C-8. En ellos podemos ver que la labor de EY ha sido notable al examinar el 78% de los Costos de Construcción, que es una cifra elevada.

[195] El informe del Sr. Campo no propone ningún ajuste contable y no cuenta con un examen previo de la documentación soporte. Sus críticas han sido contestadas por el segundo informe de EY que es el PER-C4.

[196] EY establece que en Cajamarca el total de costos de construcción incurridos por Redes (sin incluir el IVA) alcanzó los $ 71,998,114 dólares de los Estados Unidos. Si se le añade el IVA, la cifra sube a $ 82,166,248 dólares de los Estados Unidos.

52'360,000.00 (cincuenta y dos millones trecientos sesenta mil y 00/100 dólares de los Estados Unidos de América), mediante la devolución a favor de Redes del importe depositado por dicho monto en la cuenta especial del Banco de la Nación No. 06068002824.

371. Redes solicita también que la devolución no se limite al principal de la GA sino que se extienda a los intereses. Sin embargo, no solicita el pago de intereses sino una compensación por vía de daño emergente sobre la que volveremos más adelante[197].

372. En cuanto a la petición de que se declare que las Demandadas no podrán compensar las sumas de dinero que el Tribunal Arbitral les ordene restituir como consecuencia de la ejecución indebida de la Garantía de Adelanto, contra cualquier potencial suma de dinero que el Tribunal Arbitral ordene pagar a Redes a favor de las Demandadas bajo el Contrato o contra cualquier otra posible acreencia que en el futuro pudiera generarse a favor de las Demandadas frente a Redes procede su estimación por las mismas razones que las señaladas en relación con la GFC.

373. Consecuentemente la petición de Redes en este sentido debe ser acogida, tanto en lo que se refiere al petitorio principal como a los accesorios, salvo en lo relativo a intereses, que será una cuestión abordada más adelante

374. **El cuarto grupo de petitorios de Redes incluye el 6 (que se declare desestimada la oposición de las Demandadas a la entrega de los bienes del Contrato de Financiamiento ofrecida y ejecutada por Redes Andinas.); 7 (que se declare que Redes Andinas ha entregado los bienes objeto del Contrato de Financiamiento a las Demandadas en cumplimiento del Contrato de Financiamiento, y que la entrega es válida y eficaz para todos los fines del Contrato de Financiamiento a partir de la fecha de cada ofrecimiento de la entrega de bienes, respectivamente); 8 (que se declare que la liquidación del Contrato de Financiamiento que han pretendido realizar las Demandadas es inválida al no sustentarse en el Contrato de Financiamiento ni en las leyes aplicables y, en consecuencia, no surte efectos); 9 ( que se declare que no corresponde aplicar contra Redes Andinas penalidad alguna bajo el Contrato de Financiamiento) y 10 (que se apruebe la liquidación del Contrato de Financiamiento propuesta por Redes Andinas y, en consecuencia, se ordene a las Demandadas pagar solidariamente a Redes Andinas la suma de US$ 11'855,049.00 (once millones ochocientos cincuenta y cinco mil cuarenta y nueve y 00/100 dólares de los Estados Unidos de América) más los intereses que se devenguen a partir del 10 de junio de 2022).**

375. La primera cuestión a resolver es cómo regula el Contrato la entrega de los bienes.

376. La cláusula 2, numerales 8 y 9, del Contrato define los bienes de la Red de Acceso

---

[197] Párrafos 459 y 460 de este Laudo.

y Transporte, respectivamente[198]. Por su parte, los numerales 1 y 2 de la misma cláusula establecen que es el acta de adjudicación el documento mediante el cual Redes transfiere la propiedad de los correspondientes bienes al PRONATEL (en el caso de los que integran la Red de Acceso) o al MTC (en el supuesto de los que forman parte de la Red de Transporte).

377. Una de las obligaciones de Redes es transmitir a PRONATEL/MTC la propiedad de los bienes de la Red de Acceso/Transporte en las condiciones establecidas en el Contrato y en las especificaciones técnicas.[199].

378. Redes se obliga a transmitir la propiedad y el dominio de los bienes de la Red de Transporte, debidamente saneados, a favor del MTC con la suscripción del Acta de Adjudicación de estos bienes, una vez suscrito el contrato de concesión entre el MTC y el concesionario de la operación de la Red de Transporte[200].

379. En el momento en que se produjo la resolución del Contrato la Red de Transporte no se había entregado ni se había suscrito el contrato de concesión entre el MTC y el operador de la Red de Transporte. A su vez, la Red de Acceso no se había implementado porque no se había acabado el periodo de inversión, es decir, no se había iniciado el periodo de operación.

380. Nada en el Contrato regula la entrega de los bienes en esta situación [201].

381. En esta situación, Redes envió la carta de 23 de mayo de 2019[202], que dio lugar a negociaciones en forma de reuniones y cartas cruzadas sobre la forma de entregar los bienes de las redes[203].

---

[198] La cláusula 2.8 dice:

"*BIENES DE LA RED DE ACCESO: Son los bienes conformados por las estructuras metálicas, torres autosoportadas, bases de cimentación y el lote donde se asientan esas estructuras y todo ELEMENTO PASIVO que conforme la RED DE ACCESO y que sean de propiedad y dominio del FITEL luego de la suscripción del ACTA DE ADJUDICACIÓN DE LOS BIENES DE LA RED DE ACCESO. El equipamiento activo será de propiedad y dominio de EL CONTRATADO*".

La cláusula 2.9, por su parte, tiene el siguiente tenor:

"*BIENES DE LA RED DE TRANSPORTE: Son todos los bienes muebles o inmuebles que integran la RED DE TRANSPORTE, de acuerdo a lo establecido en las ESPECIFICACIONES TÉCNICAS de la RED DE TRANSPORTE. Estos bienes serán de propiedad y dominio del MTC luego de la suscripción del ACTA DE ADJUDICACIÓN DE LOS BIENES DE LA RED DE TRANSPORTE entre EL CONTRATADO y el FITEL, quien suscribirá dicha acta en representación del MTC*".

[199] Documento C-001, cláusula 7, numerales 31 y 32.

[200] Documento C-001, cláusula 16.1.

[201] La estipulación 19.2. 3; 2.4. y 2.5. del Contrato se refiere a supuestos diferentes a la situación a la que se enfrentaban las Partes tras la resolución contractual.

[202] Documento C-126.

[203] Documento C-046. En la presentación que utilizó la Demandante para sus alegatos iniciales en la audiencia hay dos páginas (102 y 103) que recogen un cronograma detallado de lo ocurrido en relación con la entrega desde el 24 de abril de 2019 hasta el 15 de diciembre de 2020. En los documentos C-130, C-131, C-132, C-133, C-134, C-135, C-136, C-137, C-138, C-139, entre otros, se pueden ver los

382. El 14 de agosto de 2019 PRONATEL exigió la entrega en 5 días de los bienes comprendidos en el primer avance de la Red de Transporte[204], es decir, una entrega parcial de los bienes.

383. La correspondencia entre abril de 2019 y agosto de 2019 acredita que PRONATEL consideraba posible la entrega parcial de los bienes a pesar de la resolución operada por la propia PRONATEL[205]. Estamos, pues, ante verdaderos actos propios de PRONATEL que chocan con la posición mantenida en el arbitraje consistente en defender que no cabe el cumplimiento parcial del Contrato.

384. El Derecho peruano parte de un principio que es el de que cabe el cumplimiento parcial de las obligaciones contractuales cuando las partes así lo acuerdan[206].

385. El paso siguiente es ver si el Contrato permite la entrega parcial y el consiguiente pago parcial.

386. En este punto tenemos que acudir a la cláusula 19, numerales 2.4 y 2.6. que regulan supuestos claros de entrega y pago parciales[207]. Aunque, como ya se ha dicho, son

---

esfuerzos hechos por Redes para enviar información a PRONATEL para la entrega de bienes, la remisión de un cronograma de entrega, el rechazo de PRONATEL a participar en las diligencias de entrega y cómo se realizó la entrega sin la participación de PRONATEL mediante las correspondientes Actas de Entrega que implicaron las revisiones de nodos y del tendido de la fibra óptica.

[204] Documento C-044.

[205] Documentos C-205 y C-206, además de los ya mencionados C-005, C-007 y C-044.

[206] El artículo 1221 del CC peruano dice: "*No puede compelerse al acreedor a recibir parcialmente la prestación objeto de la obligación, a menos que la ley o el contrato lo autoricen.*"

[207] La cláusula 19.2.4 dice:

"*En caso que EL CONTRATADO haya adquirido los BIENES DE LA RED DE ACCESO o BIENES DE LA RED DE TRANSPORTE sin haber procedido a su instalación y el CONTRATO DE FINANCIAMIENTO se resolviera durante el PERIODO DE INVERSIÓN DE LA RED DE ACCESO o PERIODO DE INVERSIÓN DE LA RED DE TRANSPORTE correspondiente, en virtud de los literales a) hasta el literal o) del Numeral 19.2.1. precedente, con excepción de los literales e) y m), las PARTES suscribirán el acta de adjudicación correspondiente y EL CONTRATADO endosará a favor de FITEL las pólizas de seguro a que se refieren el Numeral 7.21 de la Cláusula Séptima del CONTRATO DE FINANCIAMIENTO y devolverá la parte no ejecutada del desembolso del FINANCIAMIENTO ADJUDICADO o, en su defecto, se ejecutará las garantías a que diera lugar.*

*Excepcionalmente, y siempre que EL CONTRATADO haya acreditado fehacientemente haber utilizado la totalidad del desembolso del FINANCIAMIENTO ADJUDICADO en la adquisición de los BIENES DE LA RED DE ACCESO o los BIENES DE LA RED DE TRANSPORTE, las PARTES suscribirán el acta de adjudicación correspondiente*".

La cláusula 19.2.6 establece:

"*En el caso que EL CONTRATADO haya adquirido y efectuado la instalación de los BIENES DE LA RED DE ACCESO o los BIENES DE LA RED DE TRANSPORTE y el CONTRATO DE FINANCIAMIENTO se resolviera en virtud del literal m) del Numeral 19.2.1., las PARTES suscribirán el acta de adjudicación correspondiente y EL CONTRATADO endosará a favor del FITEL las pólizas de seguro a que se refieren el Numeral 7.21 de la Cláusula Séptima del CONTRATO DE FINANCIAMIENTO y EL CONTRATADO conservará el monto de FINANCIAMIENTO ADJUDICADO recibido en la parte equivalente al valor del suministro.*

*Asimismo, en el caso que EL CONTRATADO haya adquirido pero no haya efectuado la instalación de los BIENES DE LA RED DE ACCESO o los BIENES DE LA RED DE TRANSPORTE y/o el*

casos distintos al que nos ocupa, lo importante es que permiten comprobar que el Contrato considera admisible su cumplimiento parcial.

387. A lo indicado hay que añadir que la resolución del Contrato obedeció a una decisión de PRONATEL que ya se ha calificado en este Laudo como contraria a Derecho. No tendría sentido que se declarara que Redes solo ha cumplido parcialmente con el Contrato y que no tiene derecho a solicitar la liquidación del avance logrado puesto que, si no se hubiera resuelto el Contrato por PRONATEL, Redes habría tenido derecho a continuar con el cumplimiento del Contrato hasta la culminación del Proyecto, como ha ocurrido en otros proyectos regionales.

388. Lo expuesto encaja con la previsión contractual de la cláusula 20. 5 sobre la obligatoriedad de realizar la conciliación de saldos.

389. En coherencia con lo hasta aquí dispuesto, no se puede compartir la postura de PRONATEL de negarse a rechazar el nivel de alcance que Redes pueda acreditar por la única razón de que no se ha producido una entrega total. Afirmar que solo cabe la entrega total y, además, operar una resolución contraria a Derecho que lo que impide es precisamente el cumplimiento total es contradictorio y pone de manifiesto la injusticia que supondría esta opción para Redes.

