## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| REDES ANDINAS DE | : | | |
| COMUNICACIONES S.R.L., | : | | |
| | : | | |
| Petitioner, | : | Civil Action No.: | 22-3631 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 26, 32 |
| | : | | |
| THE REPUBLIC OF PERU, *et al.*, | : | | |
| | : | | |
| Respondents. | : | | |

## MEMORANDUM OPINION

### DENYING RESPONDENT PROGAMA NACIONAL DE TELECOMUNICACIONES' MOTION TO DISMISS; GRANTING PETITIONER'S MOTION FOR LEAVE TO FILE SUR-REPLY

## I.  INTRODUCTION

Redes Andinas de Comunicaciones S.R.L. ("Redes") brought this action to confirm two arbitration awards against Respondents the Republic of Peru, Peru's Ministry of Transportation and Communications (the "Ministry"), and Programa Nacional de Telecomunicaciones, or PRONATEL.  The Clerk of Court entered default against all three Respondents.  The Court subsequently granted Redes's motion for default judgment as to Peru and the Ministry. PRONATEL, however, entered an appearance and moved to set aside the Clerk's entry of default.  The Court granted that motion.

Now PRONATEL moves to dismiss the claims against it, arguing that the Court lacks personal and subject-matter jurisdiction; that Redes's petition for enforcement fails to meet certain procedural requirements; and that Redes failed to effect proper service.  For the reasons discussed below, the Court denies the motion to dismiss.

## II.  BACKGROUND

The Court described the factual background in its prior memorandum opinion.  *See Redes Andinas de Comunicaciones S.R.L. v. Republic of Peru* ("*Redes Andinas I*"), No. 22-cv-3631, 2024 WL 4286107 at *1 (D.D.C. Sept. 24, 2024); Mem. Op. Granting in Part and Denying in Part Pet'r's Mot. for Default J.; Granting Respondent PRONATEL's Mot. to Set Aside Entry of Default, ECF No. 25.  An overview follows.

Redes is a Peruvian corporation that engages in construction work.  Pet. for Confirmation, Recognition, and Enforcement of Foreign Arbitral Awards ("Pet. Confirm Arbitral Awards") ¶¶ 3, 13–14, ECF No. 1.  In December 2015, Redes entered into two agreements with Peru's Telecommunications Investment Fund ("FITEL") to install broadband infrastructure across Peru.  Ex. 1 to Pet'r's Mot. Default J., ECF No. 14-3; Ex. 3 to Pet'r's Mot. Default J., ECF No. 14-5.  In 2018, FITEL was absorbed by merger into the Ministry of Transportation and Communications and was renamed PRONATEL.  Ex. A to Reply to Resp't PRONATEL's Opp'n to Pet'r's Mot. Default J. & Confirmation of Arbitral Awards & Opp'n to PRONATEL's Mot. Set Aside Default ("Supreme Decree"), ECF No. 20-2; *see also* Pet. Confirm Arbitral Awards ¶¶ 5, 6 (describing PRONATEL as an "organ of" the Ministry); Resp't's Mem. Supp. Mot. Set Aside Default & Opp'n Pet'r's Mot. Default J. at 1 ("Resp't's Default Opp'n"), ECF No. 17-1.  Following construction delays, PRONATEL terminated the parties' contracts in April 2019.  Pet. Confirm Arbitral Awards ¶¶18–22.  In response, Redes initiated two arbitrations pursuant to the arbitration clauses in the parties' contracts.  *Id.* ¶¶ 25–27.

On August 2, 2022, an arbitral tribunal in Lima, Peru rendered awards in favor of Redes.  *See* Award 24471/JPA, Ex. B. to Pet. Confirm Arbitral Awards, ECF No. 1-3; Award 24472/JPA, Ex. D to Pet. Confirm Arbitral Awards, ECF No. 1-5 (collectively, the "Awards").

Redes then filed this action seeking to enforce the Awards under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201–208 (2022), which codifies the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *opened for signature* June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 (entered into force June 7, 1959) (the "New York Convention").  The New York Convention obligates each member state to "recognize [foreign] arbitral awards as binding and enforce them in accordance with" local procedural law.  *Id.* art. III.

On December 8, 2022, the Court granted Redes's motion for issuance of letters rogatory to effect service of process on Respondents.[1]  Order Granting Pet'r's Mot. Issuance Letters Rogatory, ECF No. 5.  After Respondents failed to respond to the petition, Redes moved for entry of default.  Pet'r Redes Andinas De Comunicaciones S.R.L. Request for Entry of Default Against Resp'ts the Republic of Peru, the Ministry of Transp. & Commc'ns, & PRONATEL, ECF No. 12.  On February 1, 2023, the Clerk of Court entered default against all three Respondents.  Entry of Default, ECF No. 13.

Redes moved for a default judgment on February 20, 2024.  *See* Pet'r's Mot. Default J. & Confirmation of Arbitration Awards, ECF No. 14.  PRONATEL entered an appearance for the first time on March 5, 2024, opposed the motion for default judgment, and moved to set aside the default.  Resp't's Default Opp'n at 1.  PRONATEL appeared "solely on its own behalf"; Peru and the Ministry did not appear.  *Id.* at 1 n.1.

The Court granted Redes's motion for default judgment as to Peru and the Ministry. *Redes Andinas I*, 2024 WL 4286107, at *9.  But it denied the motion as to PRONATEL, finding that PRONATEL had established a "hint of a suggestion" that it may have a meritorious defense

---

[1] A letter rogatory is "a formal request from a court in which an action is pending[] to a foreign court to perform some judicial act" including "the serving of a summons."  22 C.F.R. § 92.54.

against default. *Id.* at *6–9 (citing *Keegel v. Key W. & Caribbean Trading Co.*, 627 F.2d 372, 374 (D.C. Cir. 1980)). It also granted PRONATEL's motion to set aside the Clerk's entry of default. *Id.* at *9.

Now PRONATEL has moved to dismiss the claims against it under Federal Rule of Civil Procedure 12(b)(1), (2), and (6). Resp't PRONATEL's Mot. Dismiss ("Mot. Dismiss"), ECF No. 26. Redes filed an opposition; PRONATEL filed a reply; and Redes filed a sur-reply.[2] Pet'r Redes Andinas de Comunicaciones S.R.L.'s Opp'n to PRONATEL's Mot. Dismiss ("Pet'r's Opp'n"), ECF No. 27; Resp't Programa Nacional de Telecomunicaciones' Reply Mem. of L. in Supp. of Mot. Dismiss Pet. to Enforce Arbitral Award ("Resp't's Reply"), ECF No. 31; Pet'r's Sur-Reply in Supp. of Opp'n to PRONATEL's Mot. Dismiss Pet. ("Sur-Reply"), ECF No. 32-6.