390. Resuelta, pues, la duda sobre el cumplimiento parcial, vamos a centrarnos en otra objeción formulada por PRONATEL[208] en el Informe de la Asesoría Legal de PRONATEL de 28 de abril de 2021 que se adjunta al Oficio de la misma fecha que fue notificado a Redes el 12 de mayo del mismo año. En aquél se dice que PRONATEL está dispuesta a recibir la Red de Transporte y la Red de Acceso siempre que la totalidad de los predios estén "*debidamente saneados e inscritos en Registros Públicos a favor de Redes Andinas*".

391. La cuestión que subyace es el impacto que tiene que los bienes no estén saneados en la posibilidad de ser entregados. Como ya explicamos[209], el saneamiento no es requisito para acceder a la propiedad de los bienes inmuebles, si bien permite una mejor defensa de los predios registrados y mejora la seguridad jurídica.

392. No podemos olvidar que el saneamiento podía realizarse en un plazo de diez años en la Red de Acceso y hasta la suscripción del Contrato de Concesión entre el MTC y el concesionario de la operación de la Red de Transporte.

393. Puesto que la resolución fue improcedente y que, por tanto, Redes no pudo realizar

---

*FITEL no haya entregado más de un desembolso, y el CONTRATO DE FINANCIAMIENTO se resolviera en virtud del literal m) del Numeral 19.2.1. precedente, las PARTES suscribirán el acta de adjudicación correspondiente, siendo obligación de EL CONTRATADO realizar a favor del FITEL el endoso de las pólizas de seguro a que se refieren el Numeral 7.21 de la Cláusula Séptima del CONTRATO DE FINANCIAMIENTO sin que el FITEL efectúe otros desembolsos del FINANCIAMIENTO ADJUDICADO. En este supuesto el FITEL podrá optar por exigir la instalación de los BIENES DE LA RED DE ACCESO y de la RED DE TRANSPORTE*".

[208] Documento C-280.

[209] Párrafos 218 y siguientes de este Laudo.

el trabajo de saneamiento pendiente porque la resolución se lo impidió, no puede alegar PRONATEL la falta de inscripción de los bienes inmuebles en el Registro para rechazar la entrega de bienes cuya propiedad está en manos de Redes y, por tanto, con posibilidad de ser transmitida a PRONATEL.

394. Lo que procede hacer es la revisión del avance de las obras para ver qué es lo que se puede entregar por Redes y recibir por PRONATEL. Si esa es la solución jurídicamente procedente, lo mismo se puede decir desde el punto de vista de la lógica económica y del interés público que subyace en este Contrato. No tendría sentido desaprovechar unas redes de telecomunicaciones sustancialmente avanzadas, en las que ya se ha hecho un desembolso considerable, e impedir que la Región de Cajamarca disponga de unos servicios que son imprescindibles en cualquier sociedad moderna, empezando de cero el proyecto por segunda vez.

395. La parte esencial de este punto es el examen del nivel de avance conseguido por Redes.

396. En las pruebas periciales aportadas por las Partes aparece una diferencia notable. Empezando por la Red de Transporte, FTI Construcción [210](perito de Redes) considera que la Demandante había alcanzado un avance del 100%, mientras que BRG Construcción[211] (perito de PRONATEL) lo limita al 87.77%.

397. Esa diferencia, no obstante, exige formular ciertos matices. Los datos que acabamos de proporcionar relativos a las Demandadas son de BRG Construcción, pero otro perito utilizado por PRONATEL, Rafael Gold Araoz, ofreció datos diferentes: 87,1% en la planta externa de fibra óptica, 97.6% en obras civiles, 98.7 % en equipamiento de nodos y 95.1% en equipamiento de red[212]. La brecha con el cálculo de Redes se reduce.

398. La prueba aportada por Redes es robusta porque no solo consiste en los informes periciales de FTI Construcción, sino que también abarca las comprobaciones hechas *in situ* por las empresas CIP y Telnes[213] en relación con los nodos y la fibra óptica. PRONATEL no ha desvirtuado los datos aportados por estas empresas.

399. Adicionalmente contamos con la documentación que Redes puso a disposición de PRONATEL para intentar la entrega de los bienes que forman esta red. Particularmente importantes son las actas de instalación que Redes obtuvo y que, sorprendentemente, no habían sido examinadas por el perito de BRG Construcción[214], lo que supone una debilidad relevante a la hora de atribuir mayor o menor peso a las conclusiones de este perito.

---

[210] PER. C-2 y PER. C-5.

[211] Primer Informe BRG Construcción y Segundo Informe BRG Construcción.

[212] Presentación de *power point* de BRG Construcción, página 102.

[213] Doc. FTI-D-210 (Informe CIP) y Doc.FTI-D-59 (Informe Telnes).

[214] Transcripción del día 4 de las audiencias, páginas 981 a 985 y 993.

400. Aunque es difícil precisar con total exactitud el nivel de avance, el hecho de que la resolución contractual decidida por PRONATEL solamente se refiriera a los retrasos en la Red de Acceso, hace pensar que PRONATEL no objetaba que la Red de Transporte se hubiera culminado, lo que inclina a este Tribunal Arbitral a pensar que se puede dar por bueno que esa red avanzó hasta el 100%.

401. Cuestión diferente es la valoración económica del nivel de avance alcanzado. Las Partes tampoco coinciden en la metodología empleada para hacer ese cálculo.

402. Redes considera que el sistema adecuado es el del valor ganado[215].

403. Explicó el perito Sr. Costa que este método cuenta con respaldo del Project Management Institute[216] y consiste en multiplicar el presupuesto final del proyecto por el porcentaje del avance completado. En su fórmula, que toma como referencia el 100% del avance, el valor ganado sería de 29,5 millones de dólares.

404. La postura de partida de PRONATEL, como sabemos, es no reconocer cantidad alguna porque considera que no se llegó a implementar toda la red y, al no admitirse el cumplimiento parcial, no habría derecho a reconocer ningún valor a Redes. Ya hemos explicado que esta postura no es aceptada por el Tribunal Arbitral.

405. La segunda opción que plantea PRONATEL es no reconocer cantidad alguna que supere el 87.7% del presupuesto porque parte del cronograma de ejecución y atribuye el mismo valor a cada día del programa.

406. La diferencia entre aplicar un método u otro en la Red de Transporte es importante: mientras BRG considera que las actividades pendientes de ejecutar tienen un valor de US$ 3 millones, en el caso de FTI se reducen a US$ 72.000.

407. El Tribunal Arbitral se inclina por la metodología de FTI por varias razones. La primera es ser de uso común a nivel internacional, lo que supone un buen criterio interpretativo en un proyecto internacional como el que nos ocupa.

408. La segunda es que no parece muy acertado atribuir el mismo valor a cada día de ejecución del proyecto puesto que las actividades son dispares y no todas aportan el mismo valor. El cálculo correcto es el que reconoce el valor real del trabajo realizado.

409. En relación con la cuestión de si para evaluar la utilización del financiamiento adjudicado se deben considerar los montos gastados más el Impuesto General a las Ventas ["**IGV**"], la respuesta es muy simple porque el Contrato, en todas las referencias al financiamiento del Proyecto[217], incluye la frase "*incluye* -o *incorpora*-

---

[215] En la terminología inglesa utilizada habitualmente a nivel internacional *earned value*.

[216] Una organización internacional sin ánimo de lucro que está considerada como la más grande del mundo, cuenta con más de 500.000 miembros y presencia en más de 100 países. Su prestigio es indiscutido entre los profesionales de la ingeniería.

[217] C-001, cláusula segunda, incisos 17, 18 y 19.

C-0368-SPA

*todos los impuestos de ley*", que incluyen el IGV.

410. El mayor problema con el que nos encontramos, en términos económicos, radica en la Red de Acceso por el mayor presupuesto de esta parte del proyecto. Ambas Partes coinciden en que no se alcanzó un nivel parecido al de la Red de Transporte, pero la distancia entre las dos posturas que hemos de analizar no es excesivamente grande.

411. FTI cifra el avance logrado por Redes en el 68.76%[218] mientras que BRG lo reduce al 59.26%[219].

412. La cifra que reconocen los peritos de PRONATEL dista mucho de la que la propia PRONATEL emplea como argumento para justificar la resolución del Contrato en abril de 2019. Puesto que PRONATEL se remite a los informes de sus peritos, el Tribunal Arbitral asume que PRONATEL acepta como válido el porcentaje de avance que reconocen sus peritos.

413. Para la Red de Acceso se pueden dar por reproducidos buena parte de los argumentos expuestos en relación con la Red de Transporte y a ellos nos remitimos en aras de la brevedad.

414. No obstante, en este caso no contamos con algunos elementos de juicio que existían en relación con la Red de Transporte, pero el elemento que nos inclina a aceptar la cifra de FTI Construcción en lugar de la de BRG Construcción es doble.

415. El primero es la mayor credibilidad que el Tribunal Arbitral otorga a los informes de FTI puesto que, en los puntos en que se han confrontado las versiones de las dos empresas periciales, el rigor de FTI ha parecido superior.

416. El segundo es que la sucesión de informes de los respectivos peritos y las ratificaciones orales permiten apreciar una mayor capacidad de respuesta a las objeciones de la contrapericial que la observada en el caso de BRG.

417. Por tanto, el Tribunal Arbitral se inclina por admitir que el nivel de avance de la Red de Acceso es el establecido por FTI.

418. <u>Los argumentos expuestos llevan a la estimación de las pretensiones 6 y 7 de la Demandante</u>.

419. Las penalidades que, a juicio de PRONATEL, debería soportar Redes aparecen en el Informe elaborado por la Dirección de Supervisión de Proyectos de PRONATEL el 22 de abril de 2019[220].

420. Este documento parte de considerar que "*el plazo para finalizar la ETAPA DE*

---

[218]  PER.C-2, párrafo 95.

[219]  Primer Informe de BRG Construcción, párrafo 267.

[220]  Documento R-062.

*INSTALACIÓN de la RED DE TRANSPORTE fue el 28 de julio del 2018, la cual fue culminada por REDES ANDINAS posteriormente el 28 de diciembre de 2018 y el plazo para finalizar la ETAPA DE INSTALACIÓN de la RED DE ACCESO fue el 28 de agosto de 2018, la cual a la fecha no ha sido concluida por el precitado operador...el proyecto contaría con 237 días de retraso, respecto a la implementación de la RED DE ACCESO*"[221].

421. El documento se emitió después de que PRONATEL otorgara a Redes un plazo de quince días calendario, que había vencido el 18 de abril, a fin de que *"REDES ANDINAS satisfaga las prestaciones objeto de incumplimiento; bajo apercibimiento de resolver de pleno derecho EL CONTRATO"*[222].

422. Es importante destacar que este informe admite que la Red de Transporte está implementada al 100% en todos los ámbitos que señala (nodos ópticos, Centros de Mantenimiento Requeridos, enlaces de fibra óptica e instalación de fibra óptica) si bien sujeta a supervisión y conformidad por parte de PRONATEL. También reconoce que todos los terrenos están comprados, pero solo dos inscritos, lo que no permitirá en el corto plazo la suscripción del Acta de Adjudicación[223].

423. Por el contrario, asume que la Red de Acceso presenta un retraso en diversos aspectos que pone en riesgo su finalización[224], con incumplimientos en la implementación de la Red de Acceso, instalación de los servicios en las Instituciones Abonadas Obligatorias, actividades de sensibilización y difusión correspondientes a las etapas de mantenimiento y cierre, contratación de la póliza de seguros que resguarde la integridad de la Red de Acceso e instalación de los centros de atención a los usuarios[225].

424. A partir de estos datos, PRONATEL hace un detallado cálculo de penalidades en base a la aplicación de la cláusula 18 del Contrato que concluye en la suma de S/ 102´868,839.50 (ciento dos millones ochocientos sesenta y ocho mil ochocientos treinta y nueve con 50/100 soles)[226].

425. A pesar de la importancia de esta reclamación, su mención en los Memoriales de PRONATEL es escasa[227]y no cuenta con explicaciones adicionales a las que se

---

[221] Documento R-062, página 4.

[222] Documento R-062, página 2.

[223] Documento R-062, páginas 5 y 6.