---

[2] Following the conclusion of scheduled briefing, Redes moved for leave to file a sur-reply, which PRONATEL opposed. Pet'r's Mot. for Leave to File Sur-Reply in Supp. of Opp'n to PRONATEL's Mot. Dismiss ("Sur-Reply Mot."), ECF No. 32; Mem. P. & A. in Opp'n to Pet'r's Mot. for Leave to File a Sur-Reply in Resp. to PRONATEL's Reply to Pet'r's Opp'n to PRONATEL's Mot. Dismiss ("Sur-Reply Opp'n"), ECF No. 33; *see also* Pet'r's Reply in Supp. of its Mot. for Leave to File Sur-Reply in Supp. of Opp'n to PRONATEL's Mot. Dismiss, ECF No. 34. A sur-reply is appropriate "when a party is unable to contest matters presented to the court for the first time in the last scheduled pleading." *Ben-Kotel v. Howard Univ.*, 319 F.3d 532, 536 (D.C. Cir. 2003) (internal quotation marks and citation omitted); *Connecticut v. U.S. Dep't of Interior*, 344 F. Supp. 3d 279, 307 n.24 (D.D.C. 2018). The decision to grant or deny leave to file a sur-reply is committed to the sound discretion of the district court. *Flynn v. Veazey Constr. Corp.*, 310 F. Supp. 2d 186, 189 (D.D.C. 2004).

PRONATEL's reply in support of its motion to dismiss raises new facts related to its degree of independence from Peru. Resp't Programa Nacional de Telecomunicaciones' Reply Mem. of L. in Supp. of Mot. Dismiss Pet. to Enforce Arbitral Award at 4–8, ECF No. 31. Permitting Redes to file a sur-reply is "helpful to the resolution of the pending motion by providing additional clarity on certain . . . arguments, particularly in response to issues raised in depth for the first time in [PRONATEL's] reply brief." *See Moore v. Hayden*, No. 18-cv-2590, 2021 WL 11629829, at *7 n.3 (D.D.C. Feb. 22, 2021). And prejudice to PRONATEL appears minimal. The Court therefore concludes that Redes may file the sur-reply and will consider its contents in deciding the motion to dismiss.

Neither party has requested jurisdictional discovery. The motion to dismiss is thus ripe for review.

## III. LEGAL STANDARDS

### A. Lack of Subject-Matter Jurisdiction

Federal courts are courts of limited jurisdiction, and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Under Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss an action when the court lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A motion for dismissal under Rule 12(b)(1) "presents a threshold challenge to the court's jurisdiction." *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987). On a Rule 12(b)(1) motion, the petitioner "bears the burden of establishing jurisdiction by a preponderance of the evidence." *Bagherian v. Pompeo*, 442 F. Supp. 3d 87, 91 (D.D.C. 2020); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (same). Because subject-matter jurisdiction focuses on the Court's power to hear a claim, the Court must give a petitioner's factual allegations closer scrutiny than would be required for a 12(b)(6) motion for failure to state a claim. *See Grand Lodge of Fraternal Ord. of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).

### B. Lack of Personal Jurisdiction

To withstand a motion to dismiss for lack of personal jurisdiction under Federal Rule 12(b)(2), the petitioner bears the burden of making a prima facie showing of specific and pertinent jurisdictional facts. *See Reuber v. United States*, 750 F.2d 1039, 1052 (D.C. Cir. 1984); *Naegele v. Albers*, 355 F. Supp. 2d 129, 136 (D.D.C. 2005). "A [petitioner] makes such a showing by alleging specific acts connecting the defendant with the forum." *United States v. Philip Morris Inc.*, 116 F. Supp. 2d 116, 121 (D.D.C. 2000) (citing *Naartex Consulting Corp. v.*

*Watt*, 722 F.2d 779, 787 (D.C. Cir. 1983)).  When considering personal jurisdiction, the Court

need not treat the petitioner's allegations as true.  Instead, the Court "may [also] receive and

weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts."

*Philip Morris Inc.*, 116 F. Supp. 2d at 120 n.4; *see also Brunson v. Kalil & Co.*, 404 F. Supp. 2d

221, 223 n.1 (D.D.C. 2005) (same).  However, the court must resolve any factual discrepancies

in favor of the petitioner.  *See Crane v. New York Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir.

1990).

### C.  Failure to State a Claim

Federal Rule of Civil Procedure 12(b)(6) requires petitioners to "state a claim upon which

relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A motion to dismiss under Rule 12(b)(6) does

not test a petitioner's ultimate likelihood of success on the merits.  *See Scheuer v. Rhodes*, 416

U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 807

(1982).  Instead, a court considering a Rule 12(b)(6) motion presumes that the petition's factual

allegations are true and construes them in the light most favorable to the petitioner.  *See, e.g.*,

*Philip Morris, Inc.*, 116 F. Supp. 2d at 120 n.4.  Nevertheless, "[to] survive a motion to dismiss,

a complaint [or petition] must contain sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### IV.  ANALYSIS

PRONATEL makes four arguments in its motion to dismiss.  One, that the Court lacks

personal jurisdiction over it.  Two, that Redes failed to comply with Article IV of the New York

Convention, which requires a party seeking to enforce an arbitral award to include the arbitration

agreement with its petition.  Three, that Redes failed to properly serve PRONATEL under

Peruvian law.  And four, that this Court lacks subject-matter jurisdiction because Redes did not submit the parties' arbitration agreements with its petition.  The Court first considers whether it has subject-matter jurisdiction and then turns to PRONATEL's other arguments.

### A.  Subject-Matter Jurisdiction

Under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602–11, a foreign state and its instrumentalities are "presumptively immune from the jurisdiction of United States courts."[3]  *E.g.*, *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).  But there are exceptions to that presumptive immunity.  28 U.S.C. §§ 1605–07.  One of those exceptions is for actions brough to confirm certain arbitral awards.  28 U.S.C. § 1605(a)(6)(B) (abrogating sovereign immunity for any action brought to confirm an arbitral award where the award is "governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards").  The D.C. Circuit has held that the FSIA's arbitration exception requires three "jurisdictional facts": (1) an arbitration agreement, (2) an arbitration award, and (3) a treaty potentially governing award enforcement.  *E.g.*, *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088, 1100 (D.C. Cir. 2024).

The Court has already found those facts here.  *Redes Andinas I*, 2024 WL 4286107, at *4.  PRONATEL argues that the Court was wrong—not because there is any doubt about the existence or authenticity of the underlying arbitral awards, but because Redes did not attach copies of the parties' arbitration agreements to its petition for enforcement.  Mot. Dismiss at 10–13.  Instead, Redes attached copies of the arbitral awards, which reproduced the text of the parties' arbitration agreements.  *See* Ex. A to Pet. Confirm Arbitral Awards ("Award

---

[3] The parties agree that PRONATEL is an instrumentality of Peru.  *Redes Andinas I*, 2024 WL 4281607, at *6.