[224] Documento R-062, página 7.

[225] Documento R-062, páginas 8 a 11.

[226] Documento R-062, páginas 11 a 22. Este cálculo de penalidades forma parte de la liquidación del Contrato realizada por PRONATEL el 3 de agosto de 2020 mediante Oficio Nº 1192-2020-MTC/24 (Documento C-015) en la que también figura una petición de PRONATEL a Redes para que reembolsase *"US$ 7´365,200.00 (siete millones trescientos sesenta y cinco mil doscientos y 00/100 dólares) correspondiente al Segundo desembolso como parte del financiamiento otorgado no recuperado"*:

[227] Contestación y Reconvención, página 160.

pueden encontrar en el Informe de la Supervisión de Proyectos de PRONATEL de 22 de abril de 2019.

426. Esta pretensión de PRONATEL no puede ser acogida porque parte de un principio que no es compartido por el Tribunal Arbitral, cual es que en abril de 2019 Redes estaba en situación de ser considerado responsable de retrasos e incumplimientos que derivaban de aquellos, de tal forma que al ser declarado por este Tribunal Arbitral que los supuestos incumplimientos de Redes son atribuibles a hechos no imputables a Redes que permitían solicitar ampliación de plazo para la implementación de la Red de Acceso, las penalidades no proceden y ello evita tener que analizar si la cuantificación fue acorde a lo establecido en la cláusula del Contrato aplicable a estos supuestos.

427. En definitiva, se deben estimar las pretensiones 8 y 9 de la Demandante en cuanto se rechaza la liquidación efectuada por PRONATEL y la imposición de penalidades a Redes.

428. El último punto sobre esta parte es la liquidación del Contrato (pretensión 10).

429. Redes solicita que se ordene a las Demandadas pagar solidariamente a Redes la suma de US$ 11'855,049.00 (once millones ochocientos cincuenta y cinco mil cuarenta y nueve y 00/100 dólares de los Estados Unidos de América) más los intereses que se devenguen a partir del 10 de junio de 2022.

430. Para efectuar una liquidación adecuada del Contrato hay que ser coherente con lo ya señalado. El primer aspecto a tener en cuenta es la forma de calcular el avance del Proyecto. Como se ha explicado[228], el método adecuado es el del *earned value* o valor ganado.

431. El segundo dato del que partimos es el resultado del avance. El Tribunal Arbitral considera que en la Red de Transporte se ha llegado al 100% mientras que en la Red de Acceso la cifra aceptada es el 68,76 %.

432. PRONATEL realizó desembolsos por un importe de US$ 59,725,200.00 (cincuenta y nueve millones setecientos veinticinco mil doscientos dólares de los Estados Unidos).

433. El nivel de avance del Proyecto supone un valor de US$ 70,765,600.00 (setenta millones setecientos sesenta y cinco mil seiscientos dólares de los Estados Unidos) que se calculan por la proporción del 100% de avance de la Red de Transporte con un CAPEX de US$ 29,460,800.00 (veintinueve millones cuatrocientos sesenta mil ochocientos dólares de los Estados Unidos) y un 68,76% de avance de la Red de Acceso con un CAPEX de US$ 60,069,600 (sesenta millones sesenta y nueve mil seiscientos dólares de los Estados Unidos), lo que supone un valor ganado de US$ 41,304,800 (cuarenta y un millones trescientos cuatro mil ochocientos dólares de los Estados Unidos). La suma de las dos partidas de valor ganado resulta en la cifra

---

[228] Párrafos 402 y siguientes de este Laudo.

señalada.

434. La diferencia entre el valor ganado (US$ 70,765,600.00) y el desembolso total realizado por PRONATEL (US$ 59,725,200.00) alcanza los US$ 11,040,400.00 (once millones cuarenta mil cuatrocientos dólares de los Estados Unidos) que es la cifra reclamada por la Demandante en relación con la obra realizada hasta el 30 de junio de 2019[229].

435. La Demandante reclama que a esa cifra se sume el interés correspondiente por no haberse abonado en la fecha de 30 de junio de 2019 en el caso del 99.6% de los costos de construcción y en el 30 de junio de 2020 en el 0.4% de ellos que se incurrieron en esa fecha (US$ 814.649, ochocientos catorce mil seiscientos cuarenta y nueve dólares de Estados Unidos de América)[230]. Las Demandadas creen que la fecha de inicio del cómputo debe ser el 30 de junio de 2020[231]. El Tribunal Arbitral se inclina por las fechas utilizadas por la Demandante porque se basan en la fecha real en que se ha incurrido en el gasto, que es el 30 de junio de 2019 en la inmensa mayoría de los casos, puesto que es la fecha hasta la que trabajó Redes en esta obra.

436. La tasa de interés que el perito de la Demandante aplica es el tipo de interés medio anual del Bono de Perú a 10 años en dólares de Estados Unidos[232]. La propuesta de las Demandadas es la tasa de los bonos de Estados Unidos a 10 años[233].

437. La tasa aplicada por Redes parece correcta puesto que el pagador es el Gobierno de la República del Perú, las cifras están calculadas en dólares y el bono del Estado a diez daños ofrece una imagen razonable de la rentabilidad que un Estado ofrece a sus acreedores en un horizonte suficientemente amplio como para que no se vea afectado, ni al alza ni a la baja, por circunstancias puntuales. Los argumentos de las Demandadas no pueden prosperar porque lo previsible es que Redes pudiera generar utilidades en el futuro y porque los activos están situados en Perú, no en Estados Unidos.

438. La cifra de principal e intereses, calculados a 10 de junio de 2022, es decir, tres meses después del Escrito de Alegatos Finales de las Partes, asciende a US$ 11'855,049.00 (once millones ochocientos cincuenta y cinco mil cuarenta y nueve y 00/100 dólares de los Estados Unidos de América), que el Tribunal Arbitral considera correcta y, por tanto, se estima la pretensión décima. Desde esa fecha se siguen devengando intereses hasta la fecha del laudo aplicando el tipo de interés medio anual del Bono de Perú a 10 años en dólares de Estados Unidos de América.

---

[229] La explicación detallada y el cálculo realizado, con las remisiones a los informes realizados, se encuentran en Demanda (C-4), págs. 131 a 137.

[230] Escrito de la Demandante de 19 de mayo de 2022, párrafos 11 y 12.

[231] Escrito de las Demandadas de 25 de mayo de 2022, párrafo 11.

[232] Demanda (C-4), párrafos 454 a 456; Escrito de la Demandante de 19 de mayo de 2022, párrafos 3, 7 y 8.

[233] Escrito de las Demandadas de 25 de mayo de 2022, párrafo 10.

El mismo tipo se aplicará a los intereses post-laudo hasta la fecha de pago efectivo.

439. **El quinto grupo de pretensiones son las que se agrupan en el Petitorio undécimo consistente en que se ordene a PRONATEL y al MTC pagar solidariamente a Redes Andinas la suma de US$ 37'518,577.00 (treinta y siete millones quinientos dieciocho mil quinientos setenta y siete y 00/100 dólares de los Estados Unidos de América) más los intereses que se devenguen a partir del 10 de junio de 2022, por concepto de indemnización por los daños derivados de su incumplimiento contractual neto de cualquier impuesto que resulte aplicable.**

440. La cantidad reclamada se desglosa en varios conceptos[234] que analizaremos por separado.

441. **El primero** de ellos es el coste por la ejecución de las garantías. La Demandante reclama dos conceptos bajo este epígrafe.

442. El primero es el coste que se materializa, a juicio de la Demandante, en el daño financiero causado por el tiempo sin disponer de ese dinero hasta que se cumpla el laudo y el beneficio que se habría obtenido si se hubiera dispuesto de él.

443. La primera objeción que formulan las Demandadas está vinculada a la legitimación para reclamar este concepto. Efectivamente las Demandadas consideran que "*Redes no tiene titularidad para exigir a Pronatel por unos supuestos daños incurridos por terceros. No hay un nexo causal entre el daño que se exige y la parte de la relación obligacional*"[235]. El argumento se basa en que es Quanta Services Inc ["**Quanta Services**"] quien habría sufrido el daño que se invoca, pero quien lo reclama es Redes.

444. Las Demandadas consideran que su tesis se ve reforzada por el hecho de que lo que se reclama por la Demandante es rentabilidad ligada al costo de oportunidad por no haber dispuesto de los fondos usados para pagar las Garantías de Adelanto y de Fiel Cumplimiento[236], algo que no se discute[237].

445. Finalmente, las Demandadas alegan que el perito de la Demandante, el Sr. Piñeiro, reconoció que esos montos no han sido pagados por Redes a Quanta Services[238].

446. Por su parte, Redes defiende su legitimación para reclamarlas invocando que "*fue

---

Escrito de Alegatos Finales de la Demandante, págs. 121 a 144, la última de las cuales incluye un cuadro en el que se recogen los conceptos y cuantías. El artículo del CC que justifica la reclamación de daños y perjuicios es el 1321, que dice: "*El resarcimiento por la inejecución de la obligación o por su cumplimiento parcial, tardío o defectuoso, comprende tanto el daño emergente como el lucro cesante*".

[235] Escrito de Alegatos Finales de las Demandadas, párrafo 399.

[236] Escrito de Alegatos Finales de las Demandadas, párrafo 398.

[237] Escrito de Alegatos Finales de la Demandante, párrafos 391 y 392.

[238] Escrito de Alegatos Finales de las Demandadas, párrafos 400 y 401.

*Redes Andinas, parte del Contrato de Financiamiento, quien presentó las Garantías de Adelanto y Fiel Cumplimiento*"[239]. Esta circunstancia no es discutible porque el Contrato fue suscrito, exclusivamente, por Redes en su condición de Contratado. Quanta Services no es parte del Contrato.

447. La consecuencia de esta circunstancia es que es Redes, y solo Redes, quien puede invocar, con base en el Contrato, los daños que atribuye a la contraparte contractual por incumplimientos del propio Contrato.

448. La Demandante también alega que "*una vez que Pronatel solicitó la ejecución de ambas garantías a Chubb Seguros Perú S.A. ((en adelante, "Chubb"), Chubb a su turno requirió a Redes Andinas (y no a un tercero) que reembolse los importes de las mismas. Por lo tanto, no existe duda de que es Redes Andinas quien cuenta con legitimidad para requerir no solo el reembolso de los importes de dinero de la Garantía de Adelanto y de Fiel Cumplimiento, sino también los daños causados por su indebida ejecución*"[240].

449. No hay duda de que el Contrato exige[241] que el Contratado entregue las Garantías de Adelanto y de Fiel Cumplimiento, emitidas por una empresa bancaria local o empresa de seguros local o por una entidad financiera internacional. En el caso que nos ocupa fue una entidad de seguros local (Chubb)[242].

450. Tampoco hay disputa en que PRONATEL exigió a Chubb la ejecución de las Garantías[243] y de que la ejecución se produjo[244].

451. Por su parte, la Demandante reconoce que fue Redes quien reembolsó a Chubb los importes de las Garantías que PRONATEL había ejecutado a Chubb[245], si bien afirma que lo hizo con cargo a fondos de Quanta Services Inc.

452. Para justificar el daño patrimonial sufrido por Redes, la Demandante se apoya en que en el "Joint Venture Operating Agreement" [ el"**JOA**"] celebrado entre Redes y Servicios de Infraestructura del Perú SAC (empresa de propiedad de Quanta Services Inc) para efectos de la presentación de garantías bajo el Contrato de Financiamiento, se utilizarían las "*bonding facilities de Quanta Services*". Asimismo, y como veremos en detalle debajo, el JOA establecía la obligación de Redes Andinas de reembolsar los costos que genere la ejecución de las garantías[246].

---

[239] Escrito de Alegatos Finales de la Demandante, párrafo 384 (i).

[240] Escrito de Alegatos Finales de la Demandante, párrafo 384 (ii).

[241] Cláusula Decimoquinta.

[242] Documentos C-002 y C-003.

[243] Documentos C- 008 y C-011.

[244] Documentos C- 010 y C-013.

[245] Escrito de Alegatos Finales de la Demandante, párrafo 385.