No. 24471/JPA"), ECF No. 1-2 (original award rendered in Case No. 24471/JPA); Ex. B to Pet. Confirm Arbitral Awards ¶ 17, ECF No. 1-3 (English translation of award rendered in Case No. 24471/JPA); Ex. C to Pet. Confirm Arbitral Awards ("Award No. 24472/JPA"), ECF No. 1-4 (original award rendered in Case No. 24472/JPA); Ex. D to Pet. Confirm Arbitral Awards ¶ 17, ECF No. 1-5 (English translation of award rendered in Case No. 24472/JPA).  Ultimately Redes submitted the parties' contracts, including the arbitration clauses, with its motion for default judgment.  Ex. 1 to Pet'r's Mot. Default J. art. 22, ECF No. 14-3; Ex. 3 to Pet'r's Mot. Default J. art. 22, ECF No. 14-5.

The Court once again concludes that Redes has established each jurisdictional fact.  First, Redes has proved the existence of an arbitration agreement between the parties by producing (1) the underlying contracts and (2) the arbitral awards, which include the text of the parties' agreements to arbitrate.  *See* Ex. 1 to Pet'r's Mot. Default J. art. 22; Ex. 3 to Pet'r's Mot. Default J. art. 22; Award No. 24471/JPA; Award No. 24472/JPA; *see also Chevron Corp. v. Ecuador*, 795 F.3d 200, 204–05 (D.C. Cir. 2015) (stating that a plaintiff satisfies its burden of production under the FSIA's arbitration exception by producing the arbitration agreement and the resulting arbitral award).  Redes has plainly made a "prima facie showing that there was an arbitration agreement."  *See Chevron Corp.*, 795 F.3d at 205; *Marseille-Kliniken AG v. Republic of Equatorial Guinea*, No. 20-cv-3572, 2023 WL 8005153 at *2 (D.D.C. Nov. 17, 2023) (holding that petitioner seeking to enforce a foreign arbitral award met its burden of production when it produced the "[a]greement containing the dispute clause calling for arbitration" and "the arbitration award").  Redes also plead facts that bring the suit within the Court's jurisdiction, *contra* Mot. Dismiss at 12, because it stated in the petition that the parties had valid arbitration agreements.  *See* Pet. Confirm Arbitral Awards ¶ 23.

PRONATEL does not dispute that Redes has proven the second and third jurisdictional facts. *See generally* Mot. Dismiss at 12–13; *see also Redes Andinas I*, 2024 WL 42816107, at *6 (holding that the arbitration awards at issue are subject to enforcement under the New York Convention). The Court agrees: Redes produced copies of the two arbitral awards, which both fall under the New York Convention—"exactly the sort of treaty Congress intended to include in the arbitration exception." *See Creighton Ltd. v. Gov't of the State of Qatar*, 181 F.3d 118, 123–24 (D.C. Cir. 1999) (internal quotation omitted). The Court therefore has subject-matter jurisdiction over this action under the FSIA's arbitration exception. *Cf. Redes Andinas I*, 2024 WL 4286107, at *4 (same).

## B.  Personal Jurisdiction

The Court now considers personal jurisdiction. Under the FSIA, a federal court generally has personal jurisdiction over a foreign state or instrumentality if there is subject matter jurisdiction and if service is made pursuant to the FSIA's service of process provision, 28 U.S.C. § 1608. 28 U.S.C. § 1330(b); *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1548 n.11 (D.C. Cir. 1987). The FSIA defines "instrumentality of a foreign state" to include any entity that is (1) "a separate legal person, corporate or otherwise"; (2) "an organ of a foreign state or political subdivision thereof"; and (3) not a "citizen of a State of the United States" or "created under the laws of any third country." 28 U.S.C. § 1603(b). Governments in developing countries often use instrumentalities "to obtain the financial resources needed to make large-scale national investments." *First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611, 624, 625 (1983). The parties agree that PRONATEL is an instrumentality of Peru. *See supra* at 7 n.3.

Whenever a defendant is a foreign instrumentality, personal jurisdiction under the FSIA has an added layer. This is because the Due Process Clause of the Fifth Amendment provides that no "person" shall be deprived of life, liberty, or property without "due process of law." U.S. Const. amend. V. Any "person" not present within a forum must have "certain minimum contacts" with the forum "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The term "person" in the Fifth Amendment does not include a foreign state itself, *see Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002), but may include a foreign instrumentality under certain conditions.

The case setting out those conditions is *TMR Energy Limited v. State Property Fund of Ukraine*, 411 F.3d 296 (D.C. Cir. 2005). There the D.C. Circuit held that an instrumentality is treated as a foreign state for due process purposes if the foreign sovereign has "plenary control" over it. *Id.* at 325–26. Although "government instrumentalities established as juridical entities distinct and independent from their sovereign[s] should normally be treated as such," that presumption gives way "[w]henever a foreign sovereign controls an instrumentality to such a degree that a principal-agent relationship arises between them."[4] *GSS Grp. Ltd. v. Nat'l Port Auth. of Liberia* ("*GSS Group I*"), 680 F.3d 805, 814, 815 (D.C. Cir. 2012); *see also Bancec*, 462 U.S. at 626–27. Under those circumstances, "the instrumentality receives the same due process protection as the foreign sovereign: none." *GSS Group I*, 680 F.3d at 815. The petitioner bears

---

[4] The presumption of separateness can also give way if "recognition of the instrumentality as an entity apart from the state 'would work fraud or injustice.'" *TIG Ins. Co. v. Republic of Argentina*, 110 F.4th 221, 238 (D.C. Cir. 2024) (quoting *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C. Cir. 2000)). Redes does not advance that argument.

the burden of asserting facts sufficient to overcome the presumption of separateness. *GSS Grp.*

*Ltd. v. Nat'l Port Auth. of Liberia* ("*GSS Group II*"), 822 F.3d 598, 605 n.9 (D.C. Cir. 2016).

The Supreme Court explained in *First National City Bank v. Bancec* that when evaluating

an instrumentality's separateness, courts should consider certain "characteristic features of

independence," including:

> creation by an enabling law that prescribes the instrumentality's powers and duties; establishment as a separate juridical entity with the capacity to hold property and to sue and be sued; management by a government-selected board; primary responsibility for its own finances; and operation as a distinct economic enterprise that often is not subject to the same administrative requirements that apply to government agencies.