[246] Escrito de Alegatos Finales de la Demandante, párrafo 386.

453. El JOA establece que Redes reembolsará "*todos los costos y gastos razonablemente documentados en los que el SIP haya incurrido en relación con todos los acuerdos de fianza, seguridad, aval y garantía financiera, incluyendo, pero sin limitarse a, los costes y gastos incurridos por SIP en relación con cualquier obligación de fianza de RAC*"[247].

454. Aquí surge el problema de la legitimidad de Redes. En efecto, nadie duda de que Redes está obligada a reembolsar a SIP, que no a Quanta Services, todos los costos y gastos documentados en que SIP haya incurrido en relación con las garantías. Sin embargo, lo que ahora se reclama por Redes son costos de oportunidad ligados a no haber dispuesto de esas cantidades desde que se ejecutaron las fianzas hasta que se cumpla el Laudo y, por tanto, se devuelvan esas cantidades a Redes. Pero, con una peculiaridad, que es que se dice que quien no ha dispuesto de esos montos es Quanta Services, que, además de no ser parte en el Contrato, tampoco lo es en el JOA entre SIP y Redes[248].

455. A ello hay que añadir que no consta que Redes haya pagado cantidad alguna hasta la fecha por este concepto, ni haya hecho un reconocimiento de deuda por esta cifra, y tampoco que Quanta Services ni SIP hayan reclamado a Redes cantidad alguna por este concepto. Ni siquiera que Quanta Services se la haya reclamado a SIP.

456. Por tanto, en este momento no se pude decir que quien es Parte en este procedimiento arbitral, que es únicamente Redes, haya tenido, por esta vía, un costo o gasto del que deba ser reembolsada por PRONATEL. En otras palabras, no hay un daño reclamable por Redes ni lo pueden reclamar sociedades con personalidad jurídica propia que no son Parte en este arbitraje.

457. Debe añadirse que una reclamación por el costo de oportunidad es de difícil acogida por las incertidumbres que existen sobre la obtención de los resultados que, idealmente, la compañía habría obtenido si hubiera dispuesto de estas cantidades.

458. Consecuentemente, esta reclamación no puede ser estimada y, por ende, no es preciso examinar si el cálculo debía hacerse en relación con el ROC[249] de Quanta Services.

459. Cuestión diferente es la reclamación de intereses de las cantidades indebidamente ejecutadas por PRONATEL.

460. Las cantidades cobradas por PRONATEL han estado en su poder desde mayo de

---

[247] Documento C- 790, cláusula 9.1, en versión original inglesa, de la que la Demandante ha realizado su propia traducción, que es la que figura en el párrafo 388 del Escrito de Alegatos Finales de la Demandante que se ha transcrito.

[248] En el JOA Quanta Services Perú S.A.C. aparece mencionada en la cláusula 6 como la epecista contratada por Redes en el Contrato de EPC entre ambas compañías. Por su parte, Quanta Services Inc. aparece citada en la Cláusula 9.2. En esa cláusula se dice que SIP facilitará a Redes las garantías que precise en el Contrato hasta que Redes pueda hacerlo por sí misma. Es SIP quien utiliza las "*bonding facilities de Quanta Services Inc.*" para obtener las garantías que tiene que prestar a Redes.

[249] *Return on Capital* (párrafo 390 del Escrito de Alegatos Finales de la Demandante).

2019, lo que significa que su devolución debe incluir, no solo el principal sino los intereses devengados para ser coherentes con el principio de reparación integral que establece el Derecho peruano[250]. La fecha de cómputo debe ser el 2 y 15 de mayo de 2019, respectivamente[251]. La tasa de interés debe ser la misma que la aplicada al saldo pendiente de pago, es decir, el tipo de interés medio anual del Bono de Perú a 10 años en dólares americanos.

461. **En segundo lugar**, la Demandante reclama US$ 7,322,236.00 (siete millones trescientos veintidós mil doscientos treinta y seis mil dólares de Estados Unidos) por lo que denomina <u>sobrecoste de retraso</u>.

462. La Demandante explica que la construcción sufrió retrasos por eventos no imputables a Redes que podrían haberse resuelto con la intervención de las Demandadas. Estas demoras han causado que los gastos indirectos incurridos por Redes se hayan incrementado considerablemente. Por gastos indirectos se entienden "*aquellos derivados de tareas de gestión o departamentos transversales como recursos humanos o corporativos*"[252] que se ven afectados por el paso del tiempo.

463. Por tanto, los informes periciales de la Demandante analizan los costos indirectos sufridos por Redes (directamente o a través de la epecista) en este proyecto[253], calcula los días de retraso[254] y obtiene un costo indirecto diario de cada día de retraso[255].

464. Según el último cálculo presentado por la Demandante[256], la cifra inicialmente reclamada se ha ido ajustando hasta reducirse a la todavía muy importante suma de US$ 7,322,236.00.

465. Una de las objeciones planteadas por los peritos de las Demandadas ha sido la de que la reclamación de Redes no era coherente con la planilla de costos de Quanta Perú, la empresa epecista, que no consideraba costos indirectos parte de los que sí

---

[250] Este principio resulta del artículo 1321 del CC ("*resarcimiento por la inejecución de la obligación o por su cumplimiento parcial, tardío o defectuoso, comprende tanto el daño emergente como el lucro cesante*"). Lo expresa muy claramente el profesor Osterling, al que las Partes citan en sus respectivos escritos, cuando dice "la indemnización, para ser completa, debe comprender todo lo necesario a fin de colocar al acreedor en la misma situación jurídica en que se encontraría si la obligación hubiese sido cumplida" (Documento C- 200. OSTERLING, Felipe. "Estudio Preliminar de la Responsabilidad Civil Contractual" en Carlos Soto, "Tratado de Responsabilidad Civil Contractual y Extracontractual". Instituto Pacífico (2015)., página 58. Para cumplir con ese principio, la indemnización debe extenderse al daño derivado del transcurso del tiempo desde que se produjo el daño.

[251] Escrito de la Demandante de 19 de mayo de 2019, párrafo 13.

[252] PER.C-5, párrafo 464.

[253] US$ 12,037,084 según Demanda (C-004), párrafos 500 y 501; US$ 8,942,731 según PER.C-9, párrafo 153.

[254] 976 según Demanda (C-004), párrafo 502.

[255] US$ 10,098 según Demanda (C-004), párrafo 502; US$ 7,502 según PER.C-9, párrafo 153.

[256] Escrito de Alegatos Finales de la Demandante, párrafo 403.

se incluyen en esa categoría por la empresa que realizó los informes periciales de la Demandante, FTI.

466. Es indudable que un experto tiene libertad para realizar su propia clasificación de los costos soportados por su cliente y que, por ello, no puede exigirse una coincidencia plena entre lo que el cliente y el perito consideran. No es menos cierto, no obstante, que el criterio seguido por el propio cliente es un elemento relevante, especialmente en el caso de una empresa epecista, porque no es discutible que una empresa dedicada a la ejecución de contratos de gran importancia como son los EPCs, tiene que saber distinguir entre costos directos o indirectos.

467. En el caso de Quanta Perú, además, se trata de una sociedad integrada en un grupo internacional de un tamaño notable por lo que cabe presumir una capacidad profesional y técnica suficiente como para realizar correctamente esta distinción.

468. Lo expuesto lleva a concluir que la opinión experta de FTI, lo que se denomina recategorización[257], tendría que estar muy sólidamente fundada para ser acogida con preferencia a la tesis que su propio cliente había adoptado.

469. Otra crítica que no se puede obviar es la que BRG formula cuando dice que falta información para sustentar la condición de indirectos de muchos de los costos que FTI califica como tales[258].

470. FTI admite que la categorización que se basa en la planilla de Quanta Perú le permite llegar a una cifra de costes indirectos (74.6%) que extrapola a la parte correspondiente a Redes y a partidas en las que no es posible desagregar qué parte de los conceptos están relacionados con el tiempo[259].

471. Los ajustes realizados por FTI a raíz de las críticas de BRG evidencian la fragilidad de la metodología seguida, que no puede considerarse suficientemente fiable para una reclamación de daños de esta envergadura y que obligaría a contemplarla con ojos críticos si fuera a ser aceptado el concepto reclamado.

472. Mas no es éste tampoco el principal problema al que se enfrenta esta reclamación para poder prosperar. La cuestión medular gira sobre la responsabilidad de los retrasos.

473. Ya hemos explicado que la resolución contractual operada por PRONATEL es inválida porque atribuye a Redes el retraso en la ejecución del Contrato cuando lo cierto es que las demoras se han debido a hechos no imputables a Redes.

474. Esos hechos no imputables a Redes tampoco pueden ser considerados responsabilidad de PRONATEL porque son cuestiones que, en esencia, proceden

---

[257] PER.C-9, párrafo 143.

[258] BRG Segundo Reporte Pericial de Contestación, párrafos 435 a 447.

[259] PER. C-9, párrafos 144 a 148.

de la situación de los terrenos y de las dificultades para adquirirlos o sanearlos.

475. Las ampliaciones de plazos solicitadas por Redes, salvo la última, fueron admitidas por PRONATEL. Es cierto que no llegaron a cuantificarse los retrasos imputables a la problemática de la adquisición de terrenos, pero las ampliaciones se fueron concediendo por otras causas y Redes pudo avanzar en la implementación de las dos redes. Por consiguiente, no pueden achacarse a Redes los retrasos que se produjeron durante los períodos de tiempo en que estaban vigentes las ampliaciones de plazos.

476. Es en la última petición de prórroga cuando se produce el indebido rechazo de PRONATEL. Así las cosas, a primera vista, podría pensarse que los retrasos de esa última fase son atribuibles a las Demandadas, pero una reflexión más profunda conduce al rechazo también de los costos indirectos de ese lapso temporal por dos razones.

477. La razón fundamental es que Redes siguió trabajando durante ese tiempo, aunque no gozara de una ampliación formal.

478. En efecto, Redes siguió con los trabajos hasta después de la Resolución del Contrato.

479. Aún hay un punto más que debemos recordar. Ya se ha expuesto que la no aplicación del Decreto de Urgencia al Proyecto Cajamarca supone una diferencia de trato acreditativa de que Redes debería haber recibido mayor tiempo y facilidades para concluir el Proyecto, pero el hecho de que el Decreto de Urgencia sea de diciembre de 2019 y de que Redes paralizase sus trabajos el 30 de junio del mismo año prueba que no haber sido beneficiado por el Decreto de Urgencia no fue un perjuicio en cuanto se refiere a los retrasos de las obras antes de su paralización.

480. La conclusión de cuanto se ha expuesto es que el Tribunal Arbitral no considera justificada la reclamación de daños por este concepto.

481. **El tercer reclamo** dentro de este petitorio es el sobrecoste de entrega ordinaria.

482. Estamos ante los costes que estaban previstos al iniciarse el Proyecto pero que se excedieron por las vicisitudes que atravesó la entrega de los bienes en la fase posterior a la indebida resolución del Contrato.

483. Como ya sabemos, Redes procuró la entrega de los activos, a lo que PRONATEL respondió con la negativa a recibirlos. Esta extraña situación dificultó y alargó el proceso de entrega.

484. La problemática se centra en medir los retrasos. La Demandante encargó a FTI Construcción el análisis de esta cuestión. Lo que hizo FTI fue establecer una nueva línea base y determinar cuánto del tiempo empleado en la realidad era imputable al retraso de PRONATEL

485. También BRG realizó sus cálculos con resultados muy diferentes.

486. Mientras que el perito de la Demandante fijó la nueva línea base en 79 días, el de las Demandadas la elevó hasta los 141 días[260].

487. La tesis de las Demandadas no puede prosperar porque asume un punto de partida que no se corresponde con la realidad, que es la normalidad de la situación en la que la entrega se haría en fases sucesivas y sin haberse producido la resolución.

488. La falta de ajuste entre la realidad y el caso base del perito de las Demandadas atribuye mayor credibilidad al cálculo de la Demandante.