*DRC, Inc. v. Republic of Honduras*, 71 F. Supp. 3d 201, 209 (D.D.C. 2014) (citing *Bancec*, 462

U.S. at 624). None of these factors, however, is dispositive, *see Bancec*, 462 U.S. at 633, and

additional characteristics may indicate an entity's dependence or independence. *Entes Indus.*

*Plants, Constr. & Erection Contracting Co. v. Kyrgyz Republic* ("*Entes*"), No. 18-cv-2228, 2020

WL 1935554, at *3 (D.D.C. Apr. 22, 2020). In other words, the *Bancec* factors should not be

applied mechanically or without considering context. *Id.*

The parties vigorously dispute whether PRONATEL is a separate legal entity from Peru

entitled to Fifth Amendment protection. *Compare* Mot. Dismiss at 3–5 (stating that

PRONATEL is a "person" within the meaning of the Fifth Amendment), *with* Pet'r's Opp'n at

16–17 (arguing that PRONATEL, as an "extensively-controlled instrumentalit[y]," is not a

"'person' under the Fifth Amendment's Due Process Clause," and "thus ha[s] no right to assert a

personal jurisdiction defense" (quoting *Gebre LLC v. Kyrgyz Republic*, No. 20-cv-1795, 2022

WL 2132481, at *7 (D.D.C. June 14, 2022))). Redes takes the position that Peru has "plenary

control" over PRONATEL and that "[s]ince its establishment, PRONATEL [] has been part of

the [Ministry]."[5]  Pet'r's Opp'n at 16.  In support of that argument, Redes invokes the following

facts: PRONATEL was "created by a Supreme Decree signed by the Peruvian president and the

minster of the Ministry of Transportation and Communications"; the Ministry appoints

PRONATEL's top official; PRONATEL's budget is financed by the institutional budget of the

Ministry; PRONATEL is represented by the Ministry's public attorney; and PRONATEL serves

a quintessential governmental function by "conducting, formulating, and supervising investment

projects and activities designed to achieve universal access to broadband telecommunications

services."  *Id.* at 16–17.  Redes concedes that PRONATEL has no contacts with the United

States.  *See* Resp't's Reply at 2–3; *see also GSS Group I*, 680 F.3d at 810 n.3 (holding that in

FSIA actions, "the relevant frame of reference for the minimum contacts analysis is the United

States as a whole, rather than the specific jurisdiction in which the suit is filed").

In reply, PRONATEL argues that Redes has not overcome the presumption of

separateness.  Resp't's Reply at 3.  PRONATEL emphasizes that it was created by an enabling

statute, Supreme Decree No. 018-2018-MC, that establishes its objective and functions; it

operates as a distinct economic enterprise; it functions independently from Peru and under its

own management that exercises day-to-day supervisory and operational authority; it is

responsible for its own budget and other financial matters; it enters into its own contracts; it has

the capacity to hold property; and it can sue and be sued.  *Id.* at 7–12; *see also* Supreme Decree

No. 018-2018-MTC, *Diario Oficial El Peruano*, June 29, 2018 (Peru).  Taken together,

---

[5] The parties agree that the Ministry, as part of the executive branch of the Peruvian government, has the same legal identity as the Republic of Peru.  *E.g.*, Pet'r's Opp'n at 16; *see also Redes Andinas I*, 2024 WL 4281607, at *4 (holding that the Ministry of Transportation and Communication is "synonymous with the Republic of Peru").

PRONATEL argues, these facts establish that PRONATEL is a separate legal entity from the Ministry and from Peru itself.  Resp't's Reply at 12.

Redes's sur-reply argues that PRONATEL is not constitutionally distinct from the Ministry because its managing board reports directly to the Ministry; its administrative office is required to coordinate its functions with the Ministry; it obtains financial resources from the institutional resources of the Ministry and must coordinate with the Ministry when conducting its budgeting process, managing its financing, and administering debt; its sole function is to serve a government objective and to implement a specific public policy; and because it is "a national program of the" Ministry.  Sur-Reply at 2–6.  Redes also points out that in other legal proceedings, Peru has conceded that PRONATEL was "formed [as] part of the [Ministry of Transportation and Communications] and d[oes] not enjoy an autonomous legal personality separate from the Government."  Decl. of Cristina Ferraro Delgado in Supp. of Pet'r's Sur-Reply in Supp. of Opp'n to PRONATEL's Mot. Dismiss Pet. ("Ferraro Delgado Due Process Decl.") ¶ 16, ECF No. 32-1.

Taking all of the jurisdictional facts into account, the Court concludes that Redes has established that PRONATEL is not entitled to Fifth Amendment protection.  The Court bases its decision on PRONATEL's enabling law, Supreme Decree No. 018-2018-MTC, and its official Operations Manual, which was drafted by the Vice-Ministry of Communications and approved by the Ministry.  Supreme Decree; Ex. 1 to Resp't's Reply, ECF No. 31-2 ("Operations Manual Part I"); Ex. C to Pet'r's Mot. Leave File Sur-Reply in Supp. of Opp'n to PRONATEL's Mot. Dismiss ("Operations Manual Part II"), ECF No. 32-4; *see* Supreme Decree arts. 8.1, 8.2, and add'l provision one.  The parties do not dispute the authenticity of these materials or the content of their English translations.

13

First and foremost, Redes has shown that PRONATEL is formally a part of the Ministry of Transportation and Communications.  *See* Pet'r's Opp'n at 16.  *Bancec*'s central holding is that when a sovereign elects to create an instrumentality with a separate legal personality, that decision should normally be respected.  *See Bancec*, 462 U.S. at 626–27.  PRONATEL, however, does not appear to have a separate legal personality from the Ministry.  Sur-Reply at 1–2.  PRONATEL was created by a law that merged the now-defunct Telecommunications Investment Fund, or FITEL, into the Ministry.  Sur-Reply at 5–6; *see* Supreme Decree at 2 (establishing that "[t]he Ministry of Transportation and Communications and FITEL must merge, with MTC being the acquiring entity"); *see also* Supreme Decree art. 1 ("The approval of the merger of the Telecommunications Investment Fund (FITEL) with legal personality, with the Ministry of Transportation and Communications; the latter shall hold the positing of the absorbing entity . . . .").  The Supreme Decree expressly situates PRONATEL "within the ambit of the Ministry of Transportation and Communications."  Sur-Reply at 4 (citing Supreme Decree art. 4).  And the Operations Manual confirms that PRONATEL is "a national program of the" Ministry of Transportation and Communications, dependent on the Viceministerial Office of Communications.  *Id.* (quoting Operations Manual Part II, art. 3); *see also id.* at 5 (same).  Possession of a separate juridical identity is "the defining characteristic of the independent instrumentality."  *DRC, Inc.*, 71 F. Supp. 3d at 210; *see also id.* at 212 (holding that an instrumentality was independent where the enabling law contained an "unequivocal statement . . . establishing [the entity's] independent juridical identity").  PRONATEL lacks that characteristic.  Sur-Reply at 4–5.