489. En todo caso la entrega se extendió a 415 días, resultó extremadamente compleja, dilatada en el tiempo y carente de colaboración por parte de PRONATEL, lo que la hace responsable de los sobrecostes incurridos que ascienden a US$ 2,477,387.00 (dos millones cuatrocientos setenta y siete mil trescientos ochenta y siete dólares de Estados Unidos)[261], con la consiguiente estimación de esta pretensión.

490. Los intereses de esa cifra hasta el 10 de junio de 2022 son calculados por la Demandante[262],tomando como fechas de cómputo inicial el 30 de junio de 2020 y 1 de mayo de 2021, que no son rebatidas por las Demandadas[263], y utilizando como tasa el ROC, que es la rentabilidad que habría podido obtener Redes si el dinero gastado en estos sobrecostes lo hubiera podido dedicar a otros fines [264], estos intereses ascienden a US$ 279,007 (doscientos setenta y nueve mil siete dólares de Estados Unidos) y el Tribunal Arbitral los considera correctos. Desde el 10 de junio de 2022 se siguen devengando intereses hasta la fecha del laudo aplicando la tasa del ROC. El mismo tipo se aplicará a los intereses post-laudo hasta la fecha de pago efectivo.

491. **La cuarta cantidad** es la que se corresponde con el coste de entrega extraordinaria o, lo que es lo mismo, costes cuya naturaleza no estaba prevista y que surgieron como consecuencia de la resolución del Contrato y subsiguiente negativa de PRONATEL a aceptar los bienes[265] (peritos técnicos para certificar el estado técnico del activo, actas notariales utilizadas ante la ausencia de participación de

---

[260] Escrito de Alegatos Finales de la Demandante, párrafos 412 y 413.

[261] Escrito de Alegatos Finales de la Demandante, cuadro de la página 144; Dúplica de la Reconvención, párrafo 351; Tercer Informe de FTI Construcción (PER. C-9), párrafos 154 a 165.

[262] Escrito de la Demandante de 19 de mayo de 2022, párrafos 8,9, 15 y 16.

[263] Las Demandadas cuestionan la aplicación del ROC a todos los capítulos de daño emergente de la reclamación de las Demandantes por entender que la tasa aplicable, de haber alguna, sería la tasa de los Bonos de Estados Unidos a 10 años (Escrito de 25 de mayo de 2022, párrafo 10).

[264] El Tribunal Arbitral no acepta la aplicación de la tasa de rendimiento de bonos del Tesoro de EE.UU. con vencimiento a 10 años, como pretenden las Demandadas (Escrito de Alegatos Finales de las Demandadas, párrafo 205) porque la actividad se realizó con Perú y porque el ROC se acerca más a la actividad real y a los datos públicos.

[265] Escrito de Alegatos Finales de la Demandante, párrafos 422 a 429.

PRONATEL en la entrega).

492. La Demandante ha justificado la existencia de estos costes[266].

493. Las Demandadas apenas se han referido a estos costes extraordinarios porque su crítica le lleva a su posición inicial de corrección de la Resolución y de imposibilidad de la entrega de bienes no saneados y de entrega parcial de ciertos bienes[267].

494. Puesto que ya hemos expresado la posición del Tribunal Arbitral sobre todas estas materias y no habiendo cálculo alternativo de las Demandadas, corresponde la estimación de los gastos extraordinarios de entrega y sus intereses en los términos planteados por la Demandante, es decir, US$ 2,806,276 de principal y US$ 418,503 por intereses al 10 de junio de 2022[268] Desde el 10 de junio de 2022 se siguen devengando intereses hasta la fecha del laudo aplicando la tasa del ROC. El mismo tipo se aplicará a los intereses post-laudo hasta la fecha de pago efectivo.

495. **En quinto lugar,** se reclaman costes incurridos por Redes por cuenta de PRONATEL.

496. Se trata de costos incurridos con posterioridad a la entrega de los activos pero que han tenido que seguir siendo sufragados por Redes ante la negativa de PRONATEL a recibir los activos[269].Un buen ejemplo son los gastos de almacenaje que todavía hoy se siguen devengando en tanto en cuanto PRONATEL se sigue negando a recibir los activos.

497. FTI ha revisado estos costes y ha concluido en que, hasta la fecha de su último Informe, son reclamables US$ 459,590.00 (cuatrocientos cincuenta y nueve mil quinientos noventa dólares de los Estados Unidos) más intereses[270].

498. Las Demandadas no han presentado contrainforme ni han entrado al análisis de este concepto[271].

499. En consecuencia, puesto que se trata de un daño efectivo, acreditado documental y pericialmente y no contradicho, procede su estimación en los términos de la pretensión de la Demandante, incluidos los intereses, es decir, US$ 459,590 por principal y 33,850, por intereses hasta el 10 de junio de 2022.[272] Desde el 10 de

---

[266] Escrito de la Demandante de 19 de mayo de 2022, párrafos 8,9, 17 y 18.

[267] Escrito de las Demandadas de 25 de mayo de 2022, párrafo 13.

[268] Escrito de Alegatos Finales de la Demandante, cuadro de la página 144; Dúplica de la Reconvención, párrafo 351; Tercer informe de FTI Construcción (PER:C-9), párrafos 154 a 165.

[269] Escrito de Alegatos Finales de la Demandante, párrafos 430 a 434.

[270] Escrito de la Demandante de 19 de mayo de 2022, párrafos 8,9, 21 y 22.

[271] Escrito de las Demandadas de 25 de mayo de 2022, párrafo 13.

[272] Escrito de Alegatos Finales de la Demandante, cuadro de la página 144; Dúplica de la Reconvención, párrafo 351; Tercer Informe de FTI Construcción (PER. C-9), párrafos 154 a 165.

junio de 2022 se siguen devengando intereses hasta la fecha del laudo aplicando la tasa del ROC. El mismo tipo se aplicará a los intereses post-laudo hasta la fecha de pago efectivo.

500. **En último término,** la Demandante solicita que se le reconozca <u>el lucro cesante derivado de habérsele privado de la operación de la Red de Acceso durante 10 años,</u> como estaba previsto contractualmente.

501. No se discute que, desde el punto de vista de los beneficios de una operación constructiva, uno de sus atractivos es la operación o el mantenimiento de lo construido.

502. En el caso que nos ocupa estamos ante la operación de la red de banda ancha en una amplia región de Perú durante un plazo de tiempo notable. Esa operación se habría realizado si la fase inicial se hubiera superado.

503. No se oculta que siempre existe un riesgo de fracaso en los proyectos constructivos y de telecomunicaciones, pero está acreditado que los demás proyectos regionales similares culminaron con éxito tras el favorecimiento que supuso la aprobación del Decreto de Urgencia con las nuevas medidas que contiene para facilitar la solución de los problemas de los terrenos.

504. No puede afirmarse concluyentemente que, sin ningún género de duda, Redes hubiera llegado a operar la Red de Acceso, pero es lo que, en circunstancias normales, hubiera ocurrido porque era lo que las Partes habían acordado en el Contrato, lo deseado por Redes y lo financieramente interesante para el Contratado. No se trata, por tanto, de un daño hipotético o incierto.

505. En estas circunstancias la probabilidad de que se hubiera llegado a producir esta operación es lo suficientemente razonable como para considerar que se puede reclamar por Redes el lucro cesante vinculado a esa operación. La pérdida del lucro cesante es una consecuencia directa e inmediata del incumplimiento de PRONATEL, que impidió a Redes culminar la fase de inversión en la Red de Acceso.

506. Cuestión muy distinta es el cálculo del lucro cesante.

507. El primer obstáculo opuesto por las Demandadas es que Redes arroja pérdidas en los últimos años lo que hace difícilmente pensable que la operación hubiera ofrecido resultados positivos.

508. Este argumento no se sostiene porque los resultados actuales, que son los de una compañía sin actividad y, por tanto, sin ingresos, nada tienen que ver con los que habría registrado una sociedad operativa, desarrollando la actividad que culminaba el Contrato. De aceptar la tesis de las Demandadas, cualquier sociedad a la que se le hubiera privado de la posibilidad de terminar una obra que después debería operar, estaría imposibilitada de reclamar el lucro cesante vinculado a la pérdida de la actividad que la contraparte le habría hecho imposible, aunque esa actuación

fuera contraria a derecho. En otras palabras, la parte contratante incumplidora se vería beneficiada por su incumplimiento y la parte cumplidora estaría condenada a resultar perjudicada por su cumplimiento. Una situación de este tipo no resiste un mínimo análisis lógico.

509.   Cosa distinta es que el cálculo del lucro cesante sea una técnica delicada que debe realizarse sobre la base del conocimiento de la actividad en la que van a generarse los ingresos, con rigor en las previsiones y con una aproximación conservadora que evite los sueños de ganancias.

510.   El estudio que ha ofrecido la Demandante cumple con el primer requisito porque los peritos intervinientes aúnan el conocimiento del sector de las telecomunicaciones en Perú[273]con la experiencia en el cálculo de daños y perjuicios, incluidos los financieros[274].

511.   El rigor de los datos técnicos se acredita en los modelos topológicos de la red y en el estudio de la capacidad de la red para transportar el tráfico proveniente de la demanda[275].

512.   También se han evaluado la demanda existente en las localidades a cubrir por este Proyecto, las tarifas y los servicios para poder hacer una proyección ajustada de los ingresos[276].

513.   El recurso a fuentes públicas y al estudio de inversión pública a nivel de factibilidad realizado por PRONATEL[277] son ejemplos de que se han utilizado fuentes no discutidas en cuanto a su origen o sesgo, difícilmente cuestionables por las Demandadas.

514.   Es significativo que PRONATEL no haya aprovechado la presencia de los peritos de GYGA para contrainterrogarles y obtener aclaraciones, más información o poner en cuestión sus afirmaciones. La simple negativa a aceptar la posición del experto de la contraparte no permite valorar la robustez de esa posición.

515.   Las críticas de BRG y de PRONATEL al cálculo del mercado que captaría Redes y los ingresos que generaría no son suficientemente fundados cuando se leen las explicaciones de GYGA sobre los comparables que deben manejarse para hacer una aproximación certera. Es imposible que una cuantificación de estas características, cuando la operación no se ha llegado a iniciar, tenga garantías de suficiente

---

[273]  Los ingenieros Gonzalo Díaz y Yury Escobar, de GYGA Consulting S.A.C. (en adelante, "**GYGA**") ofrecen credenciales muy fiables de su experiencia en el sector de telecomunicaciones en Perú y, en particular, en el medio rural, como se puede comprobar en el último informe elaborado por GYGA (PER:C-11, párrafo 23).

[274]  Los informes de FTI Quantum (PER.C-3; PER.C-6 y PER.C-10) dan muestra de la experiencia de los Sres. Piñeiro y Aliaga en estas materias.

[275]  Escrito de Alegatos Finales de la Demandante, párrafo 438.

[276]  Escrito de Alegatos Finales de la Demandante, párrafo 438.

[277]  Escrito de Alegatos Finales de la Demandante, párrafo 439.

exactitud, pero la inexistencia de un cálculo alternativo más convincente sitúa al Tribunal Arbitral ante una doble opción: aceptar el modelo que ofrece la Demandante o realizar un ajuste que, necesariamente, va a carecer de sustento técnico suficiente. La prudencia aconseja decantarse por la fórmula apoyada por los peritos de la Demandante en la medida en que las Demandadas no han creado una duda significativa sobre la corrección de lo defendido por GYGA.

516. El mayor problema radica en pronunciarnos sobre la metodología seguida por los peritos de Redes.

517. El método empleado es el de descuento de flujos de caja[278] ["**DFC**"]. Se basa en "*la consideración de los ingresos futuros esperados por la explotación de un activo, en este caso por la explotación de la Red de Acceso por parte de Redes Andinas, a ser generados durante la vida económica del Proyecto Cajamarca[279]*".

518. No son necesarios grandes esfuerzos argumentativos para concluir que el DFC es la forma de valoración más utilizada en el mundo financiero para calcular ingresos futuros dejados de percibir[280].