Second, PRONATEL's sole function is to serve a government objective by implementing a specific national policy.  *See* Sur-Reply at 3–4. Courts have found that when an instrumentality

"implements national policies," it is typically not entitled to due process protection as a separate juridical entity.  *See TMR Energy Ltd.*, 411 F.3d at 302.  Same here.  PRONATEL conducts, formulates, and supervises investment projects and activities designed to achieve nationwide access to broadband services.  Pet'r's Opp'n at 16–17; *see also* Supreme Decree art. 6.1 (describing PRONATEL's "scope of activity" as "national").  Per the Supreme Decree, "the [Peruvian] Government is responsible for driving the development, use and broad dissemination of Broadband throughout the national territory."  Supreme Decree at 2.  PRONATEL's purpose is to implement universal access to broadband throughout Peru.  Sur-Reply at 5; *see also* Supreme Decree at 2 (stating that PRONATEL's objective is to "materialize the policies of universal access to telecommunications services"); Supreme Decree art. 5 ("The objective of PRONATEL is the provision of universal access to telecommunications services; the development of Broadband in its field of involvement; the promotion of services, content, applications and digital skills; the reduction of the communications infrastructure divide at the national level, in coordination with government entities, within the framework of their responsibilities and under the guidelines that apply.").  Under Peruvian law, programs like PRONATEL are "functional structures created to address a problem or critical situation, or to implement a specific public policy in the area of responsibility of the entity to which they belong."  Supreme Decree at 2 (citing *Ley Orgánica del Poder Ejecutivo* [Organic Law of the Executive Branch], Law No. 29158, art. 38, *Diario Oficial El Peruano*, Aug. 26, 2007 (Peru)); *see also* Sur-Reply at 3 (discussing how PRONATEL is a "program" within the Ministry).  PRONATEL's status as a program implementing a specific public policy indicates that it "should not be treated as an independent juridical entity."  *See TMR Energy Ltd.*, 411 F.3d at 302; Sur-Reply at 5.

Third, PRONATEL's functions are directed and controlled by the Ministry to at least an extent. Sur-Reply at 2–3. Separate instrumentalities generally "manage their operations on an enterprise basis while" enjoying "a greater degree of flexibility and independence from close political control than is generally enjoyed by government agencies." *Bancec*, 462 U.S. at 624–25. But PRONATEL's Operations Manual provides that its functions may be "assigned to it by the Ministry of Transportation and Communications." *See* Sur-Reply at 4 (quoting Operations Manual Part I tit. I, ch. I, art. 4(i)). The Ministry appoints PRONATEL's Executive Director, who reports to the Vice Ministry of Communications. Pet'r's Opp'n at 16; *see also* Supreme Decree arts. 7, 8.1, 8.2. The Executive Director heads the Executive Directorate, which is tasked with PRONATEL's general management and administration, including "functions delegated or entrusted to it by the Vice Minister of Communications."[6] Sur-Reply at 2; Operations Manual Part I tit. II, ch. II, arts. 7, 8(v). The Executive Directorate reports directly to the Ministry about the "progress of projects, their physical and financial results, management indicators, penalties and relevant information for each project, demand for the required financial resources," and more. Ferraro Delgado Due Process Decl. ¶ 11; *see also* Sur-Reply at 2 (noting the Executive Directorate reports directly to the Ministry). And PRONATEL's Administrative Office, which manages procurement, accounting, treasury, human resources, digital governance, asset control, and more, is required to "coordinate its functions" with the Ministry. Ferraro Delgado Due Process Decl. ¶ 12. Same with PRONATEL's "recruitment, compensation, performance evaluations and other human resources procedures." Sur-Reply at 3 (quoting Ferraro Delgado Due Process Decl. ¶ 10); *see also* Operations Manual Part I tit. II, ch. III, art. 14(b). That is the type of "daily management" that "significantly exceeds the normal supervisory control exercised

---

[6] It is not clear on this record how the members of the Executive Directorate are selected.

16

by any corporate parent over its subsidiary." *See Helmerich & Payne Int'l Drilling Co. v. Petroleos de Venezuela, S.A.* ("*Helmerich*"), 754 F. Supp. 3d 29, 49 (D.D.C. 2024) (quoting *Transamerica Leasing*, 200 F.3d at 843).

Additionally, PRONATEL personnel are government employees subject to generally applicable civil service laws.  Ferraro Delgado Due Process Decl. ¶ 10; *see also* Operations Manual Part II art. 25 (same).  That fact cuts against PRONATEL's independence because, as the Supreme Court explained in *Bancec*, independent instrumentalities are typically not subject to the same "personnel requirements with which government agencies must comply."[7] *Bancec*, 462 U.S. 611 at 624.

Details about PRONATEL's finances also demonstrate that it is not independent from Peru.  Sur-Reply at 3; *see Helmerich*, 754 F. Supp. 3d at 48–49 (considering a foreign sovereign's degree of economic control over an entity in determining whether to give the entity Fifth Amendment protection).  The typical independent instrumentality is "primarily responsible for its own finances." *Bancec*, 562 U.S. at 624.  PRONATEL has a Planning and Budget Office, but that office coordinates with the Ministry in "formulat[ing] and proposi[ing] institutional programs, guidelines, and strategies"; in managing PRONATEL's investment portfolio; in

---

[7] Nor do they typically have to follow the same administrative requirements as government agencies. *Bancec*, 462 U.S. 611 at 624.  Though Redes does not make this argument, it appears that PRONATEL is subject to the same administrative requirements as other Peruvian agencies. *See*, *e.g.*, Operations Manual Part I tit. II, ch. II, art. 8(q) (establishing that PRONATEL's "communications, institutional image, and public relations" and "initiatives related to disaster risk management" must be "within the framework of [the Ministry's] provisions"); *id.* tit. II, ch. II, art. 10(c) (providing that PRONATEL's investment management system must comply with the Peruvian government's "Multiannual Investment Program"); *id.* tit. II, ch. II, art. 10(k) (stating that PRONATEL's administrative modernization process is subject to "the rules and guidelines set forth by [the Ministry]"); *id.* tit. II, ch. II, art. 10(q) (requiring PRONATEL to "ensure compliance with the [Ministry's] Internal Control initiatives"); *id.* tit. II, ch. III, art. 14(t) (requiring PRONATEL to adhere to the Ministry's "continuous improvement and internal control initiatives").

budgeting; in allocating credits and budget modifications; in managing external financing and debt; and more.  Operations Manual Part I tit. II, ch. III, arts. 10(b), (c), (e), (i), (j); *see also* Ferraro Delgado Due Process Decl. ¶ 15 (describing how the Planning and Budget Office "must coordinate with the [Ministry of Transportation and Communications] when conducting and supervising the budgeting process as well as when managing and administering financing and debt").  *Contra* Resp't's Reply at 7–8 (describing PRONATEL as being solely responsible for its own budget and other financial matters).  PRONATEL also obtains financial resources from the institutional budget of the Ministry.  Sur-Reply at 3 (citing Ferraro Delgado Due Process Decl. ¶ 14); *see also* Supreme Decree art. 10.2 (providing that PRONATEL is "financed from the institutional budget of the Ministry of Transportation and Communications").  True, appropriations from a foreign sovereign to its instrumentality constitute a "normal aspect" of their relations, "not an instance of 'day-to-day' involvement in the affairs of the [instrumentality]."  *Transamerica Leasing, Inc.*, 200 F.3d at 852.  But PRONATEL's financial management is so intertwined with the Ministry that it cannot be said to be financially independent.  *See* Sur-Reply at 3.