519. Los peritos de las Demandadas se oponen a su uso por considerarlo inapropiado en el caso de una empresa que no tiene actividad. Los expertos de la Demandante consideran que la crítica carece de fundamento porque la propia BRG admite la aplicación del DFC a empresas que no están en marcha cuando se basa en información pública disponible en la fecha de resolución del Contrato y eso es justo lo que ocurre porque GYGA se ha basado en fuentes públicas que, en gran medida, existían en la fecha de resolución del Contrato.

520. La segunda objeción que formula PRONATEL es que el análisis de los peritos de la Demandante es "*altamente especulativo*"[281]. Sin embargo, existen suficientes datos en los informes periciales aportados por la Demandante para no aceptar de partida esta crítica, tales como no haber utilizado los máximos de tarifas autorizados o no haber tenido en cuenta el aumento del tráfico de internet que ha supuesto la pandemia.

521. Es un debate habitual en estas situaciones si los informes periciales han tomado una posición conservadora y la respuesta nunca es fácil. En el supuesto que analizamos una revisión de los datos aportados por GYGA y FTI permiten afirmar que, al menos, el cálculo no es desproporcionado.

522. La Demandante propone la aplicación de una Tasa de Descuento del 7% utilizando

---

[278] *Discounted Cash Flow* o DCF en inglés, párrafo 444 del Escrito de Alegatos Finales de la Demandante.

[279] PER C-3, Informe de FTI Quantum, pagina 26.

[280] PER C-3, página 26: "*La forma habitual de estimar el lucro cesante es mediante el descuento de los flujos futuros de caja*".

[281] Escrito de Alegatos Finales de la Demandante, párrafo 448, se remite a las declaraciones del Sr. Chambouleyron en la audiencia.

la metodología del coste medio ponderado del capital invertido[282].

523. Las Demandadas consideran que, si se aplica, debe ser una Tasa del 9%.[283]

524. La propuesta de la Demandante cuenta con el aval de la firma FTI y el Profesor Pablo Fernández, cuyos conocimientos y experiencia están fuera de toda duda. A su vez, la posición de BRG también debe ser considerada con el máximo respeto por los profesionales de los que procede.

525. Expuesto lo anterior, es forzoso reconocer que las conclusiones sobre esta materia nunca son totalmente exactas porque la introducción de numerosos factores y la inevitable subjetividad que supone su manejo impide un acierto pleno. Todo ello aconseja la prudencia valorativa.

526. A tal efecto el Tribunal Arbitral ha revisado detenidamente los informes periciales aportados por las Partes. Los de la Demandante muestran un orden lógico correcto: examinan los flujos de caja a percibir por Redes en los 10 años de operación, la inversión que Redes tendría que hacer para poder explotar la Red de Acceso, toma como referencia una fecha de inicio de operaciones (31 de marzo de 2020) y aplica una tasa de descuento[284] para calcular el Valor Actual Neto ("**VPN**").

527. BRG cuestiona todos y cada uno de los puntos mencionados[285], lo que obliga a FTI a rebatir las críticas del perito de las Demandadas e, igualmente, lo hace punto por punto.

528. Uno de los puntos más debatidos es la aplicación del método DFC. Al margen de la utilización habitual de este método para traer a valor presente los flujos de caja que se van a obtener en el futuro, las otras metodologías habituales no ofrecen una mejor alternativa en este caso.

529. El método de utilización del valor de negocio mediante referencias de valor de otros negocios similares de los que haya datos no es factible porque no hay comparables, es decir, compañías o transacciones similares[286].

530. El de valor de los activos lleva a una reclamación sustancialmente mayor, lo que, en virtud de la prudencia valorativa que creemos conveniente aplicar en reclamaciones de lucro cesante, aconseja no adoptarlo[287].

531. El enfoque *ex ante* o *ex post* es otra de las cuestiones que se debaten. FTI utiliza el

---

[282] En inglés, *Weighted Average Cost of Capital* [la "**WACC**"], párrafos 329 y siguientes del Primer Informe de FTI Quantum (PER. C-3).

[283] Escrito de Alegaciones Finales de la Demandante, párrafo 452.

[284] Segundo Informe de FTI Quantum, párrafo 178 (PER. C-6).

[285] Segundo Informe de FTI Quantum, párrafo 181 (PER. C-6).

[286] Segundo Informe de FTI Quantum, párrafos 199 a 204 (PER. C-6).

[287] Segundo Informe de FTI Quantum, párrafos 205 a 208 (PER. C-6).

segundo mientras que BRG se inclina por el primero.

532. El enfoque *ex ante* solo tiene en cuenta la información disponible a la fecha de terminación del Contrato mientras que el *ex post* utiliza toda la información disponible cuando se realiza el análisis[288].

533. Aunque ambos sistemas se utilizan, el uso del *ex post* en nuestro caso es más adecuado porque las necesidades y la tecnología cambian en el período de varios años que van desde el inicio de la licitación hasta el momento actual y teniendo en cuenta la fecha de operación efectiva[289].

534. Cuestión también sujeta a discusión es la de la fecha de valoración.

535. FTI se decanta por el 31 de marzo de 2020, que es la fecha en que entendió el perito que empezaría a operar la Red de Acceso. Por el contrario, BRG es partidario de utilizar la fecha de resolución del Contrato (abril de 2019).

536. El Tribunal Arbitral considera más acertada la fecha de potencial inicio de las operaciones porque en la de resolución del Contrato no se habrían generado flujos de caja al no estar operativa la Red de Acceso.

537. Los márgenes de rentabilidad que utiliza FTI son ampliamente cuestionados por BRG por considerarlos demasiado altos.

538. FTI responde señalando que los datos que BRG emplea para considerar que los márgenes de Redes serían altos no son de sectores comparables (otros servicios como agua y electricidad), se corresponden con países emergentes de otras áreas geográficas del mundo (singularmente Asia), no tienen en cuenta las especialidades de las zonas rurales y el hecho de que Redes no tendría competencia durante unos años[290]. Estas objeciones son correctas.

539. Finalmente, en cuanto a la WACC son varios los aspectos en los que ha surgido la disparidad de opiniones. El primero es la tasa libre de riesgo.

540. FTI aplica un 2.34% en base al Bono de Perú a 10 años en USD a 31 de marzo de 2020, mientras que BRG utiliza un 2.59% en base al promedio de los 12 meses anteriores de ese mismo bono.

541. La tasa libre de riesgo es la alternativa de inversión que no tiene riesgo para el inversionista y que ofrece un rendimiento seguro en un plazo determinado.

542. Es normal medirla en función de los bonos de los estados. Cada estado tiene su nivel de riesgo. En el caso de Perú los bonos en USD a 10 años parecen el indicador

---

[288] Segundo Informe de FTI Quantum, párrafo 213 (PER. C-6).

[289] Segundo Informe de FTI Quantum, párrafos 210 a 221 (PER. C-6).

[290] Segundo Informe de FTI Quantum, párrafos 271 a 285 (PER. C-6).

adecuado.

543. Lo que no es aconsejable es la utilización de promedios históricos que no están garantizados. Es más seguro tomar un momento fijo en el tiempo[291].

544. Otro dato relevante es el cálculo que realiza FTI siguiendo la metodología de BRG, pero corrigiendo lo que FTI considera errores de BRG. Con esas correcciones, la tasa de BRG sería del 6.5%. A su vez, la tasa que resultaría aplicando la metodología de BRG, pero con la fecha de valoración de FTI (31 de marzo de 2020) es el 6.9%. Ambos datos confirman la robustez del cálculo de FTI (7%) e inclinan al Tribunal Arbitral a darlo por correcto[292].

545. En su Segundo Informe, BRG hace algunos cambios como que la fecha de operación de la Red de Acceso no sería hasta agosto de 2021, pero mantiene sustancialmente la misma posición que en el Primer Informe y no consigue desvirtuar las conclusiones de FTI, como se explica en el Tercer Informe de FTI[293]. Para el Tribunal Arbitral es relevante que la sucesión de informes periciales permite apreciar una diferencia: mientras que los de FTI van dando respuesta detallada a los de BRG, los de esta empresa consultora muestran una menor capacidad de contestación a los de FTI y reiteran argumentos ya empleados.

546. Por todo lo señalado, <u>el Tribunal Arbitral estima la pretensión de lucro cesante formulada por la Demandante</u> (US$ 7,121,783, siete millones ciento veintiún mil setecientos ochenta y tres dólares de los Estados Unidos de América)

547. En relación con los intereses, la Demandante utiliza la fecha ya mencionada, el 31 de marzo de 2020 y, como tasa, el tipo de interés medio anual del Bono de Perú a 10 años en dólares de los Estados Unidos. Las Demandadas no entran en detalles sobre esta cuestión pues se centran en negar la existencia de lucro cesante.[294]El Tribunal Arbitral, por las razones expuestas en relación con la reclamación de daños y perjuicios, considera aceptable la petición de intereses, que asciende a US$ 384,796 (trescientos ochenta y cuatro mil setecientos noventa y seis dólares de los Estados Unidos de América) hasta el 10 de junio de 2022. Desde esa fecha se siguen devengando intereses hasta la fecha del laudo aplicando el tipo de interés medio anual del Bono de Perú a 10 años en dólares de Estados Unidos de América. El mismo tipo se aplicará a los intereses post-laudo hasta la fecha de pago efectivo.

548. La petición de la Demandante incluye un inciso final que se refiere a que el monto que se reciba lo sea "*neto de cualquier impuesto que resulte aplicable*". Para comprender adecuadamente el funcionamiento del IGV en Perú, el Tribunal Arbitral formuló dos preguntas a las Partes que fueron respondidas en sus

---

[291] Segundo Informe de FTI Quantum, párrafos 292 a 297 (PER. C-6).

[292] Segundo Informe de FTI Quantum, párrafos 319 a 325 (PER. C-6).

[293] Tercer Informe de TFI Quantum (PER:C-10).

[294] Escrito de las Demandadas de 25 de mayo de 2022, párrafos 10 y 15.

respectivos escritos[295].

549. El resultado es que Redes no puede recuperar las cantidades pagadas en concepto de IGV porque, al haberse resuelto el Contrato, no ha llegado a haber operaciones de prestación de servicios o transferencia de bienes que sirvieran para compensar un crédito fiscal por IGV si hubiera llegado a existir. En consecuencia, procede estimar la petición de la Demandante en el sentido de que el monto que reciba sea neto de impuestos.

550. Sobre las peticiones del Petitorio 12 de condena al pago de los costos, costas y gastos del arbitraje más intereses a partir de la fecha del laudo, nos pronunciaremos sobre costos, costas y gastos del arbitraje tras la decisión sobre las pretensiones de la reconvención de las Demandadas. En relación a los intereses a partir de la fecha del laudo, ya se ha resuelto sobre ella en los casos en que se han aceptado las pretensiones de pago de cantidades[296]. En relación con los intereses de los costos del arbitraje, el Tribunal Arbitral considera que no proceden intereses pre-laudo por no haber méritos suficientes para ello y que los post-laudo siguen el mismo régimen que las demás partidas, empezando a computar desde la fecha de notificación del laudo y hasta la fecha de pago efectivo.

**B.    Reclamaciones de las Demandadas en relación con la demanda principal**

551. Como explicamos en el párrafo 138 de este Laudo, a continuación, el Tribunal Arbitral se pronunciará sobre las peticiones de las Demandadas relacionadas con la Demanda principal, que son:

> PETITORIO 01. La improcedencia de los incumplimientos imputados por Redes al Pronatel que habrían causado la resolución de contrato, toda vez que Pronatel ha demostrado haber actuado dentro de los términos que el Contrato de Financiamiento le permite.
>
> PETITORIO 02. Declarar la validez de la ejecución de la carta fianza de Fiel Cumplimiento de acuerdo a lo pactado en el Contrato de Financiamiento y ser de libre disponibilidad de Pronatel.
>
> PETITORIO 03. Declarar la validez de la ejecución de la carta fianza de Adelanto efectuadas de acuerdo a lo pactado en el Contrato de Financiamiento siendo parte de la liquidación del Contratos de Financiamiento y de ser compensada contra toda acreencia a favor de Redes.
>
> PETITORIO 04. Que, se declare que si corresponde aplicar las penalidades a Redes bajo el Contrato de Financiamiento.
>
> PETITORIO 05. Que, se rechace la liquidación del Contrato de

---

[295] Escrito de Alegatos Finales de la Demandante, párrafos 461 a 474; escrito de Alegatos Finales de las Demandadas, párrafos 109 a 117.