All that said, some jurisdictional facts cut the other way.  For one thing, PRONATEL was established by a Supreme Decree jointly issued by the President of the Republic of Peru and the Minister of Transportation and Communications.  Resp't's Reply at 3–4; Supreme Decree at 5. *Bancec* instructs that "[a] typical government instrumentality . . . is created by an enabling statute that proscribes the powers and duties of the instrumentality."  *Bancec*, 462 U.S. at 624; *see also DRC, Inc.*, 71 F. Supp. 3d at 209 (similar).  Superficially, the Supreme Decree qualifies.  But it does not clearly establish PRONATEL's "independence or autonomy" from the Ministry.  *See* Sur-Reply at 4–5.  Instead, PRONATEL's enabling law defines it as *a part of* the Ministry.  Sur-

Reply at 4 (discussing how PRONATEL was "created as a program 'within the ambit of the Ministry of Transportation and Communications, under the Vice Ministry of Communications'" (quoting Ferraro Delgado Due Process Decl. ¶ 6)).  It is the text of an enabling law that matters, "not just the fact that there [is] an enabling law to point to."  *Entes*, 2020 WL 1935554, at *4.

For another thing, PRONATEL can hold property, sue and be sued, and enter into contracts.  *See* Resp't's Reply at 8–9.  But these qualities "'add[] little, if anything, when it comes to [PRONATEL's] autonomy or degree or separation from the state.'"  Sur-Reply at 5 (quoting *Entes*, 2020 WL 1935554, at *4).  For example, PRONATEL's financial resources may only be deposited into accounts approved by Peru's Ministry of Economy and Finance.  *Id.* at 3; *see also* Supreme Decree art. 10.3 (same).  That does not indicate independence.  And though PRONATEL is managed by a government-selected Executive Director who heads an executive board, *see Bancec*, 462 U.S. at 624, that characteristic is not determinative.  *See Entes*, 2020 WL 1935554, at *4.  The Court also finds it immaterial that PRONATEL is represented by a public attorney.  Resp't's Reply at 10–11; *UAB Skyroad Leasing v. OJSC Tajik Air*, No. 20-cv-763, 2021 WL 254106, at *10 (D.D.C. Jan. 26, 2021), *aff'd*, No. 21-7015, 2022 WL 2189300 (D.C. Cir. June 17, 2022) (holding that even if an entity has a government lawyer, "such a modest mixing of government and corporate resources cannot bear the burden of overcoming the presumption of separateness").

PRONATEL does have some degree of independence in managing its affairs.  *See generally* Resp't's Reply at 4–8.  Its internal structure encompasses an Administration Office, Planning and Budget Office, Legal Advisory Office, and three directorates.  *Id.* at 6.  PRONATEL prepares its own monthly, quarterly, and annual financial statements.  *Id.* at 8.  Other courts have found that maintaining accounting records and financial statements is the type

of day-to-day management consistent with the presumption of separateness. *See, e.g.*, *UAB Skyroad Leasing*, 2021 WL 254106, at *9. And it is possible that some members of the Executive Directorate are not appointed by the Peruvian government and are not government officials. *See supra* at 16 n.6. But the rest of PRONATEL's employees work for the Peruvian government. Sur-Reply at 3. As discussed, PRONATEL is obligated to "coordinate" many of its actions with the Ministry. And it is formally a program within the Ministry of Transportation and Communications, not a separate juridical entity. *Id.* That a program within a government has its own internal structure and some internal functions does not establish, in and of itself, that the program is juridically independent.

In reaching this decision, the Court takes as instructive the D.C. Circuit's holding in *TMR Energy*, 411 F.3d 296. *See* Sur-Reply at 5. There the Circuit held that the State Property Fund of Ukraine was not a "person" within the meaning of the Fifth Amendment because of certain "structural features." *Id.* at 301–03. Like PRONATEL, the State Property Fund was a "body of the State" that "implement[ed] national policies"; its chairman was appointed by government officials; and its expenses were paid from the state budget. *See id.* at 302. But there are distinctions between the State Property Fund and PRONATEL. The State Property Fund's full board was approved by the Ukrainian parliament; the State Property Fund was expressly "subordinated and accountable to" the parliament; and unlike the State Property Fund, PRONATEL obtains some of its funding from sources other than the national treasury. *Id.*; Resp't's Reply at 10 (describing how some of PRONATEL's budget comes from fees it charges to entities operating in the marketplace). This case is not as clear-cut as *TMR Energy*. Still, the Court concludes that on the whole, Redes has shown that PRONATEL is not a separate person from the Ministry of Transportation and Communications.

There is a "high bar against" disregarding the presumption of separateness afforded to government instrumentalities. *DRC, Inc.*, 71 F. Supp. 3d at 209 (citing *Bancec*, 462 U.S. at 626–27 and *Bank of New York v. Yugoimport*, 745 F.3d 599, 614 (2d Cir. 2014)). Courts have "long struggled" to determine when a petitioner has cleared that bar. *Transamerica Leasing, Inc.*, 200 F.3d at 849. The Court does not take lightly its decision here. But as Redes has emphasized, Peru has elsewhere conceded that PRONATEL was "formed [as] part of the [Ministry of Transportation and Communications] and d[oes] not enjoy an autonomous legal personality separate from the Government." Ferraro Delgado Due Process Decl. ¶ 16. That concession is no small deal. It supports the Court's conclusion that PRONATEL is not entitled to due process protection as a separate legal person from Peru itself. Because the Court finds that PRONATEL is not subject to the Fifth Amendment, it will deny PRONATEL's motion to dismiss for lack of personal jurisdiction.[8]

### C. New York Convention

Next PRONATEL argues that this action must be dismissed because Redes failed to comply with Article IV of the New York Convention, which provides that "at the time of the application" seeking enforcement of an arbitral award, the petitioner must "supply . . . [t]he original agreement" to arbitrate. Mot. Dismiss at 5–6 (quoting New York Convention art. IV(1)(b)). PRONATEL relies on *Al-Qarqani v. Chevron Corp.*, 8 F.4th 1018, 1023 (9th Cir. 2021), where the Ninth Circuit stated the obvious: "without an agreement to arbitrate, the [New York] Convention does not provide for enforcement." *Id.*

---

[8] PRONATEL also argues that it is not subject to personal jurisdiction because it was not served in accordance with the FSIA. Mot. Dismiss at 5. The Court addresses that argument in Part IV(D), *infra*.