[296] Párrafos 438, 490, 494, 499 y 547 de este Laudo, a los que nos remitimos.

Financiamiento propuesta por Redes.

PETITORIO 06. Que, se rechace toda pretensión indemnizatoria de carácter solidaria contra Pronatel y/o MTC al no haber existido incumplimiento contractual y si el Tribunal declara la responsabilidad de Pronatel los daños son inciertos y especulativos.

552. El Petitorio 1 es la desestimación de la declaración de improcedencia de los incumplimientos imputados por Redes a PRONATEL que habrían causado la resolución del contrato.

553. Esta pretensión tiene que ser desestimada en coherencia con lo señalado en el párrafo 336 de este escrito en el que se estima la pretensión 1, 2 y 3 de la Demandante puesto que se ha declarado que la resolución del Contrato operada por PRONATEL era inválida y, por el contrario, las actuaciones de PRONATEL justifican la resolución del mismo Contrato por causas imputables a la misma PRONATEL.

554. La segunda petición es la declaración de validez de la ejecución de la carta fianza de Fiel Cumplimiento según lo pactado en el Contrato de Financiamiento y la declaración de que es de libre disponibilidad de PRONATEL.

555. El Tribunal Arbitral ha declarado la invalidez de la ejecución de la carta fianza de Fiel Cumplimiento por no respetar el Contrato en el párrafo 360 de este laudo y, por ello, procede la desestimación íntegra de esta pretensión de las Demandadas.

556. La tercera petición es la declaración de validez de la ejecución de la carta fianza de Adelanto según lo pactado en el Contrato de Financiamiento siendo parte de la liquidación del mencionado contrato y ser declarada compensada contra toda acreencia a favor de Redes.

557. El Tribunal Arbitral ha declarado la invalidez de la ejecución de la carta fianza de Adelanto por no respetar el Contrato en el párrafo 373 de este laudo y, por ello, procede la desestimación íntegra de esta pretensión de las Demandadas.

558. La cuarta pretensión es que se declare que corresponde aplicar a Redes las penalidades que procedan según el Contrato.

559. Esta petición debe ser desestimada en coherencia con el párrafo 427 de este Laudo en el que se declara la improcedencia de la imposición de penalidades a la Demandante.

560. La quinta petición es que se rechace la liquidación del Contrato de Financiamiento propuesta por Redes.

561. Al haberse estimado la correlativa pretensión de Redes, admitiendo la liquidación del Contrato propuesta por la Demandante en el párrafo 438 de este Laudo, procede la desestimación de esta petición de las Demandadas.

562. La sexta pretensión de las Demandadas es que se rechace toda pretensión indemnizatoria de carácter solidario contra PRONATEL y/o MTC al no haber existido incumplimiento contractual y, si el Tribunal declara la responsabilidad de PRONATEL, porque los daños son inciertos y especulativos.

563. Esta pretensión es parcialmente estimada porque solo una parte de las pretensiones de la Demandante reclamando daños y perjuicios han sido atendidas en los párrafos 460 ,490, 494, 499 y 546 a 549 de este Laudo, mientras otras pretensiones indemnizatorias de la misma Demandante han sido rechazadas en los párrafos 460 y 480 del propio Laudo.

### C.  Reclamaciones de las Demandadas en la demanda reconvencional

564. A continuación, el Tribunal Arbitral tiene que resolver sobre las peticiones de las Demandadas relacionadas con su Demanda reconvencional, que son:

> PETITORIO 01. Declarar la validez y eficacia de la Resolución Contractual de Pronatel comunicada el 23 de abril de 2019, notificada a Redes Andinas el 24 de abril de 2019.

> PETITORIO 02. Declarar que PRONATEL manifestó su oposición legítima a la recepción de los bienes de la Red de Transporte y Red de Acceso.

> PETITORIO 03. Declare el incumplimiento de la prestación a cargo de Redes respecto de la entrega de los Bienes de la Red de Acceso y Red de Transporte de acuerdo con el procedimiento establecido en el Contrato de Financiamiento.

> PETITORIO 04. Se ordene a Redes la devolución de la totalidad de los fondos desembolsados por PRONATEL para la ejecución de la Red de Transporte y de la Red de Acceso.

> PETITORIO 05. Que, en caso el Tribunal decida efectuar la liquidación del Contrato de Financiamiento este deberá ser en los términos del Contrato, excluyéndose los fondos de la carta fianza de fiel cumplimiento.

> PETITORIO 06. Se ordene a Redes el pago de todos los costos, costas y gastos arbitrales más intereses que ha generado este proceso.

565. La primera pretensión es que se declare la validez y eficacia de la resolución contractual operada el 23 de abril de 2019, notificada a Redes al día siguiente.

566. Esta pretensión no puede ser estimada porque el Tribunal Arbitral ya tiene declarado que la resolución contractual operada por PRONATEL no se ajustó a Derecho y, por tanto, fue inválida, como se recoge en el párrafo 336 de este Laudo.

567. La segunda petición es que se declare que PRONATEL manifestó su oposición legítima a la recepción de los bienes de la Red de Transporte y de la Red de Acceso.

568. <u>Tampoco puede prosperar esta petición</u> puesto que en el párrafo 389 de este Laudo ya se ha declarado que la oposición de PRONATEL a recibir los bienes de la Red de Transporte y de la Red de Acceso no se amparaba en el Contrato y no se ajustaba a Derecho.

569. Muy vinculada a la anterior está <u>la pretensión tercera</u> de las Demandadas consistente en que se declare el incumplimiento de la prestación a cargo de Redes respecto de la entrega de los Bienes de la Red de Acceso y Red de Transporte de acuerdo con el procedimiento establecido en el Contrato de Financiamiento.

570. Como ya se declaró en el párrafo 393 de este Laudo, la entrega de los bienes de las dos redes por parte de la Demandante se ajustó al Contrato, por lo que la correlativa pretensión de las Demandadas en sentido contrario <u>debe ser</u> forzosamente <u>desestimada</u>.

571. <u>La cuarta petición</u> es que se ordene a Redes la devolución de la totalidad de los fondos desembolsados por el PRONATEL para la ejecución de la Red de Transporte y de la Red de Acceso.

572. <u>No se puede estimar esta pretensión</u> porque el Tribunal Arbitral ya ha declarado que los fondos desembolsados por PRONATEL han sido empleados en la ejecución de la Red de Transporte y de la Red de Acceso y aún quedan pendientes pagos por parte de PRONATEL, como consta en el párrafo 434 de este Laudo.

573. <u>La quinta petición</u> también está relacionada con la liquidación del Contrato y es, en caso de que el Tribunal decida efectuar la liquidación del Contrato de Financiamiento, se haga en los términos del Contrato, excluyéndose los fondos de la carta fianza de fiel cumplimiento.

574. Al igual que en el caso anterior, la decisión del Tribunal Arbitral admitiendo la liquidación del Contrato propuesta por la Demandante <u>impide acoger la pretensión</u> de las Demandadas, incluida la excepción que se pretende, de la carta fianza de fiel cumplimiento, sin justificación para ello.

575. <u>La sexta</u> y última <u>petición</u> de las Demandadas en relación con la reconvención, es la imposición a Redes de las costas y gastos procesales, así como los intereses.

576. <u>No procede la imposición de intereses</u> puesto que la Demandante no es condenada al pago de cantidad alguna.

577. En cuanto a las costas y gastos, nos pronunciaremos de una sola vez al final del Laudo.

**D.   Reclamaciones de Redes en relación con la demanda reconvencional**

578. Finalmente procede decidir sobre las peticiones de la Demandante en relación con la reconvención de las Demandadas.

579. La Demandante solicitó la desestimación de todas las pretensiones de las

Demandadas contenidas en la reconvención. <u>Procede la estimación de esta pretensión,</u> de acuerdo con la plena desestimación de las correlativas pretensiones de la Demandada hechas valer en la reconvención, como hemos declarado en los párrafos 564 a 576 de este Laudo.

XII.   <u>COSTES DEL PROCEDIMIENTO</u>

580.   En materia de costas y gastos del presente procedimiento arbitral son varias las cuestiones pendientes de resolver:

    (i)    costas de las medidas cautelares propuestas por la Demandante y las Demandadas;

    (ii)   costas de la Demanda principal;

    (iii)  costas de la Demanda reconvencional.

581.   Conviene recordar que la Demandante resultó parcialmente vencedora en la solicitud de medidas cautelares que fue resuelta por OP 3 de 28 de diciembre de 2020. Por el contrario, las medidas cautelares solicitadas por las Demandadas fueron íntegramente desestimadas en la misma Orden Procesal.

582.   En relación con las pretensiones de la Demanda principal, la estimación de las pretensiones de la Demandante no es plena, pero supone la aceptación de una parte muy sustancial de las posiciones de Redes, mientras que las peticiones de las Demandadas son rechazadas en su integridad salvo en la pretensión de que no se estimen todas las solicitudes indemnizatorias.

583.   En el arbitraje internacional[297] y en la legislación peruana[298] sobre la imposición de costas a la parte perdedora para que el resarcimiento de la parte ganadora sea completo, es necesario que las Demandadas sean condenadas a pagar las costas razonables de este arbitraje que el Tribunal Arbitral establezca.

584.   Para concluir sobre la razonabilidad de las costas y gastos justificados por las Partes, es forzoso examinar las liquidaciones presentadas por las respectivas Partes y tener en cuenta que, en su sesión del 27 de junio de 2022, la Corte fijó los costes del arbitraje en US$ 875.000

---

[297] El artículo 38. 4 y 5 del Reglamento de la CCI dispone que "*El laudo final fijará los costos del arbitraje y decidirá cuáles de las partes los cargarán o en qué proporción serán asumidos por las partes. Al tomar decisiones en cuanto a costos, el tribunal arbitral puede tener en cuenta las circunstancias que considere relevantes, incluyendo la medida en que cada parte ha llevado a cabo el arbitraje de manera expedita y rentable*".

[298] El artículo 73.1 de la ley peruana de arbitraje dice: "*El tribunal arbitral tendrá en cuenta a efectos de imputar los costos del arbitraje, el acuerdo de las partes. A falta de acuerdo, los costos del arbitraje serán de cargo de la parte vencida. Sin embargo, el tribunal arbitral podrá distribuir y prorratear estos costos entre las partes, si estima que el prorrateo es razonable, teniendo en cuenta las circunstancias del caso*".

585. La Demandante hace la siguiente distinción[299]:

   (i)   honorarios legales: US$ 1,317,681.74;

   (ii)  gastos de personal interno: US$ 391,849.37;

   (iii) honorarios de peritos: US$ 2,167,355.76;

   (iv) provisión de gastos CCI: US$ 437,500;

   (v)  gastos de la audiencia que se deben compartir: US$ 19,624;

   (vi) otros gastos relacionados con la audiencia: US$ 58,600.98;

   (vii) Total: US$ 4,392,611.85.

586. Las Demandadas enumera los siguientes conceptos[300]:

   (i)   provisión de gastos CCI: US$ 437,500;

   (ii)  honorarios legales: S/. 1,330,000.00;

   (iii) honorarios peritos: US$ 446,288.02.

587. El Tribunal Arbitral ha decidido que las Demandadas se hagan cargo del 80% de los gastos y costas de la Demandante que a continuación se refieren:

   (i)   80% de los honorarios legales (US$ 1,317,681.74), es decir, US$ 1.054.145,39;

   (ii)  80 % de los honorarios de los peritos sobre una base máxima admitida de US$ 1.500.000. es decir. US$ 1.200.000;

   (iii) 80% de la provisión de fondos a la CCI (US$ 437,500), es decir, US$ 350.000;

   (iv) 80% de los gastos comunes de la audiencia (US$ 19,624), es decir, US$ 15.699,2;

   (v)  100% de los gastos de traslado y hospedaje del personal involucrado en la audiencia, US$ 27,064,54.