The Court has already found that the parties had agreements to arbitrate. *Supra* at 7–8. Multiple federal courts of appeal have concluded that the New York Convention's formalities are not jurisdictional requirements, and this Court agrees. *See Baker Hughes Servs. Int'l, LLC v. Joshi Techs. Int'l, Inc.*, 73 F.4th 1139, 1145 (10th Cir. 2023) (rejecting "the notion that [A]rticle IV's rules are jurisdictional"); *Reddy v. Buttar*, 38 F.4th 393, 399 (4th Cir. 2022) (holding that "the Convention's requirements for an agreement that can give rise to an enforceable award . . . do[] not go to *the power* of the court to make the determination" (emphasis in original)); *Al-Qarani*, 8 F.4th at 1024 (holding that "the existence of a written agreement to arbitrate is a merits question that does not affect subject-matter jurisdiction"); *Sarhank Grp. v. Oracle Corp.*, 404 F.3d 657, 660 (2d Cir. 2005) (holding that whether the parties have a valid arbitration agreement goes to "the merits of the case, and therefore does not involve a lack of subject matter jurisdiction"); *see also Santos-Zacaria v. Garland*, 598 U.S. 411,416–17 (2023) (holding that a statutory rule is jurisdictional only if it is "unmistakably" clear that Congress intended that result). *But see Czarina, LLC v. W.F. Poe Syndicate*, 358 F.3d 1286, 1292 (11th Cir. 2004) (holding that a petitioner seeking to confirm an international arbitration award must comply with Article IV to establish the court's subject matter jurisdiction). So PRONATEL's argument amounts to an "attempt[] to persuade the Court to refuse to confirm the award on the basis of a mere technicality." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 5 F. Supp. 3d 25, 38 (D.D.C. 2013), *aff'd*, 794 F.3d 99 (D.C. Cir. 2015) (quoting *Arb. Between Overseas Cosmos, Inc. v. NR Vessel Corp.*, No. 97-cv-5898, 1997 WL 757041, at *5 (S.D.N.Y. Dec. 8, 1997)). The purpose of Article IV's requirements is to "prove that the relevant documents exist." *Id.* "[W]here a respondent 'challenges only the enforceability—not the existence or genuineness—of the arbitration agreement or award,' an Article IV challenge to a petition to

confirm a foreign arbitration award is unavailing." *Wong To Yick Wood Lock Ointment Ltd. v. Madison One Acme Inc.*, No. 14-cv-7645, 2015 WL 13919442, at *6 (C.D. Cal. Apr. 21, 2025) (quoting *Belize Soc. Dev.*, 5 F. Supp. 3d at 38–39).

That principle applies here. The Court will not dismiss this action on a technicality, especially because "the central precept of comity teaches that, when possible, the decisions of foreign tribunals should be given effect in domestic courts." *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984); *see also Belize Soc. Dev.*, 5 F. Supp. 3d at 38 n.17 (stating that enforcing a foreign arbitral award despite technical defects is "consistent with our federal treaty obligations and policies favoring arbitral dispute resolution, deference to arbitrators, and comity with fellow treaty signatories").

The Court is not persuaded that *Al-Qarqani* compels a different result. *Contra* Resp't's Reply at 12–13. Unlike here, in *Al-Qarqani* the district court found that "there was no agreement between the parties to arbitrate." *Al-Qarqani v. Chevron Corp.*, No. 18-cv-3297, 2019 WL 4729467, at *5 (N.D. Cal. Sept. 24, 2019). The court also concluded that "numerous procedural infirmities would independently preclude confirmation of the arbitral award": the petitioners did not file an authenticated or certified copy of the documents underlying their enforcement request; they did not file an original English-language copy of the arbitration agreement, even though the English-language version was controlling; and they filed multiple versions of the arbitration award "appearing with and without suspect authentication stamps." *Id.* In holding that those issues collectively required dismissal, the district court relied on the Eleventh Circuit's decision in *Czarina, LLC v. W.F. Poe Syndicate*, 358 F.3d 1286 (11th Cir. 2004) that Article IV's conditions are jurisdictional. *Id.* But when the Ninth Circuit took up *Al-Qarqani* on appeal, it expressly rejected the Eleventh Circuit's position and held that the district court "incorrectly

attached a jurisdictional label to what should have been a decision on the merits." *Al-Qarqani*, 8 F.4th at 1024, 1027 (holding that "[t]he requirement that a binding agreement exist is *not* jurisdictional" (emphasis added)).  That there was no valid arbitration agreement in *Al-Qarqani* has no bearing on this case, where the parties' arbitration agreements undisputably exist.  The Court accordingly rejects PRONATEL's argument that Article IV is an independent basis for dismissal.

### D.  Service of Process

Finally the Court addresses PRONATEL's argument that it was not properly served under Peruvian law.  Personal jurisdiction under the FSIA requires that a foreign instrumentality be served "in accordance with an applicable international convention on service of judicial documents."[9]  28 U.S.C. § 1330(b) (stating that personal jurisdiction over foreign instrumentalities exists where there is subject-matter jurisdiction and "service has been made under section 1608 of this title"); *id.* § 1608(b)(2) (providing that "if no special arrangement exists," service may be made upon an instrumentality pursuant to a relevant international treaty).  Here the applicable treaty is the Inter-American Convention on Letters Rogatory and Additional Protocol, Jan. 30, 1975, 14 I.L.M. 327, which provides for service of process pursuant to "the laws and procedural rules of the State of destination."  *Id.* arts. 2(a), 10.  So if PRONATEL was not served in a manner recognized by Peruvian law, then the Court must dismiss this action for lack of personal jurisdiction.

The following facts are not in dispute.  On January 23, 2023, Peru's Ministry of Foreign Affairs received from this Court "packages for service" for each Respondent in this action.  Decl.

---

[9] The FSIA provides for other methods of service not relevant here.  *See* 28 U.S.C. § 1608(b)(1) (service by special arrangement) and (3) (residual service methods if "service cannot be made under paragraphs (1) or (2)").

of Cristina Ferraro Delgado in Supp. of Pet'r's Reply to Resp't PRONATEL's Opp'n to Pet'r's

Mot. Default J. & Confirmation of Arbitration Awards & Opp'n to PRONATEL's Mot. Set

Aside Default ("Ferraro Delgado Service Decl.") ¶ 3, ECF No. 19-1.  Pursuant to Peruvian

protocol, the Ministry of Foreign Affairs initiated three separate judicial proceedings, randomly

assigned to different judges, to effect service on each of the Respondents.  *Id.* ¶ 4; *see also*

Pet'r's Opp'n at 13.  PRONATEL should have been served in case number 2252-2023, but the

assigned court did not order service because it could not locate PRONATEL's address.  Pet'r's

Status Report ¶ 5(c), ECF No. 10.  The court refused to order service at a different address then

that listed in the letter rogatory.  Ex. 3 to Resp't's Reply, ECF No. 31-4; *see also* Letter

Rogatory, ECF No. 6.