588. Los conceptos que no se reconocen son:

   (i)   los gastos de personal interno de Redes porque son empleados de la compañía entre cuyas tareas estás las de defensa de sus intereses, además de que no se ha justificado documentalmente la inversión de horas en este procedimiento

---

[299] Escrito de liquidación de gastos de la Demandante de 17 de marzo de 2022.

[300] Escrito de declaración de costas y costos de las Demandadas de 17 de marzo de 2022.

ni su coste;

(ii) los honorarios de peritos que exceden la parte proporcional de condena de los US$ 1,500,000 porque, si bien el caso tenía un elevado componente técnico y el rol de los peritos ha sido considerable, el Tribunal Arbitral ha considerado razonable establecer un límite;

(iii) los gastos relacionados con la audiencia, pero incurridos voluntariamente por la Demandante.

589. Adicionalmente las Demandadas deben soportar la integridad de sus propios gastos y costes.

590. La Demandante ha solicitado que el Laudo haga efectiva la medida cautelar en la parte resolutiva del laudo[301].

591. La Orden Procesal nº 3 estimó la medida cautelar solicitada por Redes y ordenó que:

> "*Estimar el Petitorio principal nº 1 y 2 de la Demandante y el Petitorio accesorio al principal nº 1 y el accesorio al principal nº 2 en el sentido de que las cantidades resultantes de la ejecución de las Garantías de Fiel Cumplimiento del contrato de financiamiento (US$ 14,960,000,00 – Catorce Millones Novecientos Sesenta Mil con 00/100 Dólares de los Estados Unidos-) y de Adelanto (US$ 52,360,000,00 -Cincuenta y Dos Millones Trescientos Sesenta MIL con 00/100 Dólares de los Estados Unidos-), deben ser depositados por Pronatel en una "cuenta especial- Ejecución de cartas fianzas por garantías" en el Banco de la Nación conforme a lo establecido por la Resolución Directoral Nº 011-2018-EF/52.03*".

592. Las Demandadas comunicaron el 5 de febrero de 2021 que habían depositado los importes de la Garantía de Fiel Cumplimiento y de la Garantía de Adelanto en la cuenta especial del Banco de la Nación Nº 06068002824[302].

593. La Resolución Directorial Nº 011-2018-EF/52.03 establece que las cantidades custodiadas que se encuentren sujetas a controversias arbitrales con una decisión firme y consentida deben ser devueltas al proveedor contratista o similar.

594. En consecuencia, en función de la decisión que se contiene en la parte dispositiva de este Laudo, las cantidades depositadas en la cuenta especial del Banco de la Nación Nº 06068002824 deben ser devueltas a Redes.

595. Por todo lo expuesto, el Tribunal Arbitral ha decidido resolver por unanimidad en el sentido que recoge el texto del Fallo que a continuación se transcribe.

---

[301] Escrito de Alegatos Finales de la Demandante, párrafos 475 a 479.

[302] Escrito de 5 de febrero de 2021.

**XIII.** <u>FALLO</u>

596. El Tribunal Arbitral, por unanimidad, RESUELVE:

1. Estimar el Petitorio 1 de la Demanda, declarando que las Demandadas han resuelto el Contrato de manera indebida y, en consecuencia, declarando ineficaz la resolución contractual realizada por las Demandadas.

2. Estimar el Petitorio 2 de la Demanda, declarando que el Contrato ha quedado resuelto de pleno derecho por causa imputable a las Demandadas.

3. Estimar el Petitorio 3 de la Demanda, declarando que las Demandadas incumplieron el Contrato al no colaborar con el Proyecto negándose a otorgar la última ampliación de plazo solicitada por Redes, resolver indebidamente el Contrato, ejecutar indebidamente las Garantías de Fiel Cumplimiento y de Adelanto y oponerse injustificadamente a la entrega de los bienes del Proyecto.

4. Estimar el Petitorio principal 4 y sus Petitorios Accesorios, declarando:

   (i) que las Demandadas han ejecutado indebidamente la Garantía de Fiel Cumplimiento;

   (ii) que se ordena a las Demandadas restituir a Redes las sumas de dinero obtenidas como consecuencia de la ejecución indebida de la Garantía de Fiel Cumplimiento por US$ 14'960,000.00 (catorce millones novecientos sesenta mil y 00/100 dólares de los Estados Unidos de América), mediante la devolución a favor de Redes del importe depositado por dicho monto en la cuenta especial del Banco de la Nación No. 06068002824;

   (iii) que se declara que las Demandadas no podrán compensar las sumas de dinero que el Tribunal Arbitral les ordene restituir como consecuencia de la ejecución indebida de la Garantía de Fiel Cumplimiento, contra cualquier otra posible acreencia que en el futuro pudiera generarse a favor de las Demandadas frente a Redes.

5. Estimar el Petitorio principal 5 y sus Petitorios accesorios, declarando:

   (i) que las Demandadas han ejecutado indebidamente la Garantía de Adelanto;

   (ii) que se ordena a las Demandadas restituir a Redes las sumas de dinero obtenidas como consecuencia de la ejecución indebida de la Garantía de Adelanto por US$ 52,360,000.00 (cincuenta y dos millones trescientos sesenta mil y 00/100 dólares de los Estados Unidos de América), mediante la devolución a favor de Redes del importe depositado por dicho monto en la cuenta especial del Banco de la

Nación No. 06068002824;

(iii)   que se declara que las Demandadas no podrán compensar las sumas de dinero que el Tribunal Arbitral les ordene restituir como consecuencia de la ejecución indebida de la Garantía de Fiel Cumplimiento, contra cualquier otra posible acreencia que en el futuro pudiera generarse a favor de las Demandadas frente a Redes.

6.   Estimar el Petitorio 6 de la Demanda, declarando la desestimación de la oposición de las Demandadas a la entrega de los bienes del Contrato ofrecida y ejecutada por Redes.

7.   Estimar el Petitorio 7 de la Demanda, declarando que Redes ha entregado los bienes objeto del Contrato y que la entrega es válida y eficaz para todos los fines del Contrato a partir de la fecha de cada ofrecimiento de la entrega de bienes, respectivamente.

8.   Estimar el Petitorio 8 de la Demanda, declarando que la liquidación del Contrato que han pretendido realizar las Demandadas es inválida al no sustentarse en el Contrato ni en las leyes aplicables y, en consecuencia, no surte efectos.

9.   Estimar el Petitorio 9 de la Demanda, declarando que no corresponde aplicar contra Redes penalidad alguna bajo el Contrato.

10.   Estimar el Petitorio 10 de la Demanda, aprobando la liquidación del Contrato propuesta por Redes y, en consecuencia, ordenando a las Demandadas pagar solidariamente a Redes   la suma de US$ 11´855,049.00 (once millones ochocientos cincuenta y cinco mil cuarenta y nueve  y 00/100 dólares de los Estados Unidos) más los intereses que se devenguen desde el 10 de junio de 2022, calculados por el mismo procedimiento y con la misma tasa utilizada por Redes para calcular los intereses devengados hasta el 10 de junio de 2022, hasta la fecha de pago efectivo..

11.   Estimar parcialmente el Petitorio 11 de la Demanda, ordenando a PRONATEL y al MTC pagar solidariamente a Redes:

(i)   Los intereses de las cantidades cobradas por PRONATEL el 2 y 15 de mayo de 2019, respectivamente, por la ejecución de las Garantías, al tipo de interés medio anual del Bono de Perú a 10 años en dólares americanos hasta la devolución de las Garantías con los intereses correspondientes.

(ii)   Por concepto de sobrecostes de entrega ordinaria US$ 2,477,387.00 (dos millones cuatrocientos setenta y siete mil trescientos ochenta y siete dólares de Estados Unidos) más los intereses de esa cifra hasta el 10 de junio de 2022, que ascienden a US$ 279,007 (doscientos setenta y nueve mil siete dólares de Estados Unidos), más los intereses que se

devenguen desde el 10 de junio de 2022, calculados por el mismo procedimiento y con la misma tasa utilizada por Redes para calcular los intereses devengados hasta el 10 de junio de 2022, hasta la fecha de pago efectivo..

(iii) Por concepto de costes de entrega extraordinaria, US$ 2,806,276.00 (dos millones ochocientos seis mil doscientos setenta y seis mil dólares de Estados Unidos), más los intereses de esa cifra hasta el 10 de junio de 2022, que ascienden a US$ 418,503 (cuatrocientos dieciocho mil quinientos tres dólares de los Estados Unidos), más los intereses que se devenguen desde el 10 de junio de 2022, calculados por el mismo procedimiento y con la misma tasa utilizada por Redes para calcular los intereses devengados hasta el 10 de junio de 2022, hasta la fecha de pago efectivo..

(iv) Por concepto de costes incurridos por Redes por cuenta de PRONATEL, US$ 459,590 (cuatrocientos cincuenta y nueve mil quinientos noventa dólares de los Estados Unidos), más los intereses de esa cifra hasta el 10 de junio de 2022, que ascienden a US$ 33,850 (treinta y tres mil ochocientos cincuenta dólares de los Estados Unidos), más los intereses que se devenguen desde el 10 de junio de 2022, calculados por el mismo procedimiento y con la misma tasa utilizada por Redes para calcular los intereses devengados hasta el 10 de junio de 2022, hasta la fecha de pago efectivo..

(v) Por concepto de lucro cesante, US$ 7,121,783 (siete millones ciento veintiún mil setecientos ochenta y tres dólares de los Estados Unidos), más los intereses de esa cifra hasta el 10 de junio de 2022, que ascienden a US$ 384,796 (trescientos ochenta y cuatro mil setecientos noventa y seis mil dólares de los Estados Unidos), más los intereses que se devenguen desde el 10 de junio de 2022, calculados por el mismo procedimiento y con la misma tasa utilizada por Redes para calcular los intereses devengados hasta el 10 de junio de 2022, hasta la fecha de pago efectivo.

(vi) Las cantidades que Redes perciba en concepto de indemnización e intereses lo serán netas de cualquier impuesto que resulte aplicable.

12. Estimar el Petitorio 12 de la Demanda, condenando a PRONATEL y al MTC a pagar solidariamente los costos y costas que se describen a continuación:

(i) US$ 1.054.145,39 en concepto de honorarios legales:

(ii) US$ 1.200.000 en concepto de honorarios de peritos;

(iii) US$ 350.000 en concepto de pago de la provisión de fondos a la CCI;

(iv) US$ 15.699,2 en concepto de gastos comunes de la audiencia;

C-0368-SPA

(v)   U$ 27,064,54 en concepto de gastos de traslado y alojamiento para la realización de la audiencia.

13.   Desestimar los Petitorios 1 a 6 de las Demandadas en relación con la Demanda, salvo, en relación con el Petitorio 6, en la medida en que se desestima parcialmente el Petitorio 11 de la Demanda y, correlativamente, se estima parcialmente el Petitorio de las Demandadas en este sentido.

14.   Desestimar los Petitorios 1 a 6 de las Demandadas en su Reconvención.

15.   Estimar el Petitorio de Redes en relación con la Reconvención de las Demandadas.

16.   Desestimar cualesquiera otras pretensiones hechas valer por las Partes que no hayan sido mencionadas en los apartados anteriores de este fallo.

*** 

En Lima (Perú), sede del arbitraje, a 2 de agosto de 2022.

_____
Guido Santiago Tawil
Coárbitro

_____
Eddy Rodríguez Malluma
Coárbitro

Firmado digitalmente por:
EDDY NEPTALI RODRIGUEZ MALLMA
Motivo: Soy el autor del documento
Fecha: 01/08/2022 18:11:16 -0500

NOMBRE CAINZOS FERNANDEZ JOSE ANTONIO - NIF 32443575M
Firmado digitalmente por NOMBRE CAINZOS FERNANDEZ JOSE ANTONIO - NIF 32443575M
Fecha: 2022.08.02 23:05:33 +02'00'

_____
D. José Antonio Caínzos
Presidente