Instead the court assigned to case number 2250-2023 ("the 2250-2023 court"), which was

initiated to serve Peru, ordered service of all three Respondents.  Ferraro Delgado Service Decl.

¶¶ 4–5; *see also* Ex. 3 to Mot. Dismiss, ECF No. 26-4.  Again there were issues locating

PRONATEL's address, so on June 6, 2023, Redes requested that PRONATEL be served at its

legal defense office—the address listed in the parties' arbitration agreements.  Ferraro Delgado

Service Decl. ¶ 8; Pet'r's Opp'n at 13.  In July 2023, PRONATEL's representative at the legal

defense office refused service because the numbering in the documents to be served went front to

back, not back to front.  Ferraro Delgado Service Decl. ¶ 11.  Redes requested that the 2250-

2023 court order service on PRONATEL again; and on October 5, 2023, PRONATEL was

finally served at its legal defense office.  *Id.* ¶ 13; Ex. 4 to Mot. Dismiss, ECF No. 26-5.

PRONATEL never challenged that service before the Peruvian authorities.  Pet'r's Opp'n at 13.

The Ministry of Foreign Affairs then certified that the Peruvian court had successfully served

PRONATEL.  Affidavit of Service at 6, ECF No. 11; *see also* Ferraro Delgado Service Decl. ¶ 14.

PRONATEL points to two procedural defects that it claims render its service invalid. First, it argues that because case 2250-2023 was initiated to serve a different party, the 2250-2023 court exceeded its authority by serving PRONATEL.  Mot. Dismiss at 9.  Next it argues that the court was not permitted to order service at any address other than that listed in the letter rogatory.  *Id.* at 9–10.  Considering the Peruvian legal authorities that the parties have submitted, the Court rejects both arguments.

In arguing that the 2250-2023 court lacked the authority to order service on all three Respondents or to order service at a different address, PRONATEL invokes Article VII of the Peruvian Code of Civil Procedure's Preliminary Title.  Mot. Dismiss at 8 (citing Cód. Proc. Civ. [Civil Procedure Code] tit. prelim., art. VII (Peru)).  That provision provides that a Peruvian judge "cannot go beyond the request or base his or her decision on facts other than those that the parties have asserted."  Mot. Dismiss at 8; Ex. 1 to Mot. Dismiss, ECF No. 26-2.  Pursuant to that principle, "every judicial decision must have . . . [c]onsistency between what the parties requested and the final decision, without omitting, altering or exceeding such requests."  Ex. 2 to Mot. Dismiss, ECF No. 26-3 (excerpting Peruvian civil court decision from case no. Cassation 1099-2017).  Any judicial action that contravenes that requirement is, according to PRONATEL, void.  Mot. Dismiss at 8; *see also* Ex. 1 to Mot. Dismiss.

But Peruvian law establishes that a "formal defect on service" does not "render the service invalid if it is shown that the party subject to service has gained knowledge of its content."  Decl. of Cristina Ferraro Delgado in Supp. of Pet'r's Opp'n to PRONATEL's Mot. Dismiss ("Ferraro Delgado Procedural Congruence Decl.") ¶ 13, ECF No. 27-1; Pet'r's Opp'n at

14; *see also* Ex. 1 to Pet'r's Opp'n ("Peruvian Code of Civil Procedure") art. 172, ECF No. 27-2

("In the event of defective service of notice, nullity is cured if the litigant acts in such a manner

which confirms that the party has become aware of the contents of the resolution in a timely

manner.").  The Peruvian Constitutional Court has held that service at an "address different from

the one indicated" is valid as long as "official notice was actually received."  Ex. 7 to Pet'r's

Opp'n, ECF No. 27-8 (translated excerpt from Peruvian case No. 05229-2022-PA/TC).  Because

PRONATEL was indisputably served at its legal defense office on October 5, 2023, it has

"actually received" official notice of this action.  *See* Peruvian Code of Civil Procedure art. IX;

Pet'r's Opp'n at 14 ("PRONATEL is clearly aware of the service.").  That PRONATEL was

served at an address different from that listed on the letter rogatory is immaterial.  *See* Pet'r's

Opp'n at 14.

 Same with the fact that PRONATEL was served in a different legal proceeding than that

initiated specifically to effect its service.  *See* Peruvian Code of Civil Procedure art. 172

(providing that defective service is cured "where the procedural act, in spite of the failure to

satisfy the formal requirements, achieves the purpose sought").  PRONATEL claims that

Peruvian law requires a judge executing a letter rogatory to "adhere as strictly as possible to what

is indicated by the requesting judge in the letter rogatory."  Resp't's Reply at 22 (quoting Ex. 2

to Resp't's Reply, ECF No. 31-3).  But the letter rogatory issued in this action requested service

of all three Respondents.  *See* Letter Rogatory.  In ordering service of PRONATEL, the 2250-

2023 court did not exceed the letter's scope.

 The Court also rejects PRONATEL's argument that dismissal is required because Redes

stated in its motion for entry of default that it had served PRONATEL pursuant to 28 U.S.C.

§ 1608(a), which governs service of foreign states, instead of § 1608(b), which governs service

of instrumentalities. *See* Mot. Dismiss at 7. For one thing, Redes's motion for default judgment acknowledges that PRONATEL was served under § 1608(b). Mem. L. in Supp. of Pet'r's Mot. Default J. & Confirmation of Arbitration Awards at 11–12, ECF No. 14-1. For another, the relevant statutory language is identical: "if no special arrangement exists," service may be made "in accordance with an applicable international convention on service of judicial documents." 28 U.S.C. §§ 1608(a)(2), (b)(2); *see* Pet'r's Opp'n at 12 n.7.

And as Redes points out, Peru's Ministry of Foreign Affairs submitted a certificate of authority stating that each of the Respondents, including PRONATEL, was served as of December 1, 2023. Pet'r's Opp'n at 14; *see* Affidavit of Service. "[I]f PRONATEL had not been properly served under Peruvian law, the Peruvian judge would have informed the Ministry of Foreign Affairs that service was not completed[.]" Pet'r's Opp'n at 14–15 (quoting Ferraro Delgado Procedural Congruence Decl. ¶ 20). PRONATEL does not cite any case where a U.S. court rejected a foreign authority's certification of service. The Court will not do so here. The Court therefore rejects PRONATEL's argument that this action must be dismissed because PRONATEL was improperly served.

## V.  CONCLUSION

For the foregoing reasons, PRONATEL's motion to dismiss is denied. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  July 22, 2025                                       RUDOLPH CONTRERAS
                                                                       United States District Judge